One of petitioners' expert witnesses theorizes that it would take 10 years to bring the tar sands properties into commercial development using the ElektraFlo technology, at which point in time he speculates that the tar sands property interests of the partnerships would be sold to a major oil company for a sale price of at least $30 million. Another of petitioners' expert witnesses opines that the Barton business plan was a reasonable investment with a high income potential. He, however, bases his report on inappropriate assumptions as to the oil reserves on the property to be leased by Barton, production levels attributable to specific undeveloped EOR technology, and cash flows from joint ventures that did not yet exist.

We found the testimony of respondent's expert witnesses concerning the EOR technology and the structure and reasonableness of the license fees and royalties more credible. The fixed fees to be paid by the partnerships for the EOR technology licenses were not competitive in the oil industry and were contrary to industry norms. All but two of the technologies were undeveloped, untested processes for which no prudent investor would pay any substantial fixed fees, and the TEC and Carmel processes that were developed likely could have been licensed by the partnerships directly from the inventors thereof for running royalties based solely on income realized therefrom.

Petitioners' expert witness regarding the value of the EOR technology license agreement with Elektra did not opine on any specific or general dollar fair market value thereof. The expert witness admitted that the terms of the license agreement were unreasonable but justified in this case on the ***172** ground that the unreasonableness of the license agreement somehow could or should be overlooked because of the large amount of money the partnerships were assumed to make from the natural gas drilling program in the Monroe, Louisiana natural gas field. This assumption, among other assumptions, is made in spite of the fact that the original properties assigned to Barton were outside the producing area of the natural gas field and were only exploratory in nature and in spite of the fact that the terms of the drilling agreement with Glenda Petroleum were unfavorable to the partnerships and not at arm's length.

Petitioners did not offer an expert witness regarding the fair market value of the EOR technology licensed from Hemisphere, nor did petitioners offer an expert witness as to the reasonableness of the license agreement with Hemisphere. Rather, petitioners submitted the report of the National Institute of Petroleum Energy Research (NIPER) which merely summarizes NIPER's research with two types of EOR technology and the status generally of EOR technology in the early 1980s, and which provides very general estimates of the amount of oil that might some day be recoverable by someone through the use of EOR technology.

The authors of the NIPER report understood little concerning the terms of the partnerships' license agreements with Elektra and Hemisphere, when the license agreements were entered into, and what technology was included. The NIPER report relies significantly on data from 1980, even though the continuing viability of that data in 1981 and certainly by 1982 was questionable.

Petitioners argue that the business plans of Barton and the other Wichita Partnerships were carefully developed and that the plans were unsuccessful only because of the unexpected decline in world oil and gas prices. More specifically regarding Barton, petitioners argue that the amount of the EOR license fees was based on the number of barrels of oil that were projected to be recovered using EOR technology from the particular properties in which the partnerships obtained working interests. For example, petitioners note that under Barton's EOR license agreement the properties to be acquired were to have not more than 100,000 barrels of oil resources in the ground per partnership unit. Inexplicably, using this *maximum* number of 100,000 barrels ***173** of oil, the promoters of Barton then assumed a 20- percent oil recovery rate using EOR technology, or a total of 20,000 barrels of oil per partnership unit, spread ratably over 10 years or 2,000 barrels of oil a year. The EOR license fee for the right to use the EOR technology acquired by each partnership unit was then set at $2,000 each year or $1 a barrel of projected oil in the ground. Petitioners argue that the 20-percent recovery rate was based on expert opinions, that it was conservative and reasonable, and that $1 a barrel was "a bargain".

We disagree. The estimate of a 20-percent recovery rate

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

using EOR technology that had not been tested in any significant manner on the particular partnership properties was grossly excessive. We believe that by making the license fees due from the partnerships a definite, fixed amount (that was due independently of any successful test of the technology in the properties and independently of any income or oil production from the properties using EOR technology), the license fees were not reasonable, nor realistic. The fixed, definite nature of the license fees flies in the face of the many assumptions and risky, speculative projections on which the stated business plans of the partnerships were based.

If, as petitioners contend, the amount of the license fees related so directly to estimates of recoverable oil in the properties leased by the partnerships and to the utilization or projected utilization of the EOR technology on those properties (and not to the number of partnership units sold), why was accrual of the fees and the amount of the fees not made dependent upon successful pilot tests on the properties of the technology and on actual income realized therefrom or on incremental increased production of oil attributable to the EOR technology (as were the fees Elektra and Hemisphere were to pay for the same technology and as were the license fees to be computed in connection with any sublicenses of the technology by Hemisphere or by the partnerships).

We reiterate that, with respect to the Wichita Partnerships, the properties in which the partnerships were to acquire working interests were not required to have "at least" 100,000 barrels of oil in the ground (which is the basis on which petitioners' argument and computations on this point seem to be made). Rather, the properties were required to have no more than, or not in excess of, 100,000 barrels of ***174** oil in the ground. Petitioners' argument and computations do not take into account the possibility that many of the working interests that the Wichita Partnerships might have acquired under this provision could have had much less than 100,000 barrels of estimated oil in the ground and still would have been in compliance with the provisions of the partnership's business plan.

A significant additional flaw in the projections used by the promoters of both the Manhattan and Wichita Partnerships, in the analyses used by petitioners' expert witnesses, and in petitioners' arguments herein, is that world oil prices would continue increasing from 1979 and 1980 prices on a continuing upward spiral for the next 20 years.

