No. 05-1189 T
(Judge Charles F. Lettow)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

THOMAS H. McGANN and EVELYN G. McGANN,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

---

DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT WITH BRIEF IN SUPPORT THEREOF AND IN RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

---

RICHARD T. MORRISON
Acting Assistant Attorney General

DAVID GUSTAFSON
STEVEN I. FRAHM
ROBERT STODDART
Attorneys
Justice Department (Tax)
Court of Federal Claims Section
P.O. Box 26
Ben Franklin Post Office
Washington, D.C. 20044
TEL: (202) 307-6445
FAX: (202) 514-9440

**TABLE OF CONTENTS**

*Page*

Defendant's cross-motion for summary judgment.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Brief in support of defendant's cross-motion for summary judgment and in response to plaintiffs' motion for summary judgment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
Questions presented. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
Statement of the case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

I. *Former Code § 6221(c) requires the McGanns to pay interest at 120% of the ordinary rate on a tax underpayment that results from denial of deductions generated by a sham transaction.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

II. *The McGanns' underpayment is "attributable to a tax motivated transaction" within the meaning of former Code § 6621(c) even though other grounds also support the underpayment* .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

A. *By its plain meaning, Code § 6621(c) applies to the McGanns' underpayment*.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

B. *Even if § 6621(c) had no plain meaning, its legislative history would demonstrate that the McGanns owe the penalty*. . . . . . . . . . . . . . . 15

1. *Congress did not intended a narrow definition of "tax motivated transaction."*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

2. *Congress did not repeal Code § 6621(c) on the ground that the IRS "abused" it*.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

C. *The Fifth Circuit's decision in Weiner does not establish that a transaction is immune from the § 6621(c) penalty if it has multiple flaws, including that it is a tax motivated transaction*. . . . . . . . . . . . . . . . 21

1. *Weiner's underpayment resulted from a settlement that mentioned no tax motivated transaction; the McGanns' underpayment results from a court-confirmed FPAA that definitively establishes several tax motivated transactions*.. . . . . 22

[Table of Contents, continued]

*Page*

2. *Although an earlier Fifth Circuit decision supports the McGanns, Heasley v. Commissioner, it is a decision that other circuits have rejected, for good reason.* . . . . . . . . . . . . . . . . . 25

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Appendix A:

Statutes and regulations:

Internal Revenue Code of 1986, 26 U.S.C. (1988 ed.). . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
Internal Revenue Code of 1986 (current). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
Treasury Regulations (26 C.F.R.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
Deficit Reduction Act of 1984, Pub. L. No. 98-369, 98 Stat. 494. . . . . . . . . . . . . . . . . . . 37
Omnibus Budget Reconciliation Act of 1989 (OBRA), Pub. L. No. 101-239, 103 Stat. 2106. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
Tax Reform Act of 1986, Pub. L. No. 99-514, 100 Stat. 2085. . . . . . . . . . . . . . . . . . . . . 46

Miscellaneous:

H.R. Conf. Rep. No. 98-861, 1984 U.S.C.C.A.N. 1445. . . . . . . . . . . . . . . . . . . . . . . . . . 49
H.R. Conf. Rep. No. 99-841, 1986 U.S.C.C.A.N. 4075. . . . . . . . . . . . . . . . . . . . . . . . . . 53
H.R. Rep. No. 101-247, 1989 U.S.C.C.A.N. 1906. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
135 Cong. Rec. S13893-7, 1989 WL 186980 (daily ed. Oct. 24, 1989) (Statement of Senator Pryor). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65
Federal Rules of Appellate Procedure. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66
Rules of the U.S. Court of Appeals for the Sixth Circuit. . . . . . . . . . . . . . . . . . . . . . . . . 66

[Table of Contents, continued]

*Page*

Appendix B:


Declaration of Michael Faust. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

| Exhibit | Description | Page |
|---|---|---|
| 1. | Form 4605-A for Drake Oil Technology. . . . . . . . . . . . . . . . . . . . . . . . . . | 70 |
| 2. | Excerpt from Form 886-Z for Drake Oil Technology Partners. . . . . . . . . | 72 |
| 3 | Form 4605-A for McWal Co.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 73 |
| 4. | Form 886-Z(C) for McWal Co.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 74 |

Declaration of Marion S. Friedman. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

| Exhibit | Description | Page |
|---|---|---|
| 1. | Exhibit O of Motion to Dismiss, *Vulcan Oil Technology Partners et al. v. Comm'r*, No, 21530-87 (T.C. Dec. 20, 2001), . . . . . . . . . . . . . . . | 89 |
| 2. | Worksheets prepared by members of the IRS Appeals staff in connection with completing the section 183 computation for the 1983 tax year of Drake Oil. . . . . . . . . . . . . . . . . . . . | 90 |
| 3. | Letter from Marion S. Friedman to John Gigounas (March 22, 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 95 |

Declaration of Robert Stoddart. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

| Exhibit | Description | Page |
|---|---|---|
| 1. | Calculation of Code § 6621(c) interest on the McGanns' underpayment produced by TaxInterest for Windows. . . . . . . . . . . . . . . | 100 |

**TABLE OF AUTHORITIES**

*Page*

Cases:

*Acierno v. Commissioner*, 74 T.C.M. (CCH) 738 (1997),
*aff'd mem.*, 185 F.3d 861 (3d Cir. 1999).. . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 21
*Adam Sommerrock Holzbau, GmbH v. United States*, 866 F.2d 427 (Fed. Cir. 1989). . . 15
*Bartimmo v. United States*, 2007 WL. 4246113 (S.D. Tex. 2007). . . . . . . . . . . . . . . . . 28
*Chakales v. Commissioner*, 79 F.3d 726 (8th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . 11
*Coltec Indus., Inc. v. United States*, 454 F.3d 1340 (Fed. Cir. 2006). . . . . . . . . . . . . . . . 11
*DeMartino v. Comm'r*, T.C. Memo 1986-263, 1986 WL. 22000. . . . . . . . . . . . . . . . . . . 17
*DeSoto Securities Co. v. Commissioner*, 235 F.2d 409 (7th Cir. 1956). . . . . . . . . . . . . . . 15
*Donahue v. Commissioner*, 1992 WL. 70174 (6th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . 27
*Electrolux Holdings, Inc. v. United States*, 491 F.3d 1327 (Fed. Cir. 2007). . . . . . . . 14, 15
*Estate of Carberry v. United States*, 933 F.2d 1124 (2d Cir. 1991). . . . . . . . . . . . . . . . . . 11
*Forseth v. Commissioner*, T.C. Memo 1985-279, 1985 WL. 14906 (1985). . . . . . . . . . . 17
*Gilman v. Commissioner*, 933 F.2d 143 (2d Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . 26-27
*Heasley v. Commissioner*, 902 F.2d 380 (5th Cir. 1990). . . . . . . . . . . . . . . . . . . . 25, 26, 29
*Illes v. Commissioner*, 982 F.2d 163 (6th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
*Kraemer v. United States*, 2002 WL. 575791 (S.D. Tex. 2002). . . . . . . . . . . . . . . . . . . . 22
*Krause v. Commissioner*, 99 T.C. 132 (1992),
*aff'd sub nom. Hildebrand v. Comm'r*, 28 F.3d 1024 (10th Cir. 1994),
*cert. denied,* 513 U.S. 1079 (1995);
*cert. denied sub nom. Krause v. Comm'r*, 513 U.S. 1078 (1995). . . . . . . . . 4-6, 21
*Massengill v. Commissioner*, 876 F.2d 616 (8th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . 26
*McCrary v. Commissioner*, 92 T.C. 827 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
*Merino v. Commissioner*, 196 F.3d 147 (3d Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . 26
*Mitchell v. Commissioner*, T.C. Memo 1997-382, 1997 WL. 473178 (1997).. . . . . . . . . . 3
*Rogers v. Commissioner*, 60 T.C.M. (CCH) 1386 (1990). . . . . . . . . . . . . . . . . . . . . . . . . 24
*Rogers v. United States*, 281 F.3d 1108 (10th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . 11
*Schachter v. Commissioner*, 67 T.C.M. (CCH) 3092 (1994). . . . . . . . . . . . . . . . . . . . . . 24
*Thomas v. United States*, 166 F.3d 825 (6th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . 11
*Todd v. Commissioner*, 862 F.2d 540 (5th Cir. 1988).. . . . . . . . . . . . . . . . . . . . . . . . 24, 25
*Transpac Drilling Venture 1983-63 v. United States*, 16 F.3d 383 (Fed. Cir. 1994). . . . . 4
*Vulcan Oil Technology Partners et al. v. Commissioner*, No. 21530-87. . . . . . . . . *passim*
*Vulcan Oil Technology Partners et al. v. Commissioner*, 110 T.C. 153 (1998). . . . . . . . 21
*Weiner v. United States*, 389 F.3d 152 (5th Cir. 2004). . . . . . . . . . . . . . . . . . . 13, 21-25, 28
*Zfass v. Commissioner*, 118 F.3d 184 (4th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . 26