With regard to price projections in the 1980 DOE report, we agree with and reiterate what has already been said:

> The 1980 Department of Energy Report was based on mid-1979 and earlier price figures and was prepared during the world energy crisis of the late 1970's. That crisis was produced mainly by the Iranian Revolution and the related oil embargo. In a sense, the report presented a worst-case scenario as of the period when it was in preparation. The difference between the mid-1979 and the nominal dollar figures shown in the above table [set forth herein *supra* at page 5] demonstrates the rapidly escalating inflation rate during the late 1970's which, by 1981 and 1982, was already being dealt with by the Federal Reserve Board and other Government agencies. The report was neither used by, nor intended to be used by, businessmen as a basis for business decisions. [*Ferrell v. Commissioner*, 90 T.C. 1154, 1194-1195 (1988).]

In support of the value of the EOR technology licenses and the amount of the license fees and royalties, petitioners refer to a transaction in early 1981 by which the Manhattan Partnerships entered into a type of joint venture agreement with Pogo Producing Co., Inc. (Pogo), a publicly traded company, to conduct test drilling operations on the Burnt Hollow tar sands property. Pogo agreed to pay approximately $1.73 million in connection with test wells to be drilled on the Burnt Hollow property in return for a 5-percent undivided interest in the profits from the GEDCO heavy oil joint venture project on the Burnt Hollow property. No representative, however, of Pogo testified at trial, and we know too little about this transaction to give it any credence in considering the value of the EOR technology licenses.

***175** In support of their argument that the partnerships' investments were reasonable, petitioners also rely on certain testimony in this case regarding a number of other apparently large and risky investments in EOR technology by major oil producing companies, some of which apparently involved fixed fees. Such testimony, however,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

was of a very general nature, was largely given by individuals who were not personally or sufficiently involved with the investments, and does little to bolster the credibility or economic substance of the tax-oriented limited partnership investments at issue in this case.

Petitioners argue that even though no existing, traditional EOR technology had been tested successfully on the Utah and Wyoming tar sands properties, the "portfolio" of EOR technology licensed by Barton and the Wichita Partnerships constituted just the type of unusual, creative combination of EOR technology that might prove valuable on such property. As we have found, however, that portfolio consisted of a package of vague, largely untested ideas, that, if and to the extent ever developed, would likely be available generally in the market place and on much more favorable terms than from the partnerships. We reject petitioners' argument that the portfolio of EOR technology obtained by the partnerships represented anything of any substantial value. The EOR technology license agreements entered into by Technology-1980 with Elektra and by Barton with Hemisphere were essentially valueless.

The multi-million dollar license fees and royalties that Technology-1980 and that Barton (and the other Manhattan and Wichita Partnerships) agreed to pay were excessive. They did not reflect arm's-length obligations, and they are not to be recognized as legitimate obligations of the partnerships. The debt obligations of the partnerships associated therewith did not constitute genuine debt obligations and are to be disregarded. *Estate of Franklin v. Commissioner,* 544 F.2d 1045 (9th Cir.1976), affg. on different grounds 64 T.C. 752 (1975); *Hulter v. Commissioner,* 91 T.C. 371, 390 (1988).

In summary, presented to us in this case is a chain or multi-layered series of obligations, stacked or multiplied on top of each other via the numerous partnerships to produce debt obligations in staggering dollar amounts, using a largely undeveloped and untested product, in a highly risky, very ***176** speculative, and non arm's-length manner in an attempt to generate significant tax deductions for investors. The transactions did not, and do not, constitute legitimate for-profit business transactions.

Losses of the partnerships are disallowed under section 183, and accrued interest deductions are disallowed due to the non-genuine nature of the underlying debt obligations.

As an alternative argument, petitioners contend that $1,800 of the per unit annual EOR license fees agreed to by the Wichita Partnerships should be treated, under section 174, as deductible research or experimental expenditures. The apparent basis for this argument is that a portion of the license fees was used by Hemisphere to pay for research on EOR technology that, if successful, would accrue to the benefit of the partnerships.

We reject petitioners' argument. We note that no portion of the license fees was paid by the partnerships as research or experimental expenses, and we reject petitioners' attempt now to recharacterize the license fees and to qualify the fees as research or experimental expenses.

Further, although the regulations under section 174 do provide that costs incurred by taxpayers to hire others to conduct research that relates to the taxpayers' businesses may be deductible as research or experimental expenditures, see sec. 1.174-2(a), Income Tax Regs., case law makes it clear that where taxpayers are merely passive investors with regard to the research, amounts paid to others with regard to the research do not qualify for a deduction under section 174. See *Nickeson v. Commissioner,* 962 F.2d 973 (10th Cir.1992); *Zink v. United States,* 929 F.2d 1015, 1021 (5th Cir.1991); *Diamond v. Commissioner,* 92 T.C. 423 (1989), affd. 930 F.2d 372, 376 (4th Cir.1991); *Levin v. Commissioner,* 87 T.C. 698, 725-726 (1986), affd. 832 F.2d 403, 406 (7th Cir.1987).

Under the above authority, even if a portion of the license fees were allowed to be recharacterized as research or experimental expenses, Hemisphere was to conduct the research totally independently of the Wichita Partnerships. The partnerships were not in the business of conducting research on EOR technology, and no portion of the EOR license fees would qualify for a deduction under section 174.

***177** We also note that under section 174(a)(2), to currently deduct research or experimental expenditures, such

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

expenditures must be identified on the tax return representing the first taxable year for which such expenses are incurred or consent to make an election to currently deduct the expenditures must be obtained from the Secretary.

For the first time in their reply brief, petitioners argue summarily that a portion of the license fees that Barton paid to Hemisphere in connection with the redistribution or sublicensing rights of Barton with regard to the EOR technology should be deductible under section 1253 as franchise fees. This is a new issue and will not be considered. Rule 41(a); *Russo v. Commissioner*, 98 T.C. 28, 31 (1992); *DiLeo v. Commissioner*, 96 T.C. 858, 891 (1991), affd. 959 F.2d 16 (2d Cir.1992).