[Table of Authorities, continued]

*Page*

Statutes:

Internal Revenue Code of 1986 (26 U.S.C.):

§ 46. . . . . . . 16
§ 183. . . . . . . 6
§ 246A. . . . . . . 15
§ 263A. . . . . . . 15
§ 455. . . . . . . 15
§ 465. . . . . . . 16
§ 704. . . . . . . 3
§ 860. . . . . . . 15
§ 999. . . . . . . 15
§ 1092. . . . . . . 16
§ 6221-26. . . . . . . 4
§ 6226. . . . . . . 9, 23
§ 6511. . . . . . . 14, 15
§ 6601. . . . . . . 10
§ 6621. . . . . . . *passim*
§ 6626. . . . . . . 22
§ 6659. . . . . . . 16, 25-27
§ 6662. . . . . . . 26
§ 6697. . . . . . . 15
§ 7702A. . . . . . . 15

Session Laws:

Deficit Reduction Act of 1984, Pub. L. No. 98-369, 98 Stat. 494. . . . . . . 10, 16
Omnibus Budget Reconciliation Act of 1989 (OBRA),
Pub. L. No. 101-239, 103 Stat. 2106. . . . . . . 19, 25
Tax Equity and Fiscal Responsibility Act of 1982,
Pub. L. No. 97-248, 96 Stat. 324. . . . . . . 4
Tax Reform Act of 1986, Pub. L. No. 99-514, 100 Stat. 2085. . . . . . . 17

Treasury Regulations (26 C.F.R.):

§ 301.6621-2T. . . . . . . 11, 13

[Table of Authorities, continued]

*Page*

Miscellaneous:

H.R. Conf. Rep. No. 98-861, 1984 U.S.C.C.A.N. 1445. . . . . . . . . . . . . . . . . . . . 16, 17
H.R. Conf. Rep. No. 99-841, 1986 U.S.C.C.A.N. 4075. . . . . . . . . . . . . . . . . . . . . . . 17
H.R. Rep. No. 101-247, 1989 U.S.C.C.A.N. 1906. . . . . . . . . . . . . . . . . . . . . . . . . . . 20
135 Cong. Rec. S13893-7, 1989 WL 186980 (daily ed. Oct. 24, 1989)
(Statement of Senator Pryor). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 20
Sixth Circuit Rule 28(g).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 05-1189 T
(Judge Charles F. Lettow)

---

THOMAS H. McGANN and EVELYN G. McGANN,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

---

DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

---

The defendant, the United States, asks the Court to grant judgment in its favor because there is no genuine issue of material fact, and the defendant is entitled to judgment as a matter of law.

Respectfully submitted,

s/ Robert Stoddart
ROBERT STODDART
Justice Department (Tax)
P. O. Box 26; Ben Franklin Station
Washington, D.C. 20044
TEL: (202) 307-6445
FAX: (202) 514-9440

RICHARD T. MORRISON
Acting Assistant Attorney General
DAVID GUSTAFSON
Chief, Court of Federal Claims Section
STEVEN I. FRAHM
Assistant Chief

s/ Steven I. Frahm
Of counsel

January 7, 2008

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 05-1189 T
(Judge Charles F. Lettow)

---

THOMAS H. McGANN and EVELYN G. McGANN,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

---

BRIEF IN SUPPORT OF DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND IN RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

---

The defendant, the United States, offers this brief in support of its cross motion for summary judgment and in response to the plaintiffs' motion for summary judgment and supporting brief (Pl. Brief), filed on November 8, 2007.

QUESTIONS PRESENTED

I. Are the McGanns required to pay interest at the higher rate under former Code §6621(c) with respect to a tax underpayment attributable to denial of deductions from a sham transaction, which is classified as a "tax motivated transaction" under § 6621(c)(2)(A)(v)?

II. Is the McGanns' underpayment "attributable to a tax motivated transaction" within the meaning of former Code § 6621(c) even though it is not attributable *solely* to a tax motivated transaction–a requirement the statute does not contain?

STATEMENT OF THE CASE

In 1983, plaintiff Thomas H. McGann (McGann) was a general partner in the McWal Company (McWal Co.), a partnership between McGann and George C. Walueff. McGann held a 50% interest in the partnership's profits, losses, and capital. (*See* Stip. ¶ 5 and Defendant's Proposed Findings of Uncontroverted Fact (DPF) 1.) McWal Co. held rental real estate (DPF 2) and a .272% interest in Drake Oil Technology Partners (Drake Oil) (Stip. ¶ 3). Drake Oil was one of several limited partnerships (the Elektra partnerships) formed between 1978 and 1986 with the stated objective of investing in enhanced oil recovery technology (EOR) for recovery of oil and natural gas. (*See* Stip. ¶ 2.)

For the 1983 taxable year, Drake Oil issued a Schedule K-1 to McWal Co. on which it reported an ordinary loss of $53,581 and noted a negative capital account of $1,803 for McWal as of the end of the year. (DPF 3.) In turn, McWal Co. reported an "ordinary loss from partnerships" of $51,778 on its own 1983 U.S. Partnership Return of Income. That amount is the $53,581 loss from Drake Oil reduced by $1,803.[1] (DPF 4.) McWal Co. combined its $51,778 Drake Oil loss with $24,107 of net income from its rental real estate and with several smaller items to calculate a net ordinary loss of $29,393. (DPF 5.) On a Schedule K-1, McWal Co. passed half of that loss, $14,696, to its 50% partner McGann. (DPF 6.) McGann claimed his $14,696 share of McWal Co's ordinary loss as a deduction on his own 1983 federal income tax

---

[1] A partner may deduct partnership losses only to the extent of its adjusted basis in the partnership at the end of the year. *See* 26 U.S.C. (Code) § 704(d). Capital account can equal basis, but frequently does not. *See, e.g., Mitchell v. Comm'r*, T.C. Memo. 1997-382, 1997 WL 473178, *3.

return, which he filed jointly with plaintiff Evelyn McGann.[2] (DPF 7.) This deduction reduced the McGanns' 1983 taxes. (Stip. ¶ 6.)

In the 1980s the IRS denied deductions claimed by the Elektra partnerships and proposed to assess deficiencies. (*See* Stip. ¶ 8.) To challenge the deficiencies, the partners (or partnerships) filed petitions in the Tax Court, some under the TEFRA partnership provisions.[3] The Tax Court consolidated two petitions that it expected to become "test cases for over 2,000 related cases and for a number of related TEFRA partnerships," *Krause v. Commissioner*, 99 T.C. 132, 133 (1992).

Petitioner Gary Krause was the tax matters partner of Barton Enhanced Oil Production Income Fund (Barton), to which the IRS had issued a notice of final partnership administrative adjustment (FPAA) denying ordinary losses for 1982 and 1983. Drake Oil is closely related to Barton, and their activities cannot be distinguished.[4] Barton was a member of the "Wichita

---

[2] McGann seems to have reduced the $14,696 loss to $14,664. He combined this loss with the others stated on Schedule E and reported a total loss of $38,064, which he deducted from his taxable income. (DPF 8.)

[3] Congress enacted the Tax Treatment of Partnership Items Act of 1982 as Title IV of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97-248, 96 Stat. 324, *codified as* 26 U.S.C. §§ 6221-6233. The Act sets out ways to determine the tax treatment of partnership items on the partnership level and to obtain a single judicial review of adjustments. *See generally Transpac Drilling Venture 1983-63 v. United States*, 16 F.3d 383, 387 (Fed. Cir. 1994) (discussing the history, purpose, and application of the TEFRA partnership provisions).

[4] Frank A. Acierno, a partner in Drake Oil, filed a petition with the Tax Court challenging a deficiency the IRS proposed for his 1982 taxable year. The court ordered him to show why his case should not be controlled by the result in *Krause*. After an evidentiary hearing, the Tax Court held: "[F]or Federal income tax purposes, petitioner's limited partnership investment in Drake, the activities of Drake, and the purported debt obligations of Drake are not distinguishable from the investments in, the activities of, and the purported debt obligations of Barton as discussed in the Krause opinion." *Acierno v. Comm'r*, 74 T.C.M. (CCH) 738, 740 (1997), *aff'd mem.*, 185 F.3d 861 (3d Cir. 1999). The Code § 6621(c) penalty was not an issue in

Partnerships," one of the three large groups of Elektra partnerships that had filed Tax Court petitions. The other petitioners in the consolidated *Krause* case were the Hildebrands, who had invested in one of the "Manhattan Partnerships," the other group in the case. *See id.* at 133.[5] The Hildebrands' partnership purported to lease rights to EOR technology from Elektra Energy Corp. (*see id*. at 140), and Barton licensed the technology from Hemisphere Licensing Corp., Elektra's successor (*id*. at 152). The partnerships executed promissory notes as partial payment of the fees. *Id*. at 141, 154.