In light of our resolution of the above issues, it is not necessary to address certain other substantive issues raised by the parties.

*Additions to Tax and Increased Interest*

For the years before us, sections 6653(a) and 6653(a)(1) provide additions to tax equal to 5 percent of the underpayments if any part of the underpayments are due to negligence or intentional disregard of rules and regulations. Section 6653(a)(2) provides an addition of 50 percent of the interest on the portion of the underpayment attributable to negligence. Negligence under sections 6653(a), 6653(a)(1) and (2) is the failure to exercise due care or the failure to do what a reasonable or ordinarily prudent person would do under the circumstances. *Zmuda v. Commissioner*, 731 F.2d 1417, 1422 (9th Cir.1984), affg. 79 T.C. 714 (1982); *Neely v. Commissioner*, 85 T.C. 934, 947 (1985).

With regard to our analysis of the additions to tax in this case, it is important to note that one of respondent's own expert witnesses acknowledges that investors may have been significantly and reasonably influenced by the energy price hysteria that existed in the late 1970s and early 1980s to invest in EOR technology. We have noted in our findings of fact a number of industry and governmental reports and publications that encouraged investors to invest in EOR technology. Various governmental incentives, funding, and subsidies ***178** were directed at development of EOR technology. In the early 1980s, a large amount of money was spent on the development of technology for the recovery of oil from shale and synthetic fuels in spite of the fact that such technology was not technically viable at the time and that minimal oil was produced therefrom.

In evaluating the imposition of the additions to tax in this case, and in light of the above facts (encouraging investments in and the development of tertiary oil recovery methods such as EOR technology), we are somewhat understanding of the individual investments that were made in the Manhattan and Wichita Partnerships. In the context of the hysteria relating to the energy crisis, the oil price increases of the late 1970s, the industry and governmental interest in EOR technology, the heavy and sophisticated promotion of these investments, and the evidence in these cases (and in spite of our findings and conclusions sustaining respondent's substantive tax adjustments), we conclude that petitioners are not liable for the additions to tax and the additional interest element for negligence under sections 6653(a), 6653(a)(1) and (2).

For 1982 and 1983, section 6659 provides for an addition to tax for underpayments of tax attributable to valuation overstatements. Valuation overstatements exist if the value or adjusted basis of property claimed on tax returns equals or exceeds 150 percent of the correct amount of the value or basis of the property. To the extent taxpayers claim tax benefits that are disallowed on grounds separately and independently from alleged valuation overstatements, the resulting underpayments of tax are not regarded as attributable to valuation overstatements. *Todd v. Commissioner*, 89 T.C. 912 (1987), affd. 862 F.2d 540 (5th Cir.1988).

In these cases, we have disallowed the claimed losses of the partnerships on the ground that the activities of the partnerships lacked actual and honest profit objectives. Although our conclusion was influenced by excessive license fees and royalties charged to the partnerships, our conclusion was not tied directly or indirectly to any specific overstatements of value per se that appeared on petitioners' tax returns. Accordingly, section 6659 additions to tax would appear inappropriate. See ***179***Rybak v. Commissioner*, 91 T.C. 524, 566-567 (1988); *Harness v.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Commissioner,* T.C.Memo. 1991-321.

Further, section 6659(e) authorizes respondent to waive all or part of additions to tax for valuation overstatements if taxpayers establish that there was a reasonable basis for the adjusted bases or valuations claimed on the returns and that such claims were made in good faith. Respondent's refusal to waive section 6659 additions to tax is reviewable by this Court for abuse of discretion. See *Brand v. Commissioner,* T.C.Memo.1988-194. In these cases, on the record before us, and in our discretion, we conclude and hold that respondent's refusal to waive the section 6659 additions to tax constitutes an abuse of discretion.

For 1982 and 1983, respondent asserts that petitioners are liable for additions to tax for substantial understatements of tax under section 6661, equal to 10 percent of their respective underpayments of tax attributable to such understatements of tax. [FN5] In order for understatements of tax to be considered substantial, the amounts of the understatements must exceed the greater of 10 percent of the taxes required to be shown on the Federal income tax returns or $5,000. Sec. 6661(b)(1)(A). Respondent contends that the additions under section 6661 should be imposed in these cases because there was no substantial authority supporting the claimed treatment of the disallowed items. Petitioners argue that even if they are otherwise determined to be liable for the section 6661 additions to tax, respondent should have waived the additions.

Based on the record in these cases and many of the factors set forth above, we conclude that respondent's refusal to waive the section 6661 additions to tax constitutes an abuse of discretion. *Mailman v. Commissioner,* 91 T.C. 1079 (1988).

***180** Section 6621(c), and its predecessor section 6621(d), provided an increased rate of interest for substantial underpayments attributable to tax-motivated transactions. Substantial underpayments are defined as underpayments in excess of $1,000. By regulation, among the types of transactions that are considered to be tax-motivated transactions within the meaning of section 6621(c) are those with respect to which the related tax deductions are disallowed under section 183 for lack of profit objective. Sec. 301.6621-2T, A-4(1), Temporary Proced. & Admin.Regs., 49 Fed.Reg. 59394 (Dec. 28, 1984); *Rybak v. Commissioner,* 91 T.C. 524, 568 (1988). In light of our findings as to the lack of profit objective, petitioners are liable for increased interest under section 6621(c).