During a 15-week trial the Tax Court heard 46 fact witnesses and 28 expert witnesses and received 1,500 multi-page exhibits. The trial transcript was 8,361 pages long. *See id.* at 134. The court made extensive factual findings and determined that (1) the partnerships' claimed license fees were not legitimate obligations (*id*. at 175); (2) the partnerships' debt obligations were not genuine obligations (*ibid*.); (3) the partnerships' transactions did not constitute legitimate, for-profit business transactions (*id*. at 176); and (4) the petitioners were liable for increased interest under Code § 6621(c) (*id*. at 180). Both petitioners appealed, and the Tenth Circuit upheld the Tax Court's decision. *See Hildebrand v. Comm'r*, 28 F.3d 1024 (10th Cir. 1994), *cert. denied, Krause v. Comm'r*, 513 U.S. 1078 (1995); *Hildebrand v. Comm'r*, 513 U.S. 1079 (1995).

---

*Acierno*. (Stip. ¶ 17.) McGann's case involves 1983 and is governed by TEFRA, unlike *Acierno*; but in *Krause* the Tax Court discussed Barton's affairs for 1983 as well as 1982, and the facts did not vary from one year to the other. *See Krause*, 99 T.C. at 150-57.

[5] The third group was the "Denver partnerships," later represented by Acierno. Drake Oil was a Denver partnership. *See Acierno*, 74 T.C.M. (CCH) at 741.

Among the more than 2,000 Elektra petitions before the Tax Court was one challenging the FPAA the IRS had issued with respect to Drake Oil and had sent to its tax-matters partner, American Energy Resources, Inc. (AER), on April 6, 1987. (*See* DPF 9, 12.) The FPAA proposed to deny $23,198,105 of Drake Oil's 1983 deductions. The proposed adjustment would eliminate Drake Oil's claimed $19,698,934 ordinary loss and result in $3,499,171 of ordinary income. (DPF 10.) The FPAA gave several explanations for the proposed adjustment, including the following: "It has not been established that the underlying events, transactions and expenditures occurred in fact or in substance." (DPF 11.) The FPAA also found generally that Drake Oil overstated the value of its assets and did not engage in its activities for profit. (*See ibid*.)

To challenge the proposed adjustment, AER filed a petition with the Tax Court for Drake Oil and six other partnerships on July 2, 1987; the case was captioned *Vulcan Oil Technology Partners et al. v. Commissioner*, No. 21530-87. (DPF 12.) On August 9, 1993, however, AER lost its status as tax-matters partner when its attorney in the Tax Court proceeding filed an involuntary bankruptcy petition against it. (DPF 13.) Because AER's successor as tax-matters partner failed to communicate either with his own attorney or with the Commissioner's, the Commissioner asked the Tax Court on December 20, 2001, to dismiss the *Vulcan* petitions for failure to prosecute. (DPF 14.)

The Commissioner's motion to dismiss contained a schedule setting out Drake Oil's partnership items as reported and as determined. The Commissioner explained that the schedule's adjustments had "been computed based on I.R.C. § 183 in accordance with the opinion in Krause." The Commissioner further explained (DPF 17)–

> No deductions for license fees or associated interest are allowable under section 183 since the Court found in Krause that the license fees paid by the partnerships "were excessive," did not reflect arm's-length obligations, and "are not to be recognized as legitimate obligations of the partnerships," and that the associated debt obligations "did not constitute genuine debt obligations and are to be disregarded." 99 T.C. at 175.

On March 22, 2002, the Tax Court issued the following order to the partners of Drake Oil and the other *Vulcan* petitioners (DPF 18):

> [The partners] shall show cause in writing on or before May 24, 2002, why this case should not be dismissed for failure properly to prosecute and that there are adjustments to the partnership items of the above named partnerships as stated in such motion.

The partners did not respond to the show cause order. On June 13, 2002, the court stated that the show-cause order would be made absolute; that the Commissioner's motion to dismiss would be granted; and that Drake Oil's partnership items would be adjusted according to a schedule attached to the court's order. The schedule attached to the order was identical to the schedule in the Commissioner's motion to dismiss. (DPF 19.)

The IRS applied the Tax Court's decision by reversing Drake Oil's 1983 deductions for interest expense and license fees–a total adjustment of $21,556,521. This amount is less than the disallowance the FPAA proposed because in the motion to dismiss *Vulcan* the IRS applied Code § 183 to permit certain deductions to the extent of Drake Oil's income. (*See* DPF 15-16.) The IRS then reduced the adjustment further by subtracting an administrative adjustment in the taxpayers' favor ($1,867,438); it also made several smaller adjustments, which are set out in the Form 4605-A issued to Drake Oil. The net adjustment was $19,689,083.00. The Form 4605-A also records the IRS's determination that interest under Code § 6621(c) would apply to resulting underpayments. (DPF 20.)

The IRS divided the $19,689,083.00 adjustment to Drake Oil's ordinary income among its partners and attributed .27% of the adjustments to McWal Co. McWal Co.'s share of the $19,689,083.00 adjustment was $53,161.00. (DPF 21.)[6]

On December 6, 2002, the revenue agent completed, signed, and dated a Form 4605-A for McWal Co. and wrote the following note in the "Remarks" section: "120% interest applies to investors." (DPF 23.)

The IRS's adjustment eliminated the $29,393 loss that McWal had originally passed through to its partners and resulted in positive ordinary income of $22,385. The revenue agent divided that income between the partners of the McWal Company as follows: George C. & Natalie Walueff, $11,193; and Thomas Herbert & Evelyn McGann, $11,192. The agent made the following note on the form: "IRC sec. 6621(c) 120% int. applies" to the adjustment to be made to the McGanns' 1983 tax account. The notation reflects the IRS's decision to apply § 6621(c) to the entire substantial underpayment that might result from the changes to the individual partners' shares of the McWal Company's 1983 tax attributes. (DPF24.)

The IRS applied McWal Co.'s adjustments to McGann's individual return by eliminating his deduction of half the partnership's 1983 losses, $14,696, and adding half of the partnership's newly adjusted income, $11,192–a total positive adjustment of $25,888. This increase in taxable income resulted in an underpayment for McGann's 1983 taxable year of $8,620. (DPF 25.) The

---

[6] When the IRS revenue agent applied the $53,161.00 share of the Drake Oil adjustment to the 1983 partnership return of the McWal Company, he assumed that McWal had a tax benefit of only $51,778 from the $53,187.00 loss reported on the original 1983 Form K-1 it received from Drake Oil. He therefore reduced the $53,187 adjustment determined by the Tax Court by $1,409 and adjusted the McWal Company's ordinary-income distribution from Drake Oil by $51,778. (DPF 22.)

IRS reported the adjustments to McGann on a Form 4549-A, which it sent to him on February 26, 2003. The Form 4549-A informed him (DPF 26)–

> All or part of the underpayment of tax you were required to show on your return is a substantial underpayment attributable to tax motivated transactions, as defined by section 6621(c)(3) of the Internal Revenue Code. Accordingly, the annual interest rate payable on your income taxes on this understatement is 120 percent of the adjusted rate established under Code section 6621(b).

Accordingly, on March 24, 2003, the IRS assessed tax of $8,620 and interest of $57,475.04 against the McGanns. (Stip. ¶ 32.) The IRS computed the interest at the rate set by Code § 6621(c) (*see* Stip. ¶ 33), and it calculated that interest on the entire $8,620 underpayment (*see* DPF 27). The assessment was timely. (*See* Stip. ¶ 34.) The McGanns paid the liabilities in full by application of a prior remittance of $8,620.00 on March 11, 2003, and payments of $17,312.79 and $40,162.25 on April 14, 2003, and April 21, 2003. (Stip. ¶ 35.)

On April 15, 2005, the McGanns filed a claim for refund of $18,309.66, which they asserted was the "portion of interest assessed due to the penalty rate under §6621(c)." (Stip. ¶ 36.) They filed their complaint in this Court on November 10, 2005. (Stip. ¶ 37.)