*Decisions will be entered under Rule 155.*

FN1. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FN2. Under an extended distribution agreement, Barton had the exclusive right to distribute or sublicense the EOR technology within four miles of the boundaries of any of the other properties in which it acquired working interests, plus the nonexclusive right to distribute or sublicense any of the EOR technology in California, Colorado, Illinois, Kansas, Ohio, Oklahoma, Pennsylvania, Texas, Wyoming, Utah, and the Province of Alberta, Canada.

FN3. Some of the significant publications prior to 1980 that had been written about EOR technology are the following:
Interstate Compact Commission, Secondary and Tertiary Oil Recovery Processes (1974).
The National Petroleum Council, Enhanced Oil Recovery (1976).
U.S. Congress, Office of Technology Assessment, Enhanced Oil Recovery Potential in the United States (1978).

FN4. The ElektraFlo process was patented in Switzerland in 1980. A U.S. patent was applied for in 1981, and a U.S. patent was issued for the ElektraFlo technology in 1984.

FN5. As originally enacted by the Tax Equity and Fiscal Responsibility Act of 1982, Pub.L. 97-248, sec. 323(a), 96 Stat. 324, 613, the amount of the addition to tax under sec. 6661(a) was 10 percent

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of the underpayment of tax attributable to the substantial understatement. The amount of the addition was increased to 25 percent of such underpayment by the Omnibus Budget Reconciliation Act of 1986, Pub.L. 99-509, sec. 8002(a), 100 Stat. 1874, 1951. The amendment made by Pub.L. 99-509, sec. 8002(a), increasing the rate of sec. 6661 addition to 25 percent, applies to all additions assessed after the date of enactment of Pub.L. 99-509. *Pallottini v. Commissioner*, 90 T.C. 498 (1988). Respondent has in an Amendment to Answer increased the sec. 6661(a) additions to tax to 25 percent above the 10 percent amount set forth in the notice of deficiency issued to Hildebrand, but respondent has not sought to increase the sec. 6661(a) additions to tax above the 10 percent amount set forth in the amendment to answer with respect to Krause.

99 T.C. No. 7, 99 T.C. 132, 1992 WL 178601 (U.S.Tax Ct.), Tax Ct. Rep. (CCH) 48,383, Tax Ct. Rep. Dec. (RIA) 99.7

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

United States Court of Appeals,
Tenth Circuit.

R.A. HILDEBRAND and Dorothy A. Hildebrand Wahl, Petitioners-Appellants,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.
Gary E. KRAUSE, Tax Matters Partner, Barton Enhanced Oil Production Income Fund, Petitioner-Appellant,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

**Nos. 93-9010, 93-9011.**

June 22, 1994.

Taxpayer sought determination that losses resulting from investments in limited partnerships and expenses of partnerships were deductible. The Tax Court disallowed deductions, and taxpayers appealed. The Court of Appeals, Tacha, Circuit Judge, held that: (1) tax court did not clearly err in determining that partnership lacked requisite profit motive; (2) errors in tax court opinion were insignificant and did not affect substance or legal conclusions therein; and (3) tax shelter was not entitled to business expense deductions.

Affirmed.

West Headnotes

**[1] Internal Revenue ⚷4707**
220k4707 Most Cited Cases

Whether taxpayers had actual and honest profit objective, as required to deduct losses resulting from investments, is a question of fact. 26 U.S.C.A. § 183.

**[2] Internal Revenue ⚷3442**
220k3442 Most Cited Cases

Tax court did not clearly err in finding that no actual and honest profit objective was present in either limited partnership for which taxpayers sought investment loss deductions. 26 U.S.C.A. § 183.

**[3] Internal Revenue ⚷3397**
220k3397 Most Cited Cases

**[3] Internal Revenue ⚷3442**
220k3442 Most Cited Cases

Court looks to economic motive of partnership, rather than to investor, to determine whether activity is engaged in for profit, for purposes of allowing investment loss deduction, and taxpayer has burden to prove requisite profit objective. 26 U.S.C.A. § 183(a).

**[4] Internal Revenue ⚷3300**
220k3300 Most Cited Cases

Tax court did not clearly err in disallowing partnership interest deductions; tax court found that debt obligations of partnerships were not based on arm's length transactions, resulted from excessive amounts paid for licenses of technology, and otherwise did not represent genuine debt obligations and, therefore, should be disregarded. 26 U.S.C.A. § 163.

**[5] Internal Revenue ⚷5215**
220k5215 Most Cited Cases

Transaction which was determined to lack profit motive was "tax-motivated transaction," within meaning of Internal Revenue Code penalty provisions allowing increased interest rate on tax underpayment attributable to tax motivated transaction. 26 U.S.C.A. §§ 6601, 6621(c).

**[6] Internal Revenue ⚷4664.1**
220k4664.1 Most Cited Cases

Tax court did not err in rendering consolidated opinion covering both partnership and investors therein, even though opinion confused facts which applied only to partners with facts surrounding partnership; those facts were insignificant and did not affect substance or legal conclusions in the opinion.

**[7] Internal Revenue ⚷3333**
220k3333 Most Cited Cases

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Exhibit "C"

Tax shelter was not entitled to business expense deductions for research and development expenses. 26 U.S.C.A. § 174.

***1025** Michael R. Matthias (Jeffrey P. Berg and Stuart R. Singer of Matthias & Berg, Los Angeles, CA, with him on the briefs), of Matthias & Berg, Los Angeles, CA, for the petitioners-appellants R.A. Hildebrand and Dorothy A. Hildebrand Wahl.

Kenneth M. Barish of Reish & Luftman, Los Angeles, CA, for petitioner- appellant Gary E. Krause, Tax Matters Partner, Barton Enhanced Oil Production Income Fund.