ARGUMENT

The Tax Court dismissed Drake Oil's TEFRA petition. Under Code § 6226(h), "the decision of the court dismissing the action shall be considered as its decision that the notice of final partnership administrative adjustment [FPAA] is correct . . . ." The FPAA found, among other things, that Drake Oil's transactions and expenditures had not occurred in fact or in substance: in other words, that the transactions and expenditures were shams. Shams constitute "tax motivated transactions" under former § 6621(c)(3)(A)(v). Tax law disregards sham transactions, and every penny of the McGanns' underpayment arises from disregarding the

deductions Drake Oil reported to McWal Co. Therefore, every penny of their underpayment is attributable to a sham, a tax motivated transaction, and they are liable for interest assessed at 120% of the ordinary rate.

The plain meaning the governing statute requires this result. To avoid it the McGanns must rewrite the statute, mischaracterize its legislative history, and stretch or ignore the judicial decisions that have interpreted it.

*I. Former Code § 6621(c) requires the McGanns to pay interest at 120% of the ordinary rate on a tax underpayment that results from denial of deductions generated by a sham transaction.*

Former Code § 6621(c)(1) imposes an interest rate equal to 120% of the usual underpayment rate prescribed in § 6601 "with respect to any substantial underpayment attributable to tax motivated transactions . . . ." The enhanced rate applies only to interest accruing after December 31, 1984, even if the underpayment arose earlier.[7] Section 6621(c)(2) defines "substantial underpayment attributable to tax motivated transactions" as "any underpayment of taxes imposed by subtitle A [income taxes] for any taxable year which is attributable to 1 or more tax motivated transactions if the amount of the underpayment for such year so attributable exceeds $1,000." And section 6621(c)(3)(A)(v) defines "tax motivated transaction" to include "any sham or fraudulent transaction."

When it dismissed the *Vulcan* case, the Tax Court determined that Drake Oil's transactions and expenditures had not occurred in fact or in substance. In tax law, transactions that never actually occurred are factual shams; transactions that occurred but lacked economic

[7] *See* Deficit Reduction Act of 1984, Pub. L. No. 98-369, § 144(c), 98 Stat. 494, 684, App. A, *infra*.

substance are substantive shams. *E.g., Rogers v. United States*, 281 F.3d 1108, 1113 n.2 (10th Cir. 2002). Shams of both kinds lack economic reality and must be ignored. *See, e.g., Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1352 (Fed. Cir. 2006).

The McGanns' underpayment is substantial because it exceeds $1,000, and the entire underpayment is attributable to a tax motivated transaction because it results from ignoring the deductions generated by Drake Oil's sham dealings. (*See* DPF 20-25.) "Under the plain language of the statute [Code § 6621(c)(3)(A)(v)], a tax motivated transaction 'means . . . [inter alia] *any* sham . . . transaction.' . . . The Commissioner has authority, therefore, to assess the penalty *simply* upon a finding that a transaction was a sham." *Chakales v. Commissioner*, 79 F.3d 726, 728 (8th Cir. 1996) (emphasis both original and added, citations omitted); *see also Estate of Carberry v. United States*, 933 F.2d 1124, 1129-30 (2d Cir. 1991). If a transaction is a sham under § 6621(c)(3)(A)(v), the penalty applies whatever the individual taxpayer's state of mind may have been. *Chakales*, 79 F.3d at 728; *accord Thomas v. United States*, 166 F.3d 825, 834 (6th Cir. 1999). *Cf. also Coltec*, 454 F.3d at 1355 (if a transaction lacks economic substance it must be ignored even without proof that the taxpayer's subjective motivation was tax avoidance).

The applicable regulation confirms that the McGanns owe the penalty on their entire underpayment. It defines "tax motivated underpayment" as the difference between the tax as properly computed (the "total tax liability") and the tax computed using the benefits claimed from tax motivated transactions (the "tax liability without regard to tax motivated transactions"). Temp. Treas. Reg. § 301.6621-2T(A-5). The following calculation of the McGann's 1983 tax motivated underpayment tracks the example set out in the regulation:

The McGanns' 1983 return reported taxable income of $25,044 and a total tax liability of $3,705. (DPF 8.)

| | |
|---|---|
| Adjustment of $25,888 due to denial of deductions from Drake Oil, passed through McWal Co. (DPF 25.). . . . . . . . . . . . . . . . . . . . . . . . . . . | $25,888 |
| 1. Reported taxable income.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 25,044 |
| Add all adjustments to items of income, gain, loss, deduction, or credit (including tax motivated transactions subject to section 6621(d)). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | + 25,888 |
| Tax=$12,325 (DPF 25) ("total tax liability").. . . . . . . . . . . . . . . . . . . . . . . . . | 50,932 |
| | ======= |
| 2. Reported taxable income.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 25,044 |
| (Add adjustments to items of income, gain, loss, deduction, or credit other than those with respect to items that are tax motivated).. . . . . . . . . . . | + 0[8] |
| Tax=$3,705 (DPF 8) ("tax liability without regard to tax motivated transactions"). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 25,044 |
| | ======= |

The tax motivated underpayment (*i.e.*, the underpayment attributable to tax motivated transactions) is $8,620 ($12,325-$3,705). Accordingly, the interest on the $8,620 would be computed at the 120% rate.

The IRS determined at the partner level that the McGanns' underpayment was substantial and applied Code § 6621(c) to the entire underpayment. (DPF 25-27; Stip. ¶ 32.)[9] The IRS assessed interest on the McGanns' $8,620 underpayment at the 120% rate as the statute and the regulation require. Accordingly, the McGanns are not entitled to the refund they demand.

---

8 There can be no other adjustments when a finding of sham invalidates an entire transaction.

9 At page 6 of Pl. Brief, the McGanns assert: "The IRS made no partner-level determinations and conducted no partner-level examination of the McGanns before imposing the § 6621(c) punitive interest rate." The assertion is not quite correct.

*II. The McGanns' underpayment is "attributable to a tax motivated transaction" within the meaning of former Code § 6621(c) even though other grounds also support the underpayment .*

To resist the penalty, the McGanns rely chiefly on a misstatement of law that appears at pages 9-10 of Pl. Brief (emphasis both original and added):

> Congress strictly limited the § 6621(c) punitive interest rate to a substantial underpayment of tax (over $1,000) that is "*attributable to*" one of the TMTs [tax motivated transactions] expressly defined by statute and regulations. In this context, "attributable to" is defined narrowly such that the specific TMT basis must be identified for each discrete dollar amount of disallowance and that TMT must be the *sole* basis for disallowance. [Here the McGanns insert a footnote citing Temp. Treas. Reg. § 301.6621-2T, A-5.] If more than one basis is given for disallowing a specified dollar amount of deductions then § 6621(c) may only be imposed if every one of the bases is itself a TMT. [Here a footnote cites *Weiner v. United States*, 389 F.3d 152, 159-62 (5th Cir. 2004) and the cases mentioned on those pages of the opinion.]

Nothing in Temp. Treas. Reg. § 301.6621-2T, A-5, supports the proposition for which the McGanns cite it. In particular, the Court will search in vain for the words *sole, solely, one, only, single, more, multiple, several, alternative*, or any other deliberate sign that the penalty cannot apply if a tax motivated transaction is not the only ground that supports an adjustment. Such an omission is astonishing if the IRS really wished to establish the rule the McGanns extract from the regulation because the statute itself does not suggest such an interpretation. Furthermore, *Weiner* is distinguishable from the McGanns' case–it is almost the polar opposite of their case–and the McGanns rely not on *Weiner*'s holding, but on dicta that cannot be reconciled with the holdings of cases that are on point.

*A. By its plain meaning, Code § 6621(c) applies to the McGanns' underpayment.*

Code § 6621(c)(1) imposes an enhanced interest rate "with respect to any substantial underpayment attributable to tax motivated transactions." As the Court of Appeals for the Federal Circuit has noted, the term "attributable to" has no technical significance in tax law, though it appears in several tax statutes. "Courts in various cases have construed the phrase according to its plain meaning, which is understood to be 'due to, caused by, or generated by.'" *Electrolux Holdings, Inc. v. United States*, 491 F.3d 1327, 1330-31 (Fed. Cir. 2007) (citations omitted) (construing Code § 6511(d)(2)(A), an extended statute of limitations governing refunds of overpayments "attributable to . . . a capital loss carryback").