Kenneth W. Rosenberg (Loretta C. Argrett, Asst. Atty. Gen., and Richard Farber, Attorney, Tax Div., Dept. of Justice, Washington, DC, with him on the brief), Atty., Tax Div., Dept. of Justice, Washington, DC, for respondent-appellee.

Before TACHA and BRORBY, Circuit Judges, and BROWN, [FN*] District Judge.

> FN* The Honorable Wesley E. Brown, Senior District Judge, United States District Court for the District of Kansas, sitting by designation.

TACHA, Circuit Judge.

The taxpayers in these consolidated cases, R.A. Hildebrand and Dorothy A. Hildebrand Wahl (the "Hildebrands") and Gary E. Krause ("Krause"), tax matters partner of Barton Enhanced Oil Production Income Fund ("Barton Income Fund"), appeal the ***1026** Tax Court's disallowance under 26 U.S.C. § 183 [FN1] of deductions for losses resulting from investments in limited partnerships and the disallowance of 26 U.S.C. § 163 interest deductions. The taxpayers also appeal the Tax Court's imposition of an increased interest rate on the tax underpayment attributable to tax-motivated transactions under 26 U.S.C. §§ 6601 and 6621(c). Finally, Barton Income Fund alleges the Tax Court erred in rendering a consolidated opinion grouping Barton with the Hildebrands and in finding that certain license fee obligations incurred by Barton were not deductible under 26 U.S.C. § 174 as research and development expenditures or under 26 U.S.C. § 1253 as franchise fees.

> FN1. All citations to Internal Revenue Code sections are to code sections in force during the tax years in question.

## I. BACKGROUND

The facts in this case are fully set forth in the Tax Court opinion, *Krause v. Commissioner,* 99 T.C. 132, 1992 WL 178601 (1992). We offer only a brief procedural summary for purposes of this appeal.

On their federal income tax returns the Hildebrands claimed losses resulting from their investment as limited partners in Technology Oil and Gas Associates 1980 ("Technology-1980"). The Commissioner of the Internal Revenue Service ("Commissioner") disallowed these losses and the Hildebrands petitioned the Tax Court for redetermination of resulting deficiencies in tax and additions to tax. The Commissioner issued Barton Income Fund a notice of final partnership administrative adjustment disallowing losses and amounts claimed as eligible for tax credits. Krause petitioned the Tax Court for redetermination of the adjustments. The Tax Court consolidated these cases for trial treating them as test cases for a number of related cases involving tax deductions by limited partnerships.

After a fifteen-week trial the Tax Court issued an opinion upholding substantially all of the Commissioner's determinations. The Tax Court disallowed under 26 U.S.C. § 183 the taxpayers' deductions for losses resulting from investments in the limited partnerships because the partnerships did not have the requisite profit motive and imposed an increased interest rate on tax underpayment attributable to tax-motivated transactions under 26 U.S.C. §§ 6601 and 6621(c). The Tax Court also disallowed under 26 U.S.C. § 163 interest deductions because the partnerships' underlying debt obligations were not genuine. The taxpayers now appeal.

This court has jurisdiction to review the Tax Court's decision pursuant to 26 U.S.C. § 7482(a).

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

We affirm.

**II. DISCUSSION**

[1][2] Whether Technology-1980 and Barton Income Fund had actual and honest profit objectives is a question of fact. *Cannon v. Commissioner,* 949 F.2d 345, 349 (10th Cir.1991), *cert. denied,* 505 U.S. 1220, 112 S.Ct. 3030, 120 L.Ed.2d 901 (1992). "The applicable standard of review is a stringent one: a finding of fact should not be disturbed unless it is clearly erroneous." *Id.* (citing Fed.R.Civ.P. 52(a)). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson v. Bessemer City,* 470 U.S. 564, 573-74, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). After carefully examining the pertinent parts of the record, we conclude that the Tax Court's finding that no actual and honest profit objective was present in either limited partnership is plausible and not clearly erroneous.

[3] The Tax Court applied the proper test in determining whether the activities in question were "engaged in for profit" under 26 U.S.C. § 183(a). All expenses associated ***1027** with a business transaction are not necessarily deductible. For a deduction to be allowed it must be shown that the activity engaged in was operated with an actual and honest profit objective. 26 U.S.C. § 183. We look to the economic motive of the partnership, not the individual investor, to determine whether the activity is engaged in for profit. *Cannon,* 949 F.2d at 349.

The taxpayer has the burden to prove the requisite profit objective. *Id.* at 350. "The test is whether profit was the dominant or primary objective of the venture." *Id.* The regulations set forth nine nonexclusive factors to be examined under § 183 in determining whether a taxpayer engages in activities with the objective of realizing a profit:

(1) the extent to which the taxpayer carries on the activity in a businesslike manner; (2) the taxpayer's expertise or his reliance on the advice of experts; (3) the time and effort the taxpayer expends in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the taxpayer's success in similar activities; (6) the taxpayer's history of income or loss in the activity; (7) the amount of occasional profits, if any; (8) the taxpayer's financial status; and (9) the elements of personal pleasure or recreation.

*Cannon,* 949 F.2d at 350; *see* Treas.Reg. § 1.183-2(b). The regulation directs:

In determining whether an activity is engaged in for profit, all facts and circumstances with respect to the activity are to be taken into account. No one factor is determinative in making this determination. In addition, it is not intended that only the factors described in this paragraph [listed above] are to be taken into account in making the determination, or that a determination is to be made on the basis that the number of factors ... indicating a lack of profit objective exceeds the number of factors indicating a profit objective, or vice versa.

Treas.Reg. § 1.183-2(b).