When it dismissed Drake Oil's petition in *Vulcan*, the Tax Court effectively determined, among other things, that Drake Oil's 1983 transactions were a sham; and by law that finding results in a denial of all Drake Oil's deductions, which in turn results in the McGanns' entire underpayment. Their underpayment is therefore due to, caused by, or generated by a sham, which is a tax motivated transaction–*i.e.*, the underpayment is *attributable to* a tax motivated transaction in the plain meaning of the words. The underpayment is also attributable–in whole or in part–to other grounds listed in the FPAA, some of which are not tax motivated transactions; but there can never be a moment in which the entire underpayment is not attributable to a sham. In simple logic, if an underpayment is attributable to several grounds, it is also attributable to each of them.

The McGanns' argument requires the Court to rewrite Code § 6621(c)(1) and to limit the penalty to "any substantial underpayment attributable [*solely*] to tax motivated transactions"–but "[c]ourts have no right, in the guise of construction of an act, to either add words to or eliminate

words from the language used by congress." *Adam Sommerrock Holzbau, GmbH v. United States*, 866 F.2d 427, 429 (Fed. Cir. 1989) (quoting *DeSoto Securities Co. v. Comm'r*, 235 F.2d 409, 411 (7th Cir. 1956)). If Congress had meant to limit the penalty to underpayments that are attributable solely to tax motivated transactions, it would have said so–as it demonstrated by using the phrase "attributable solely to" in other tax statutes, including a statute that imposes a penalty.[10]

*B. Even if § 6621(c) had no plain meaning, its legislative history would demonstrate that the McGanns owe the penalty.*

The Federal Circuit decided *Electrolux* simply by applying the words "attributable to . . . a capital loss carryback" in Code § 6511(d)(2)(A). The court cautioned: "If the language of the statute is clear and its meaning unambiguous, that is the end of our inquiry. . . . The plain meaning is conclusive, and it is erroneous to explore the legislative history in pursuit of alternative meanings." *Id.* at 1330 (citations omitted).

Similarly, the plain language of Code § 6621(c) decides this case against the McGanns. The defendant seeks no alternative meanings in the statute's legislative history. The McGanns, however, have tried to import a new requirement into the statute by misrepresenting its legislative history. The legislative history demonstrates that their attempt must fail. Despite what the McGanns contend at pages 9-10 of Pl. Brief, Congress did not intend to define "'attributable to' . . . narrowly such that the specific TMT basis must be identified for each discrete dollar amount

---

[10] *See* Code § 6697(a) (emphasis added) ("In addition to any other penalty provided by law, any regulated investment company whose tax liability for any taxable year is deemed to be increased pursuant to section 860(c)(1)(A) shall pay a penalty in an amount equal to the amount of the interest (for which such company is liable) which is *attributable solely* to such increase"); *see also* § 382(l)(3)(C). *Cf. also, e.g.*, § 7702A(c)(5) ("solely attributable"), § 999(c)(2) ("specifically attributable"), §§ 246A(d)(3)(A), 263A(f)(2)(A)(i), 455(d)(1) ("directly attributable").

of disallowance and that TMT must be the sole basis for disallowance." And Congress did not repeal § 6621(c) because the IRS had abused it, despite what the McGanns suggest. *See, e.g.*, Pl. Brief at 3, 10.

*1. Congress did not intended a narrow definition of "tax motivated transaction."*

Congress first enacted the statute as Code § 6621(d) in section 144(a) of the Deficit Reduction Act of 1984, Pub. L. No. 98-369, 98 Stat. at 682-83. The original version listed only four tax motivated transactions, which were the following:

(3) Tax Motivated Transactions.–

> (A) In General.–For purposes of this subsection, the term "tax motivated transaction" means–
>
> > (i) any valuation overstatement (within the meaning of section 6659(c)),
> >
> > (ii) any loss disallowed by reason of section 465(a) and any credit disallowed under section 46(c)(8),
> >
> > (iii) any straddle (as defined in section 1092(c) without regard to subsections (d) and (e) of section 1092), and
> >
> > (iv) any use of an accounting method specified in regulations prescribed by the Secretary as a use which may result in a substantial distortion of income for any period.

Congress broadly considered Code § 6621(d) to be an "increased rate of interest for *tax shelters*." H.R. Conf. Rep. No. 98-861, at 984, 1984 USCCAN 1445, 1672 (emphasis added). It noted that tax shelters were clogging the Tax Court's docket, and Congress hoped that the new penalty might encourage settlements. Congress instructed: "The Service should assert, without hesitancy in appropriate circumstances, the penalties that Congress has provided. In particular,

the negligence and fraud penalties are not currently being applied in a large number of cases where their application is fully justified." *Id*. at 985-86, 1984 USCCAN at 1673-74. The Elektra tax-shelter cases would soon help to swell the Tax Court's docket.

The Tax Court, however, construed "tax motivated transaction" so narrowly that it would have rendered Code § 6621(d) useless. According to the court, a shelter that engaged in straddles did not engage in a tax motivated transaction if the transaction was also a sham because shams must be ignored, and a non-existent transaction cannot be a straddle. *See Forseth v. Comm'r*, T.C. Memo. 1985-279, 1985 WL 14906; *DeMartino v. Comm'r*, T.C. Memo. 1986-263, 1986 WL 2200. Of course, tax-shelters are frequently shams in addition to their other faults; and tax shelters were Congress's object when it imposed the increased interest rate.

Congress reacted to *Forseth* and *DeMartino* by enacting what it titled a "Clarification of treatment of sham or fraudulent transactions." The clarification added § 6621(c)(3)(A)(v) to the Code[11] and made "any sham or fraudulent transaction" a tax motivated transaction subject to the enhanced interest rate of § 6621(c)(1). *See* Tax Reform Act of 1986, Pub. L. No. 99-514, § 1535(a), 100 Stat. 2085, 2750. Congress explained the new provision in H.R. Conf. Rep. No. 99-841, at II-796, 1986 USCCAN 4075, 4884–

> The Tax Court has recently held [citations to *Forseth* and *DeMartino* omitted] that sham transactions that would be subject to this special interest rate were they not shams are not subject to this special interest rate because they are shams. The conferees view it as anomalous that a genuine transaction (lacking the proper profit motive) would be subject to a higher interest rate, while a sham transaction, which is significantly more abusive, would escape the higher interest rate simply because it is a sham. Accordingly, the conference agreement, consistent with the legislative intent in originally enacting section 6621(d) in 1984,

---

[11] Another section of the Tax Reform Act of 1986 redesignated Code § 6621(d) as § 6621(c). *See* Pub. L. No. 99-514, § 1511(c)(1)(A), 100 Stat. at 2744.

> explicitly adds sham or fraudulent transactions to the list of transactions subject to the higher interest rate. The intent of the conferees is to reverse the holding of these Tax Court cases on this issue.
>
> This clarification of present law applies to interest accruing after December 31, 1984, which is the date this higher interest rate took effect. . . .

The McGanns ask this Court to follow the Tax Court into error. If the FPAA had found only that Drake Oil's transactions were a sham, the McGanns would owe the penalty under their view of the statute because "the specific TMT basis [would] be identified for [the entire] dollar amount of disallowance and that TMT [would] be the sole basis for disallowance." Pl. Brief at 9-10. But because the FPAA identified (and the Tax Court confirmed) *twenty-three* grounds for denying the deductions by the McGanns' count (*see* Pl. Brief at 14-15), they insist that they are immune from the penalty. Like Congress, the defendant finds it anomalous that a transaction with one fault can be penalized, but a transaction with twenty-three faults cannot be, though it is significantly more abusive.

*2. Congress did not repeal Code § 6621(c) on the ground that the IRS "abused" it.*

In 1989 Congress reviewed the Internal Revenue Code's penalties, which had been enacted piecemeal over the years and which by then numbered 150–more than double the number of penalties in the Code just 14 years earlier. Congress found them to be "a morass of inconsistency and irrationality." *See* 135 Cong. Rec. S13893-7 (daily ed. Oct. 24, 1989) (statement of Senator Pryor), *available at* 1989 WL 186980, App. A, *infra*. When it studied the penalties, Congress adopted several "short, simple rules for reform," among which were the following (*ibid*.):

> The amount of the penalty should be proportional to the culpability of the taxpayer. Under the present system, a taxpayer who is 1 day late pays the same penalty as a taxpayer who decides to never deposit payroll taxes.
>
> . . . .
>
> Penalties should not discourage compliance with the tax laws. If a penalty is the same if a taxpayer is a little bit late or a lot late, taxpayers will always choose to be a lot late.
>
> . . . .
>
> Penalties should be tough enough to discourage noncompliance and to encourage noncompliant taxpayers to correct their actions.