The Tax Court applied the relevant factors and concluded that the Technology- 1980 and Barton Income Fund partnerships were not motivated by profit on the following bases: (1) the amounts the partnerships agreed to pay for the licenses for the Enhanced Oil Recovery (EOR) technology and for the lease by Technology-1980 for tar sands properties "bore no relation to the value of that which was acquired, did not conform to industry norms, and precluded any realistic opportunity for profit;" (2) the partnerships' estimates of oil to be recovered through EOR technology are "not supported by credible expert testimony ... and were not reasonable" based on the undeveloped and untested status of the EOR technology; (3) the partnerships' economic projections in their offering materials reflect a series of assumptions which were not substantiated and did not account for the abnormal practice and high cost of the license fees and royalties or the significant cost of establishing commercial operations; (4) all but two of the EOR technologies licensed by the partnerships were

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

"undeveloped, untested processes for which no prudent investor would pay any substantial fixed fees" and the other two technologies could have been licensed based solely on the income realized therefrom; (5) the partnerships relied on unrealistic projections that "world oil prices would continue increasing from 1979 and 1980 prices on a continuing upward spiral for the next 20 years;" (6) the licensing agreements for the EOR technologies were not completed through arms-length negotiations; and (7) the partnerships marketed the investments in part on the basis of projected tax benefits and inaccurate information regarding the EOR technology. Additionally, the tax court noted that the partnerships had a record of substantial losses and never recorded a profit in any year of their ventures, another factor relevant to the "profit motive" inquiry. *Cannon,* 949 F.2d at 352 ("A record of such persistent and substantial losses is persuasive evidence that the partnerships did not possess the requisite profit motive."); *see also* Treas.Reg. § 1.183-2(b)(6).

Taxpayers point to the court's determination that the partnerships' reliance on the energy price projections was unreasonable and its determination that partnership management lacked expertise in the oil and gas business as the most substantial basis for ***1028** challenging the Tax Court's finding that the partnerships did not have the requisite profit motive. The taxpayers also assert error in the court's treatment of the up-front, fixed licensing fees for the EOR technology. The Hildebrands point to a joint venture agreement with an independent third party to perform test drilling on the tar sands property in return for an interest in the partnership as independent evidence of the value of the EOR technology agreements. The taxpayers argue further that, because other companies made large and risky investments in enterprises involving similar EOR technology at similar times, these investments are therefore validated.

After reviewing the record, however, we do not find the conclusions of the tax court to be clearly erroneous. The Tax Court did a thorough job of considering the profit motive issue. It applied the relevant factors, considered all the evidence and testimony presented and rested its determination on a solid foundation. It also ably addressed the arguments made by the taxpayers outlined in the above paragraph.

[4] Taxpayers next assert that the Tax Court erred in disallowing certain partnership interest deductions under 26 U.S.C. § 163. The Tax Court found that the debt obligations of the partnerships were not based on arms-length transactions, resulted from excessive amounts paid for the licenses of the EOR technology and otherwise did not represent genuine debt obligations and, therefore, should be disregarded. The Tax Court's findings in this regard are not clearly erroneous.

[5] Taxpayers also appeal the imposition of an increased interest rate on the tax underpayment attributable to tax-motivated transactions under 26 U.S.C. §§ 6601 and 6621(c). Because we do not find clearly erroneous the Tax Court's determination that the requisite profit motive did not exist, we reject taxpayers' argument and affirm the Tax Court's imposition of the increased rate of interest for substantially the reasons stated in its opinion. We specifically reject Krause's assertion that the Tax Court erred in finding Barton Income Fund liable for an increased rate of interest because a transaction which is determined to lack a profit motive does not equal a tax- motivated transaction under section 6621. Section 6621(c)(1) imposes an increased rate of interest on "any substantial underpayment attributable to tax motivated transactions," which include activities not engaged in for profit. *Wolf v. Commissioner,* 4 F.3d 709, 715 (9th Cir.1993).

[6] Krause also argues that the Tax Court erred in rendering a consolidated opinion covering both Hildebrand and Barton Income Fund. We disagree. After our own study of the record we conclude that the minor errors in the Tax Court opinion confusing facts applying only to Hildebrand with facts surrounding Barton Income Fund were insignificant and did not affect the substance or the legal conclusions in the Tax Court's opinion.

[7] Krause also asserts that the Tax Court erred in disallowing portions of its licensing fees as research and development expenses under 26 U.S.C. § 174. We disagree. The Tax Court's finding that Barton Income Fund had no profit objective precludes it from taking deductions under § 174. *Independent Elec. Supply,* 781 F.2d 724, 726 (10th Cir.1986); *Agro Science Co. v. Commissioner,* 934 F.2d 573, 576 (5th Cir.), *cert. denied,* 502 U.S. 907, 112 S.Ct. 300, 116 L.Ed.2d 243 (1991).

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

### III. CONCLUSION

We find no merit in taxpayers' remaining arguments and affirm the decision of the Tax Court for substantially the reasons stated in its opinion.

28 F.3d 1024, 74 A.F.T.R.2d 94-5189, 94-2 USTC P 50,305

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

ORIGINAL

U.S. TAX COURT
FILED
DEC 20 2001

**UNITED STATES TAX COURT**

RECEIVED

VULCAN OIL TECHNOLOGY PARTNERS, VANGUARD OIL TECHNOLOGY PARTNERS, DRAKE OIL TECHNOLOGY PARTNERS, DILLON OIL TECHNOLOGY PARTNERS, DERRINGER OIL TECHNOLOGY PARTNERS 1981, DERRINGER OIL TECHNOLOGY PARTNERS 1982, CROWNE OIL TECHNOLOGY PARTNERS, LOUIS COPPAGE, TAX MATTERS PARTNER,

Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE,

Respondent.