Congress's efforts resulted in the Improved Penalty Administration and Compliance Tax Act, which it passed as Subtitle G of the Omnibus Budget Reconciliation Act of 1989 (OBRA), Pub. L. No. 101-239, §§ 7701-43, 103 Stat. 2106, 2388-2406. One of its provisions repealed Code § 6621(c) (*see id.*, § 7721(b), 103 Stat. at 2399), but the repeal was not retroactive: it applied only "to returns the due date for which . . . is after December 31, 1989" (*id.*, § 7721(d), 103 Stat. at 2400).

From the 1989 revision of tax penalties the McGanns divine that: (1) "Congress repealed [Code] § 6621(c) and other penalties finding that the IRS *abused* them by imposing them in situations not intended by Congress" (Pl. Brief at 3, emphasis added); (2) "Congress repealed § 6621(c) and other penalties because the IRS was *abusively* imposing them in a manner never intended by Congress" (*id*. at 10, emphasis added); "TEFRA partnership-level cases offer a *devil's playground* for the IRS to *again abuse* its ability to impose § 6621(c)" (*ibid*., emphasis added); and "Congress thought interest twice the amount of tax was *abusive*. Here the interest assessed against the McGanns was almost 6.7 times the tax" (*id*. at 10-11, emphasis added).

In the McGanns' telling, Congress intended to repeal Code § 6621(c) before the IRS could abuse it yet again–and they imply that this Court will encourage the IRS to act the bully of the devil's playground if the Court imposes the penalty on them after *Vulcan*, their 15-year-long TEFRA partnership-level case. But, as shown above, Congress's actual words differ markedly from the McGanns's reading. In particular, Congress never stated or even implied that the IRS had abused § 6621(c). In Appendix A of this brief the defendant presents the entire House Report on the accuracy penalties of OBRA: the Court will never find the words *IRS* and *abuse* in the same paragraph.[12] The report refers to § 6621(c) only once–in the following sentence, which appears at the end of the report almost as an afterthought: "Finally, the bill repeals the higher interest rate that applies to substantial underpayments that are attributable to tax-motivated transactions." H.R. Rep. No. 101-247, at 1394, 1989 USCCAN 1906, 2864.

Congress would hardly have kept Code § 6621(c) effective for all returns due before December 31, 1989, if it feared abuse by the IRS. Congress kept the statute effective for a reason. As Senator Pryor explained in 1984 (135 Cong. Rec. S13893-7): "Penalties should not discourage compliance with the tax laws. If a penalty is the same if a taxpayer is a little bit late or a lot late, taxpayers will always choose to be a lot late." The McGanns have chosen to be a lot late. They

---

[12] The following sentence is the closest Congress comes to expressing displeasure with the IRS: "The committee is concerned that the present-law accuracy-related penalties (*particularly the penalty for substantial understatements of tax liability*) have been determined too routinely and automatically by the IRS." H.R. Rep. No. 101-247, at 1393, 1989 USCCAN at 2863 (emphasis added). The penalty for substantial understatement of tax liability is a different penalty from the one imposed by Code § 6621(c). Nevertheless, the McGanns quote this sentence of the House Report (without the parenthetical) as follows (Pl. Brief at 10, emphasis added): "Congress repealed *§ 6621(c)* and other penalties because the IRS was *abusing* them in a manner never intended by Congress. Congress found they were 'determined too routinely and automatically by the IRS' . . . ."

took the benefit of a sham transaction on their 1983 tax return. They let their TEFRA case languish from July 2, 1987, until they defaulted on June 13, 2002. After the 1992 *Krause* opinion demonstrated that the Elektra/Hemisphere transactions were shams, other *Vulcan* petitioners settled with the IRS; but the McGanns did not.[13] They restored their benefit from the sham in 2003. Now, after nearly twenty years' use of a wrongful tax gain, they argue that they should pay no penalty whatsoever. They are entitled to make their argument, but they cannot find support for it in the intentions of Congress. The abuse to be addressed here lies in the McGanns' claimed benefits from a sham transaction, not the IRS's imposition of a higher rate of interest as a consequence.

*C. The Fifth Circuit's decision in Weiner does not establish that a transaction is immune from the § 6621(c) penalty if it has multiple flaws, including that it is a tax motivated transaction.*

Finally the McGanns attempt to stretch *Weiner v. United States* beyond its holding to cover their own case, which is *Weiner*'s near opposite. In *Weiner*, the underpayment resulted from a settlement that did not specify the grounds to which the underpayment was attributable. Here, in contrast, the underpayment results from grounds the Tax Court determined, including grounds that are tax motivated transactions and grounds that are not. The presence of those

[13] *See Vulcan Oil Technology Partners v. Comm'r*, 110 T.C. 153 (1998). Although the McGanns maintained their petition for ten years after *Krause*, when they should have suspected it had no merit, and for five years after *Acierno*, when they should have known it had no merit, they complain that the IRS abuses Code § 6621(c) by imposing it in the "devil's playground" of TEFRA partnership cases, which can "linger in the Tax Court for 10-15 years before the assessment period even begins to run." Pl. Brief at 10. Somewhat inconsistently, they also suggest that § 6621(c) failed to encourage Tax Court litigants to settle their tax-shelter petitions, as Congress had intended. *See id.* at 9.

additional grounds for the underpayment does not immunize the McGanns from the penalty interest that otherwise clearly applies, and *Weiner* does not hold to the contrary.

1. *Weiner's underpayment resulted from a settlement that mentioned no tax motivated transaction; the McGanns' underpayment results from a court-confirmed FPAA that definitively establishes several tax motivated transactions.*

The plaintiffs in *Weiner* had filed Tax Court petitions contesting FPAAs issued to their partnerships. The FPAAs disallowed the partnerships' deductions on several grounds, including that the transactions were shams. *See Weiner*, 389 F.3d at 153-54. While the Tax Court cases were pending, Weiner and the Kraemers agreed to settle certain issues by accepting disallowance of 63% of the deductions, rather than the 100% disallowance the FPAAs proposed. The taxpayers and the IRS executed Forms 870-P(AD) that stated the terms of the settlement, including the IRS's determination to "assess additional tax liability and interest 'as provided by law.'" *Id.* at 154. But "the reasons for the adjustments *were not outlined in the Forms 870-P(AD)* . . . ." *Kraemer v. United States*, 2002 WL 575791 *12 (S.D. Tex. 2002) (emphasis added). The IRS later assessed interest under Code § 6621(c), and the taxpayers separately sued for refunds. *Weiner*, 389 F.3d at 154. A district court judge granted Weiner's claim, but the Kraemers conceded the § 6621(c) issue before trial; it was one of several issues in their case, which they lost. *Id.* at 152, 163. All parties appealed, and the Fifth Circuit consolidated the appeals.

On appeal, the taxpayers argued that Code § 6621(c) could not apply to them because (389 F.3d at 159-60, emphasis both original and added)–

> their underlying settlement agreements do not establish that their underpayments were attributable to "tax motivated transactions." In the FPAAs, the Government asserted *several* bases for the disallowance of certain deductions. Among them was a "sham or fraudulent transaction," which qualifies as a "tax motivated

> transaction" for the purposes of 6621(c). 26 U.S.C. § 6621(c)(3)(A)(v). *Because the taxpayers settled with the IRS, however, there was never any need for a court to examine the IRS's claimed bases for disallowance and make a determination about their application*.

The Fifth Circuit affirmed judgment for Weiner for this reason. *See* 389 F.3d at 160-63.

In the present case, the Tax Court dismissed a petition challenging Drake Oil's FPAA. By statute, the dismissal must "be considered as [the court's] decision that the notice of final partnership administrative adjustment is correct . . . ." Code § 6226(h). This case is therefore worlds apart from *Weiner*: Weiner's underpayment was attributable to a settlement that specified no grounds; the McGanns' underpayment is attributable to the grounds listed in the FPAA, grounds now affirmed by a judicial decision. In *Weiner* there was no agreement or other determination that the underpayment was supported by a ground that constitutes a tax motivated transaction. In the McGanns' case, the Tax Court determined that the underpayment is supported by grounds that constitute a tax motivated transaction (as well as other grounds).

Nevertheless, according to the McGanns, *Weiner* requires an allocation of the underpayment among the tax motivated transaction and the other grounds in the FPAA on a dollar-for-dollar basis. They assert–

> [T]he Fifth Circuit issued its opinion in *Weiner* . . . to hold that in a TEFRA related case where no specific TMT is designated as the *sole* basis for disallowing a discrete, designated dollar amount of the proposed adjustment, § 6621(c) cannot be imposed unless *every* possible basis for disallowance asserted in the FPAA was examined to determine exactly what portion of the adjustments were specifically "attributable to" a TMT.

Pl Brief at 6-7, citing *Weiner*, 389 F.3d at 160, 162 (original emphasis); *see also* Pl. Brief at 9-10, 16-17.