Docket No. 21530-87

BC -- ELEKTRA/HEMISPHERE
Judge Swift

**MOTION TO DISMISS FOR LACK OF PROSECUTION**

THE RESPONDENT MOVES: That the Court dismiss this case for lack of prosecution in accordance with Tax Court Rule 123 since the Petitioners' Tax Matters Partner has failed to perform the duties and responsibilities required of a tax matters partner under the Tax Court's Rules of Practice and Procedure and such failure has precluded the further prosecution and ultimate resolution of this case, whether by trial or settlement.

THE RESPONDENT FURTHER MOVES: That the Court find in its order that the following statements show the adjustments to partnership items for the indicated partnerships and tax years:

Exhibit "D"

**Drake Oil Technology Partners - 1983 Tax Year**

| Partnership Item | As Reported | As Determined |
|---|---|---|
| Adjustments to Ordinary Income: | | |
| A. Interest Expense | $3,401,521.00 | $0.00 |
| B. Guaranteed Payments | 156,350.00 | 156,350.00 |
| C. Depreciation | 8,583.00 | 8,583.00 |
| D. Other Deductions: | | |
| 1. License Fee | 18,155,000.00 | 0.00 |
| 2. Miscellaneous | 1,476,651.00 | 1,476,651.00 |
| Total Deductions | $23,198,105.00 | $1,641,584.00 |
| Total Income | 3,189,395.00 | 3,189,395.00 |
| Total Ordinary (Loss)/Income | ($20,008,710.00) | $1,547,811.00 |
| Other Adjustments: | | |
| Net Earnings from Self-Employment | ($7,720.00) | $1,549.00 |
| Unadjusted Basis in ITC Property: | | |
| New - Other - Sec. 48(q) | $0.00 | $0.00 |
| Used - Other - Sec. 48(q) | 0.00 | 0.00 |
| Tax Preference Item: | | |
| Net Investment Income | $2,619,449.00 | $2,619,449.00 |
| Cost Depletion Oil and Gas | $0.00 | $0.00 |
| Oil and Gas Depletion to the Extent of Basis | $0.00 | $0.00 |

Due to concessions by Respondent, which are based on applying I.R.C. § 183 in accordance with this Court's opinion in Krause v. Commissioner, 99 T.C. 132 (1992), aff'd sub nom. Hildebrand v. Commissioner, 28 F.3d 1024 (10th Cir. 1994), cert. denied, 513 U.S. 1078 and 1079, 115 S. Ct. 726 (1995), and aff'd sub nom. Hill v. Commissioner, 204 F.3d 1214 (9th Cir. 2000), certain of the adjustments set forth in the schedules above are less than those determined in the Notices of Final Partnership Administrative Adjustment upon which this case is based.

IN SUPPORT THEREOF, the Respondent respectfully states:

**History of this Proceeding**

1. For the taxable year 1983, all of the above-listed partnerships were TEFRA partnerships. Accordingly, the tax treatment of all the above-listed partnerships for the 1983 tax year is determined at the partnership level pursuant to I.R.C. Section 6221.

2. Notices of Final Partnership Administrative Adjustment for the 1983 tax year of the indicated partnerships were mailed to the Tax Matters Partner of the partnerships, pursuant to I.R.C. Section 6231(a)(7)(B), on the dates shown below:

| Partnership | Date of Mailing |
|---|---|
| Crowne Oil Technology Partners | April 15, 1987 |
| Derringer Oil Tech. Partners 1981 | March 30, 1987 |
| Derringer Oil Tech. Partners 1982 | March 30, 1987 |

| | |
|---|---|
| Dillon Oil Technology Partners | April 15, 1987 |
| Drake Oil Technology Partners | April 06, 1987 |
| Vanguard Oil Technology Partners | March 30, 1987 |
| Vulcan Oil Technology Partners | March 30, 1987 |

3. On July 2, 1987, in accordance with section 6226(a), a petition in this case was filed on behalf of the Tax Matters Partner of each of the above-listed partnerships, American Energy Resources, Inc., by its authorized representative Declan O'Donnell.

4. On August 9, 1993, Declan O'Donnell filed an involuntary bankruptcy petition naming American Energy Resources, Inc., as a debtor in the United States District Court for the District of Colorado under Chapter 7.

5. Under Temp. Treas. Reg. Section 301.6231(a)(7)-1-T(1)(4), as then in effect, and under Treas. Reg. § 301.6231 (a)(7)-1(l)(1)(iv), a designation as tax matters partner terminates when the partnership items of the tax matters partner become non-partnership items under Section 6231(c). Under I.R.C. Section 6231(c)(1)(E), partnership items become non-partnership items "in the case of other areas that the Secretary determines by regulation to present special enforcement considerations."

6. Under Treas. Reg. Section 301.6231(c)-7T(a), the Secretary has determined that special enforcement considerations are present when a partner is named as a debtor in a bankruptcy

proceeding. Accordingly, partnership items of that partner are converted to non-partnership items as of the date of the filing of the bankruptcy petition. Since the partnership items of American Energy Resources, Inc., were converted to non-partnership items as of the date of the filing of the bankruptcy petition, the designation of American Energy Resources, Inc., as Tax Matters Partner of the above-listed partnerships terminated at that same time.

7. On November 10, 1997, the Respondent filed a motion to appoint a new tax matters partner for the above-listed partnerships. By order dated, March 22, 1999, the Court appointed Louis Coppage as Tax Matters Partner of the partnerships and recognized Declan O'Donnell as counsel for Petitioner Louis Coppage.