As shown above, the Tax Court determined that the underpayment resulted both from tax motivated transactions and from other grounds. A tax motivated transaction (the sham finding) supports the entire underpayment. An allocation might be needed if a tax motivated transaction could explain only a portion of the underpayment, but that is not the case here.

In any event, the *Weiner* underpayment arose only from an unexplained settlement. Neither the parties nor a court had attributed the underpayment to any ground–either to one that would support imposition of penalty interest or to one that would not. Such are the facts that produced the explanations the McGanns cite (389 F.3d at 160, 162). *Weiner* did not consider facts like those of the present case, in which a court established several grounds for an underpayment, one of which is a tax motivated transaction that explains the entire underpayment.

*2. Although an earlier Fifth Circuit decision supports the McGanns, Heasley v. Commissioner, it is a decision that other circuits have rejected, for good reason.*

In *Weiner* the Fifth Circuit surveyed several judicial opinions in reaching its conclusion that a settlement cannot support penalty interest on an underpayment if the settlement fails to state the grounds for the underpayment. *See* 389 F.3d 160-62. The courts decided most of those cases on grounds that included no tax motivated transactions, so it is not surprising that they refused to attribute the resulting underpayments to tax motivated transactions. The cases are: *Todd v. Commissioner*, 862 F.2d 540 (5th Cir. 1988) (deductions were denied because the taxpayers failed to put the assets into service during the taxable year); *McCrary v. Commissioner*, 92 T.C. 827 (1989) (taxpayer conceded the case on a ground that was not a tax motivated transaction); *accord, Rogers v. Commissioner*, 60 T.C.M. (CCH) 1386 (1990) *and Schachter v. Commissioner*, 67 T.C.M. (CCH) 3092 (1994). All of these cases are distinguishable from the McGanns' for the

same reason *Weiner* is distinguishable: by statute, the Tax Court disposed of the McGanns' case on grounds that included several tax motivated transactions.

The Fifth Circuit considered only one case in which an underpayment was based on two grounds, one of which was subject to penalty and the other of which was not: *Heasley v. Commissioner*, 902 F.2d 380 (5th Cir. 1990) (discussed in *Weiner*, 389 F.3d at 161). In *Heasley*, the Tax Court applied the penalty in former Code § 6659(a) (penalizing an underpayment "attributable to" a valuation overstatement).[14] The Tax Court had found both that the Heasleys' underpayment resulted from a valuation overstatement and that the underlying transaction was a sham (not a ground that could support the penalty). On appeal the Fifth Circuit reversed the Tax Court for the following reason (902 F.2d at 383, quoted in *Weiner*, 389 F.3d at 161):

> Whenever the IRS totally disallows a deduction or credit, the IRS may not penalize a taxpayer for a valuation overstatement included in that deduction or credit. In such a case, the underpayment is not attributable to a valuation overstatement. Instead, it is attributable to claiming an improper deduction or credit.

As the Fifth Circuit realized, *Heasley* differed from the other cases on which it relied in *Weiner*. *See Weiner*, 389 F.3d at 161 ("the Tax Court specifically found that the [Heasleys'] underpayment was 'attributable to' a valuation overstatement, a situation that differed from that in *Todd*"). The Fifth Circuit included *Heasley* among the cases that provided it with "a conceptual lens through which to view the statutory phrase 'attributable to' in the context of [Code]

---

[14] OBRA repealed Code § 6659, along with many other penalty provisions. *See* Pub. L. No. 101-239, § 7721, 103 Stat. at 2399. The valuation-overstatement penalties now appear in § 6662(b) as accuracy-related penalties.

§ 6621(c)." *Ibid*. But *Heasley* is a distorting lens that blocks a ground that supports a penalty and magnifies one that does not.

Several other circuits have decided cases in which an underpayment was attributable both to a valuation overstatement and to a sham transaction, and every one of those courts disagreed with the Fifth Circuit on this point. *See Massengill v. Comm'r*, 876 F.2d 616, 619 (8th Cir. 1989); *Gilman v. Comm'r*, 933 F.2d 143, 151-52 (2d Cir. 1991); *Illes v. Comm'r*, 982 F.2d 163, 167 (6th Cir. 1992); *Zfass v. Comm'r*, 118 F.3d 184, 190 (4th Cir. 1997); *Merino v. Comm'r*, 196 F.3d 147, 158-59 (3d Cir. 1999). These cases illuminate the problem before this Court–when an underpayment is "attributable to" a transaction that is subject to a penalty.

For example, in *Gilman v. Commissioner* the Second Circuit reviewed the Tax Court's decision that Gilman's sale/leaseback transaction was a sham and that the resulting underpayment was "attributable to a valuation overstatement" concerning property from which he claimed deductions for interest and depreciation. The Tax Court disallowed all the deductions from the sham transaction and also imposed the valuation overstatement penalty of former Code § 6659(a). Gilman challenged the penalty on two grounds: (1) he could not have overvalued property he purchased if the purchase was a sham; and (2) if he did overvalue property, his underpayment was "attributable to" denial of deductions from a sham transaction, not to a valuation overstatement. *See* 933 F.2d at 149-50.

As the Second Circuit conceded, "To say that a taxpayer has a zero basis in an asset he is found not to have acquired seems strained." 933 F.2d at 150. Nevertheless, the Commissioner had made alternative arguments–that the asset was overvalued and that its purchase was a sham. Both arguments had been successful. The court reasoned that the penalty would apply if the

Commissioner had proved only one of his arguments–that the assets were overvalued. It then asked (*ibid*., emphasis added):

> If the Commissioner is more successful and persuades the Court to disregard not only the nonrecourse notes [which supported the overvaluation] but the entirety of the purchase price, thereby lowering the "price" down not only to fair market value but all the way to zero, *should the Commissioner's success have the perverse effect of sparing the taxpayer the overvaluation penalty?*[15]

The Commissioner has established that the McGanns' transaction was a sham. If he had proved nothing more, the McGanns' underpayment would be attributable without question to a tax motivated transaction. It would be perverse to spare the McGanns the § 6621(c) penalty because the Commissioner established 22 other grounds for denying the deductions. *See* page 18, *supra*.

---

[15] Because the Tax Court found Gilman's underpayment to be "attributable to a valuation overstatement," it also imposed the enhanced interest rate of Code § 6621(c) (a valuation overstatement within the meaning of § 6659 is a "tax motivated transaction" listed at § 6621(c)(3)(A)(i)). The Second Circuit affirmed that holding as well. *See* 933 F.2d at 152; *see also Donahue v. Comm'r*, 1992 WL 70174, *4-*5 (6th Cir. 1992) (On facts similar to *Gilman*'s, the Sixth Circuit upheld penalties under §§ 6659 and 6621(c). The court followed *Gilman* and rejected *Heasley*.) *Donahue* is unpublished, but the Sixth Circuit permits citation of its unpublished opinions. *See* Sixth Circuit Rule 28(g), App. A, *infra*.

CONCLUSION

The McGanns' entire underpayment arises from disallowance of Drake Oil's deductions. By statute, the Tax Court's dismissal of *Vulcan* upheld the FPAA's finding that Drake Oil's transactions were shams. The entire underpayment is therefore attributable to a tax motivated transaction, and Code § 6621(c) applies to the underpayment.[16]

WHEREFORE the defendant asks the Court to dismiss the McGanns' complaint with prejudice.

Respectfully submitted,

s/ Robert Stoddart
ROBERT STODDART
Justice Department (Tax)
P. O. Box 26; Ben Franklin Station
Washington, D.C. 20044
TEL: (202) 307-6445
FAX: (202) 514-9440

RICHARD T. MORRISON
Acting Assistant Attorney General
DAVID GUSTAFSON
Chief, Court of Federal Claims Section
STEVEN I. FRAHM
Assistant Chief

s/ Steven I. Frahm
Of counsel

January 7, 2008

[16] A district court recently entered a judgment, reviewable by the Fifth Circuit, that purports to follow *Weiner*, but actually expands it. The case arises, like the McGanns', from the Tax Court's dismissal of *Vulcan*. *See Bartimmo v. United States*, 2007 WL 4246113 (S.D. Tex. 2007). In *Bartimmo*, the parties agrees that the dismissal resulted in a finding that the FPAAs were correct. The district court ruled, however, that the FPAAs "failed to identify the specific transactions that were tax motivated" (*id*. at *6), and that the dismissal orders "did not find Plaintiff's underpayment of tax attributable to specific tax-motivated transactions" (*id*. at *7). Thus, relying on its understanding of *Weiner*, the district court ruled that the dismissal orders were insufficient to impose tax-motivated interest.