**Efforts to Contact Tax Matters Partner Louis Coppage**

8. Until late in 1999, various consistent settlement issues ancillary to this proceeding were pending before this Court. See Vulcan Oil Technology Partners v. Commissioner, 110 T.C. 153 (1998), aff'd sub nom. Tucek v. Commissioner, 198 F.3d 259 (10th Cir. 1999) and aff'd sub nom. Drake Oil Tech. Partners v. Commissioner, 211 F.3d 1277 (10th Cir. 2000), cert. denied, ___ U.S. ___, 121 S. Ct. 180 (2000).

9. After the Tenth Circuit affirmed Vulcan in Tucek and Drake, Respondent initiated contacts with Declan O'Donnell, counsel for Petitioners herein, including Louis Coppage, the

above-listed partnerships' Tax Matters Partner, in an effort to move this case toward resolution. In various conversations between counsel for respondent and Mr. O'Donnell, Mr. O'Donnell indicated that barring possible success in pursuing the issues raised in Vulcan through a writ of certiorari, Petitioners were otherwise prepared to resolve the partnership adjustments pending in this case in accordance with the opinion in Krause.

10. During these conversations, counsel for Respondent and counsel for Petitioners discussed various mechanisms available under the Court's rules for resolving the partnerships' adjustments; however, in a conversation on July 17, 2000, Mr. O'Donnell informed Respondent that he could not contact the partnerships' Tax Matters Partner, Louis Coppage, and did not have a current phone number or address for him, or any other contact information which would enable the parties to reach Mr. Coppage.

11. Subsequent to this conversation, and with authorization from Mr. O'Donnell, counsel for Respondent attempted to obtain current contact information for Mr. Coppage and make direct contact with him.

12. After various efforts to obtain contact information for Mr. Coppage, including the use of various Internet search tools, Respondent did obtain a business phone number and address for Mr. Coppage, at the corporate offices of his business, Storage Area

Networks. Using a voice mail box which identified itself as belonging to Louis Coppage, Respondent left a detailed phone message for Mr. Coppage in August of 2000.

13. After no response was made by Mr. Coppage, Respondent again attempted to contact Mr. Coppage on September 12, 2000, with no response. In a phone conversation on September 20, 2000, Mr. O'Donnell authorized and requested Respondent to contact Mr. Coppage by letter.

14. By letter dated September 25, 2000, the Respondent wrote Mr. Coppage to inform him of his responsibilities as the tax matters partner of the Partnerships. The letter requested that Mr. Coppage contact the Respondent or Mr. O'Donnell and provide either Respondent or his counsel with his current phone number and address. A copy of this letter is attached hereto as Exhibit A.

15. The letter further stated that if Mr. Coppage was unable or unwilling to continue to function as the tax matters partner, he needed to inform either Respondent or his counsel, or in the alternative, the Court itself.

16. The letter also advised Mr. Coppage that if the Court allowed Mr. Coppage to resign as the tax matters partner, then a new tax matters partner would have to be designated and that in the event no qualified partner was willing to serve as the tax matters partner, the Court would be compelled to dismiss the

actions for lack of prosecution since the proceedings cannot proceed without a functioning tax matters partner.

17. On November 11, 2000, the Respondent had a telephone conference with Mr. O'Donnell and was informed that Mr. O'Donnell had received a letter from Mr. Douglas R. Beaty, 92 Timber Creek Drive, Suite 101, Cordova, Tennesee, 38018, stating that he represented Mr. Coppage. The letter also requested information regarding Respondent's letter of September 25, 2000.

18. On November 27, 2000, Mr. O'Donnell faxed the Respondent the letter he had received from Mr. Beaty regarding the status of the partnership proceedings. The letter also states that Mr. Coppage "is not inclined to continue as the tax matters partner in these proceedings." A copy of this letter is attached here to as Exhibit B.

19. On November 30, 2000, counsel for respondent contacted Mr. Beaty by phone (901-680-0888) and inquired if he had heard anything further from Mr. Coppage regarding whether Mr. Coppage would continue as tax matters partner. Mr. Beaty indicated he was still waiting for word from Mr. Coppage and did not know when he would hear from him.

20. By letter dated, December 18, 2000, the Respondent informed the Court of the status of the proceedings, including that neither the Respondent nor Mr. Coppage's own counsel of record for these proceedings, Mr. O'Donnell, had been successful

in establishing communication with Mr. Coppage and that the parties could not proceed to resolve this action without the participation of a tax matters partner. A copy of the letter was mailed to both Mr. Coppage and Mr. O'Donnell.

21. Counsel for Respondent has had no subsequent communication, whether direct or indirect, from Mr. Coppage regarding this proceeding. In a conversation on November 13, 2001, counsel for Petitioners indicated that while he had received some correspondence from Mr. Beaty, he had not received anything that would represent instructions from Mr. Coppage as to how he should proceed in this matter.

22. More recently, in the related case of Crowne Oil Technology Partners, Louis Coppage, Tax Matters Partner v. Commissioner, at Docket No. 24725-89, which involves the 1985 tax year of the same Crowne Oil Technology Partners pending here for its 1983 tax year, Respondent has served various documents on Mr. Coppage, both directly and in care of Mr. Beaty, but has had no response from Mr. Coppage. No documents mailed to Mr. Coppage at the business address in Castle Rock, Colorado, or mailed to Mr. Coppage at the Cordova, Tennessee address in care of Mr. Beaty, have been returned to respondent as undelivered.

23. For purposes of filing this motion, Respondent obtained listings from his computerized records of the partners who invested in the above-listed partnerships and whose partnership