Contrary to *Bartimmo*, the Tax Court's dismissal order confirmed that a tax motivated transaction generated the McGanns' entire underpayment. As the defendant has shown (*see* page 14, *supra*), an underpayment attributable to a tax motivated transaction *and* to other grounds remains attributable to a tax motivated transaction. That is all Code § 6621(c) requires. *Bartimmo* will give this Court no help in its task of applying the statute to the facts.

[This page has been left blank.]

[This page has been left blank.]

APPENDIX A

Internal Revenue Code of 1986, 26 U.S.C. (1988 ed.):

§ 6621. Determination of rate of interest.

. . . .

(c) Interest on substantial underpayments attributable to tax motivated transactions–

(1) In General.–In the case of interest payable under section 6601 with respect to any substantial underpayment attributable to tax motivated transactions, the rate of interest established under this section shall be 120 percent of the underpayment rate established under this subsection.

(2) Substantial underpayments attributable to tax motivated transactions.–For purposes of this subsection, "substantial underpayment attributable to tax motivated transactions" means any underpayment of taxes imposed by subtitle A for any taxable year which is attributable to 1 or more tax motivated transactions if the amount of the underpayment for such year so attributable exceeds $1,000.

(3) Tax Motivated Transactions.–

(A) In General.–For purposes of this subsection, the term "tax motivated transaction" means–

(i) any valuation overstatement (within the meaning of section 6659(c)),

(ii) any loss disallowed by reason of section 465(a) and any credit disallowed under section 46(c)(8),

(iii) any straddle (as defined in section 1092(c) without regard to subsections (d) and (e) of section 1092),

(iv) any use of an accounting method specified in regulations prescribed by the Secretary as a use which may result in a substantial distortion of income for any period, and

(v) any sham or fraudulent transaction.

[26 U.S.C. § 6621(c)(3) (1988 ed.), continued]

(B) Regulatory authority.–The Secretary may by regulations specify other types of transactions which will be treated as tax motivated for purposes of this subsection and may by regulations provide that specified transactions being treated as tax motivated will no longer be so treated. . . .

. . . .

. . . .

. . . .

§ 6659. Addition to tax in the case of valuation overstatements for purposes of the income tax.

(a) Addition to the tax.– If–

(1) an individual, or

(2) a closely held corporation or a personal service corporation,

has an underpayment of tax imposed by chapter 1 for the taxable year which is attributable to a valuation overstatement, then there shall be added to the tax an amount equal to the applicable percentage of the underpayment so attributable.

. . . .

. . . .

Internal Revenue Code of 1986, 26 U.S.C. (current version):

§ 183. Activities not engaged in for profit.

(a) General Rule.–In the case of an activity engaged in by an individual or an S corporation, if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section.

(b) Deductions Allowable.–In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed–

(1) the deductions which would have been allowed under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and

[26 U.S.C. § 183(b), continued]

> (2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1).

. . . .

. . . .

§ 704. Partner's distributive share.

. . . .

(d) Limitation on allowance of losses.–A partner's distributive share of partnership loss (including capital loss) shall be allowed only to the extent of the adjusted basis of such partner's interest in the partnership at the end of the partnership year in which such loss occurred. Any excess of such loss over such basis shall be allowed as a deduction at the end of the partnership year in which such excess is repaid to the partnership.

. . . .

. . . .

§ 6226. Judicial review of final partnership administrative adjustments.

. . . .

(h) Effect of Decision Dismissing Action.–If an action brought under this section is dismissed (other than under paragraph (4) of subsection (b)), the decision of the court dismissing the action shall be considered as its decision that the notice of final partnership administrative adjustment is correct, and an appropriate order shall be entered in the records of the court.

. . . .

Treasury Regulations (26 C.F.R. ):

§ 301.6621-2T Questions and answers relating to the increased rate of interest on substantial underpayments attributable to certain tax motivated transactions (temporary).

The following questions and answers relate to the increased rate of interest on substantial underpayments attributable to certain tax motivated transactions as provided in section 6621(d) of the Internal Revenue Code of 1954, as added by section 144 of the Tax Reform Act of 1984 (Pub. L. 98-369, 98 Stat. 682):

. . . .

Q-2. What is a tax motivated underpayment?

A-2. A tax motivated underpayment is the portion of a deficiency (as defined in section 6211) of tax imposed by subtitle A (income taxes) that is attributable to any of the following tax motivated transactions:

(1) Any instance in which the value of any property, or the adjusted basis of any property, claimed on a return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (i.e., a valuation overstatement within the meaning of section 6659(c)(1));

(2) Any loss disallowed for any period by reason of section 465(a) or any amount included in gross income by reason of section 465(e);

(3) Any credit disallowed for any period by reason of section 46(c)(8) or section 48(d)(6);

(4) Any loss disallowed for any period with respect to a straddle, as defined in section 1092(c), but without regard to sections 1092 (d) and (e);

(5) Any use of an accounting method that may result in a substantial distortion of income for any period (see A-3 of this section); and

(6) Any deduction disallowed with respect to any other tax motivated transactions (see A-4 of this section).

. . . .

Q-5. How is the amount of a tax motivated underpayment determined?

A-5. Except as provided in A-6 of this section, the amount of a tax motivated underpayment is determined in the following manner:

(1) Calculate the amount of the tax liability for the taxable year as if all items of income, gain, loss, deduction, or credit, had been reported properly on the income tax return of the taxpayer ("total tax liability"); and

(2) Without taking into account any adjustments to items of income, gain, loss, deduction, or credit that are attributable to tax motivated transactions (as defined in A-2 through A-4 of this section), calculate the amount of the tax liability for the taxable year as if all other items of income, gain loss, deduction, or credit had been reported properly on the income tax return of the taxpayer ("tax liability without regard to tax motivated transactions").

(3) The difference between the total tax liability and the tax liability without regard to tax motivated transactions is the amount of the tax motivated underpayment.

Example. Taxpayer A, a calendar year taxpayer, files his 1984 income tax return reporting $70,000 of taxable income and $23,171 of tax liability. On January 20, 1986, A enters into a closing agreement with the Internal Revenue Service that includes the following adjustments;

Section 162 deduction disallowed (not tax motivated).......... $7,500
Loss disallowed under section 465 (tax motivated--see A-2(2) of this section)..................................................................5,000
Section 170 deduction disallowed because of a valuation overstatement (tax motivated--see A-2(1) of this section).........10,000
Loss disallowed with respect to a straddle as defined in section 1092(c) (tax motivated--see A-2(4) of this section)........ 7,000
Other adjustments (none of which are tax motivated).................4,000

1. Reported taxable income.................................................... 70,000

(Add all adjustments to items of income, gain, loss, deduction, or credit (including tax motivated transactions subject to section 6621(d)))....................................................+33,500
Tax=$39,685 ("total tax liability")..........................................103,500

=======

[26 C.F.R. § 301,6621-2T, A-5, Example, continued]

2. Reported taxable income.................................................... 70,000

(Add adjustments to items of income, gain, loss, deduction, or credit other than those with respect to items that are tax motivated)............................................................. +11,500
Tax=$28,691 ("tax liability without regard to tax motivated transactions")........................................................ 81,500

=======

The tax motivated underpayment (i.e., the underpayment attributable to tax motivated transactions) is $10,994 ($39,685-$28,691). Accordingly, the interest on $10,994 would be computed at the 120 percent rate. The remainder of the underpayment (i.e., the underpayment not attributable to tax motivated transactions) is $5,520 ($28,691 (tax liability without regard to tax motivated items)-$23,171 (tax paid with return)). The interest on $5,520 would be computed at the adjusted rate.

. . . .

Q-10. What is the effective date for the 120 percent rate?

A-10. The 120 percent rate applies to interest accruing on a deficiency attributable to a substantial tax motivated underpayment after December 31, 1984, including interest accruing with respect to transactions described in A-3 and A-4 of this section, regardless of the date prescribed for payment of the tax.

Example. Taxpayer A files his income tax return on April 15, 1983 (the last date prescribed for payment of tax for taxable year 1982 under section 6601). In January 1985, Taxpayer A files a petition in the Tax Court in response to a statutory notice of deficiency for taxable year 1982, which includes a tax motivated underpayment of $10,000. In September 1986, the Tax Court enters a decision for the Internal Revenue Service. Under section 6601, interest accrues at the adjusted rate, compounded daily, on tax motivated underpayments outstanding before January 1, 1985, and at the 120 percent rate, compounded daily, on amounts outstanding after December 31, 1984. The underpayment that is subject to the 120 percent rate includes both the $10,000 tax motivated underpayment and the interest that accrued on the underpayment at the adjusted rate from April 16, 1983, through December 31, 1984.