Public Law 98-369
98th Congress

# An Act

July 18, 1984
[H.R. 4170]

To provide for tax reform, and for deficit reduction.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

Deficit Reduction Act of 1984.
26 USC 1 note.

**SECTION 1. SHORT TITLE.**

(a) SHORT TITLE.—This Act may be cited as the "Deficit Reduction Act of 1984".

(b) ACT DIVIDED INTO 2 DIVISIONS.—This Act consists of 2 divisions as follows:

(1) DIVISION A.—Tax Reform Act of 1984.

(2) DIVISION B.—Spending Reduction Act of 1984.

Tax Reform Act of 1984.
26 USC 1 note.

## DIVISION A—TAX REFORM ACT OF 1984

**SEC. 5. SHORT TITLE; ETC.**

(a) SHORT TITLE.—This division may be cited as the "Tax Reform Act of 1984".

(b) AMENDMENT OF 1954 CODE.—Except as otherwise expressly provided, whenever in this division an amendment or repeal is expressed in terms of an amendment to, or repeal of, a section or other provision, the reference shall be considered to be made to a section or other provision of the Internal Revenue Code of 1954.

26 USC 1 *et seq.*

**SEC. 10. TABLE OF CONTENTS.**

Section 1. Short title.

DIVISION A—TAX REFORM ACT OF 1984

Sec. 5. Short title, etc.

TITLE I—TAX FREEZE; TAX REFORMS GENERALLY

Sec. 10. Table of contents.

Subtitle A—Deferral of Certain Tax Reductions

PART I—INCOME TAX PROVISIONS

Sec. 11. Amount of used property eligible for investment tax credit.
Sec. 12. Finance lease provisions.
Sec. 13. Election to expense certain depreciable business assets.
Sec. 14. Employee stock ownership credit.
Sec. 15. Cost-of-living adjustments in pension plan limitations.
Sec. 16. Repeal of partial interest exclusion.
Sec. 17. Foreign earned income of individuals.
Sec. 18. Effective date.

PART II—ESTATE AND GIFT TAX RATES

Sec. 21. Maximum rate.

PART III—EXCISE TAXES

Sec. 25. Tax rate on newly discovered oil.
Sec. 26. Excise tax on communications services.
Sec. 27. Excise tax on distilled spirits.

(b) PENALTY FOR FAILURE TO MAINTAIN LIST.—Subchapter B of chapter 68 (relating to assessable penalties) is amended by adding at the end thereof the following new section:

26 USC 6708. *Post*, p. 912.

**"SEC. 6708. FAILURE TO MAINTAIN LISTS OF INVESTORS IN POTENTIALLY ABUSIVE TAX SHELTERS.**

*Ante*, p. 681.

"(a) IN GENERAL.—Any person who fails to meet any requirement imposed by section 6112 shall pay a penalty of $50 for each person with respect to whom there is such a failure, unless it is shown that such failure is due to reasonable cause and not due to willful neglect. The maximum penalty imposed under this subsection for any calendar year shall not exceed $50,000.

"(b) PENALTY IN ADDITION TO OTHER PENALTIES.—The penalty imposed by this section shall be in addition to any other penalty provided by law."

(c) CONFORMING AMENDMENTS.—

(1) The table of sections for subchapter B of chapter 61 is amended by striking out the item relating to section 6112 and inserting in lieu thereof the following new items:

"Sec. 6112. Organizers and sellers of potentially abusive tax shelters must keep lists of investors.

"Sec. 6113. Cross reference."

(2) The table of sections for subchapter B of chapter 68 is amended by adding at the end thereof the following new item:

"Sec. 6708. Failure to maintain lists of investors in potentially abusive tax shelters."

26 USC 6112 note.

(d) EFFECTIVE DATE.—The amendments made by this section shall apply to any interest which is first sold to any investor after August 31, 1984.

**SEC. 143. INCREASE IN PENALTY FOR PROMOTING ABUSIVE TAX SHELTERS; INJUNCTION AGAINST AIDING OR ABETTING UNDERSTATEMENT OF TAX LIABILITY.**

26 USC 6700.

(a) INCREASE IN PROMOTER PENALTY.—Subsection (a) of section 6700 (relating to promotion of abusive tax shelters) is amended by striking out "10 percent" and inserting in lieu thereof "20 percent".

(b) INJUNCTION AGAINST AIDING OR ABETTING UNDERSTATEMENTS OF TAX LIABILITY.—

26 USC 7408.

(1) Subsections (a) and (b) of section 7408 (relating to action to enjoin promoters of abusive tax shelters, etc.) are each amended by inserting "or section 6701 (relating to penalties for aiding and abetting understatement of tax liability)" after "etc.)".

(2) Subsection (a) of section 7408 is amended by inserting "or section 6701" before the period at the end of the second sentence.

(3) Subsection (b) of section 7408 is amended by inserting before the period "or section 6701".

26 USC 6700 note.

(c) EFFECTIVE DATE.—The amendments made by this section shall take effect on the day after the date of the enactment of this Act.

**SEC. 144. INCREASED RATE OF INTEREST ON SUBSTANTIAL UNDERPAYMENTS ATTRIBUTABLE TO CERTAIN TAX MOTIVATED TRANSACTIONS.**

26 USC 6621.

(a) GENERAL RULE.—Section 6621 (relating to determination of rate of interest) is amended by adding at the end thereof the following new subsection:

"(d) INTEREST ON SUBSTANTIAL UNDERPAYMENTS ATTRIBUTABLE TO TAX MOTIVATED TRANSACTIONS.—

"(1) IN GENERAL.—In the case of interest payable under section 6601 with respect to any substantial underpayment attributable to tax motivated transactions, the annual rate of interest established under this section shall be 120 percent of the adjusted rate established under subsection (b).

"(2) SUBSTANTIAL UNDERPAYMENT ATTRIBUTABLE TO TAX MOTIVATED TRANSACTIONS.—For purposes of this subsection, the term 'substantial underpayment attributable to tax motivated transactions' means any underpayment of taxes imposed by subtitle A for any taxable year which is attributable to 1 or more tax motivated transactions if the amount of the underpayment for such year so attributable exceeds $1,000.

"(3) TAX MOTIVATED TRANSACTIONS.—

"(A) IN GENERAL.—For purposes of this subsection, the term 'tax motivated transaction' means—

"(i) any valuation overstatement (within the meaning of section 6659(c)), *Post*, p. 693.

"(ii) any loss disallowed by reason of section 465(a) and any credit disallowed under section 46(c)(8), *Post*, pp. 805, 810.

"(iii) any straddle (as defined in section 1092(c) without regard to subsections (d) and (e) of section 1092), and

"(iv) any use of an accounting method specified in regulations prescribed by the Secretary as a use which may result in a substantial distortion of income for any period.

"(B) REGULATORY AUTHORITY.—The Secretary may by regulations specify other types of transactions which will be treated as tax motivated for purposes of this subsection and may by regulations provide that specified transactions being treated as tax motivated will no longer be so treated. In prescribing regulations under the preceding sentence, the Secretary shall take into account—

"(i) the ratio of tax benefits to cash invested,

"(ii) the methods of promoting the use of this type of transaction, and

"(iii) other relevant considerations.

"(C) EFFECTIVE DATE FOR REGULATIONS.—Any regulations prescribed under subparagraph (A)(iv) or (B) shall apply only to interest accruing after a date (specified in such regulations) which is after the date on which such regulations are prescribed.

"(4) JURISDICTION OF TAX COURT.—In the case of any proceeding in the Tax Court for a redetermination of a deficiency, the Tax Court shall also have jurisdiction to determine the portion (if any) of such deficiency which is a substantial underpayment attributable to tax motivated transactions."

(b) CROSS REFERENCE.—Section 6214 (relating to determinations by Tax Court) is amended by adding at the end thereof the following new subsection: 26 USC 6214.

"(e) CROSS REFERENCE.—

**"For provision giving Tax Court jurisdiction to determine whether any portion of deficiency is a substantial underpayment attributable to tax motivated transactions, see section 6621(d)(4)."**

*Ante*, p. 682. 26 USC 6621 note.

(c) EFFECTIVE DATE.—The amendments made by this section shall apply with respect to interest accruing after December 31, 1984.

## PART II—INFORMATION REPORTING PROVISIONS

**SEC. 145. RETURNS RELATING TO MORTGAGE INTEREST RECEIVED IN TRADE OR BUSINESS FROM INDIVIDUALS.**

(a) IN GENERAL.—Subpart B of part III of subchapter A of chapter 61 (relating to information concerning transactions with other persons) is amended by adding at the end thereof the following new section:

26 USC 6050H.

**"SEC. 6050H. RETURNS RELATING TO MORTGAGE INTEREST RECEIVED IN TRADE OR BUSINESS FROM INDIVIDUALS.**

"(a) MORTGAGE INTEREST OF $600 OR MORE.—Any person—

"(1) who is engaged in a trade or business, and

"(2) who, in the course of such trade or business, receives from any individual interest aggregating $600 or more for any calendar year on any mortgage,

shall make the return described in subsection (b) with respect to each individual from whom such interest was received at such time as the Secretary may by regulations prescribe.

"(b) FORM AND MANNER OF RETURNS.—A return is described in this subsection if such return—

"(1) is in such form as the Secretary may prescribe,

"(2) contains—

"(A) the name and address of the individual from whom the interest described in subsection (a)(2) was received,

"(B) the amount of such interest received for the calendar year, and

"(C) such other information as the Secretary may prescribe.

"(c) APPLICATION TO GOVERNMENTAL UNITS.—For purposes of subsection (a)—

"(1) TREATED AS PERSONS.—The term 'person' includes any governmental unit (and any agency or instrumentality thereof).

"(2) SPECIAL RULES.—In the case of a governmental unit or any agency or instrumentality thereof—

"(A) subsection (a) shall be applied without regard to the trade or business requirement contained therein, and

"(B) any return required under subsection (a) shall be made by the officer or employee appropriately designated for the purpose of making such return.

"(d) STATEMENTS TO BE FURNISHED TO INDIVIDUALS WITH RESPECT TO WHOM INFORMATION IS FURNISHED.—Every person making a return under subsection (a) shall furnish to each individual whose name is set forth in such return a written statement showing—

"(1) the name and address of the person making such return, and

"(2) the aggregate amount of interest described in subsection (a)(2) received by the person making such return from the individual to whom the statement is furnished.

PUBLIC LAW 101-239 [H.R. 3299]; December 19, 1989

# OMNIBUS BUDGET RECONCILIATION ACT OF 1989

*For Legislative History of Act, see p. 1906.*

**An Act to provide for reconciliation pursuant to section 5 of the concurrent resolution on the budget for the fiscal year 1990.**

Omnibus Budget Reconciliation Act of 1989.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Omnibus Budget Reconciliation Act of 1989".

**SEC. 2. TABLE OF CONTENTS.**

Title I—Agriculture and related programs.
Title II—Student loan and pension fiduciary amendments.
Title III—Regulatory agency fees.
Title IV—Civil service and postal service programs.
Title V—Veterans programs.
Title VI—Medicare, medicaid, maternal and child health, and other health provisions.
Title VII—Revenue provisions.
Title VIII—Human resource and income security provisions.
Title IX—Offshore oil pollution compensation fund.
Title X—Miscellaneous and technical Social Security Act amendments.
Title XI—Miscellaneous.

Agricultural Reconciliation Act of 1989.

## TITLE I—AGRICULTURE AND RELATED PROGRAMS

**SEC. 1001. SHORT TITLE; TABLE OF CONTENTS.**

7 USC 1421 note.

(a) SHORT TITLE.—This title may be cited as the "Agricultural Reconciliation Act of 1989".

(b) TABLE OF CONTENTS.—The table of contents is as follows:

Sec. 1001. Short title; table of contents.
Sec. 1002. Soybean, sunflower, and safflower planting program; feed grain acreage limitation program.
Sec. 1003. Reduction of deficiency payments for 1990 crops.
Sec. 1004. Repayment of advance deficiency payments.
Sec. 1005. Reduction of expenditures under the export enhancement program and for targeted export assistance.
Sec. 1006. Purchases of Financial Assistance Corporation stock by Farm Credit System institutions.
Sec. 1007. Adjustments in dairy price support program.

**SEC. 1002. SOYBEAN, SUNFLOWER, AND SAFFLOWER PLANTING PROGRAM; FEED GRAIN ACREAGE LIMITATION PROGRAM.**

(a) PLANTING OF SOYBEANS, SUNFLOWERS, AND SAFFLOWERS ON PERMITTED ACREAGE.—Effective only for the 1990 crops, subsection (e) of section 504 of the Agricultural Act of 1949 (7 U.S.C. 1464(e)) is amended to read as follows:

"(e) Notwithstanding any other provision of this Act—

Improved Penalty Administration and Compliance Tax Act.
26 USC 1 note.

## Subtitle G—Revision of Civil Penalties

**SEC. 7701. SHORT TITLE.**

This subtitle may be cited as the "Improved Penalty Administration and Compliance Tax Act".

## PART I—DOCUMENT AND INFORMATION RETURN PENALTIES

**SEC. 7711. UNIFORM PENALTIES FOR FAILURES TO COMPLY WITH CERTAIN INFORMATION REPORTING REQUIREMENTS.**

(a) GENERAL RULE.—Part II of subchapter B of chapter 68 (relating to failure to file certain information returns or statements) is amended to read as follows:

## "PART II—FAILURE TO COMPLY WITH CERTAIN INFORMATION REPORTING REQUIREMENTS

"Sec. 6721. Failure to file correct information returns.
"Sec. 6722. Failure to furnish correct payee statements.
"Sec. 6723. Failure to comply with other information reporting requirements.
"Sec. 6724. Waiver; definitions and special rules.

**"SEC. 6721. FAILURE TO FILE CORRECT INFORMATION RETURNS.**

"(a) IMPOSITION OF PENALTY.—

"(1) IN GENERAL.—In the case of a failure described in paragraph (2) by any person with respect to an information return, such person shall pay a penalty of $50 for each return with respect to which such a failure occurs, but the total amount imposed on such person for all such failures during any calendar year shall not exceed $250,000.

"(2) FAILURES SUBJECT TO PENALTY.—For purposes of paragraph (1), the failures described in this paragraph are—

"(A) any failure to file an information return with the Secretary on or before the required filing date, and

"(B) any failure to include all of the information required to be shown on the return or the inclusion of incorrect information.

"(b) REDUCTION WHERE CORRECTION IN SPECIFIED PERIOD.—

"(1) CORRECTION WITHIN 30 DAYS.—If any failure described in subsection (a)(2) is corrected on or before the day 30 days after the required filing date—

"(A) the penalty imposed by subsection (a) shall be $15 in lieu of $50, and

"(B) the total amount imposed on the person for all such failures during any calendar year which are so corrected shall not exceed $75,000.

"(2) FAILURES CORRECTED ON OR BEFORE AUGUST 1.—If any failure described in subsection (a)(2) is corrected after the 30th day referred to in paragraph (1) but on or before August 1 of the calendar year in which the required filing date occurs—

"(A) the penalty imposed by subsection (a) shall be $30 in lieu of $50, and

**"SEC. 6665. APPLICABLE RULES.**

"(a) ADDITIONS TREATED AS TAX.—Except as otherwise provided in this title—

"(1) the additions to the tax, additional amounts, and penalties provided by this chapter shall be paid upon notice and demand and shall be assessed, collected, and paid in the same manner as taxes; and

"(2) any reference in this title to 'tax' imposed by this title shall be deemed also to refer to the additions to the tax, additional amounts, and penalties provided by this chapter.

"(b) PROCEDURE FOR ASSESSING CERTAIN ADDITIONS TO TAX.—For purposes of subchapter B of chapter 63 (relating to deficiency procedures for income, estate, gift, and certain excise taxes), subsection (a) shall not apply to any addition to tax under section 6651, 6654, or 6655; except that it shall apply—

"(1) in the case of an addition described in section 6651, to that portion of such addition which is attributable to a deficiency in tax described in section 6211; or

"(2) to an addition described in section 6654 or 6655, if no return is filed for the taxable year."

(b) REPEAL OF INCREASE IN INTEREST ON CERTAIN SUBSTANTIAL UNDERPAYMENTS.—Subsection (c) of section 6621 (relating to interest on substantial underpayments attributable to tax motivated transactions) is hereby repealed.

(c) TECHNICAL AND CONFORMING AMENDMENTS.—

(1) Section 6653 is amended to read as follows:

**"SEC. 6653. FAILURE TO PAY STAMP TAX.**

"Any person (as defined in section 6671(b)) who—

"(1) willfully fails to pay any tax imposed by this title which is payable by stamp, coupons, tickets, books, or other devices or methods prescribed by this title or by regulations under the authority of this title, or

"(2) willfully attempts in any manner to evade or defeat any such tax or the payment thereof,

shall, in addition to other penalties provided by law, be liable for a penalty of 50 percent of the total amount of the underpayment of the tax."

(2) Sections 6659, 6659A, 6660, and 6661 are hereby repealed.

(3) Subsection (b) of section 5684 is amended—

(A) by striking "6662(a)" and inserting "6665(a)", and

(B) by striking "6662" in the subsection heading and inserting "6665".

(4) Subsection (a) of section 5761 is amended by striking "or 6653" and inserting "or 6653 or part II of subchapter A of chapter 68".

(5) Subsection (c) of section 5761 is amended—

(A) by striking "6662(a)" and inserting "6665(a)", and

(B) by striking "6662" in the subsection heading and inserting "6665".

(6) Subparagraph (A) of section 6013(b)(5) is amended—

(A) by striking "section 6653" and inserting "part II of subchapter A of chapter 68", and

(B) by striking "SECTION 6653" in the subparagraph heading and inserting "PART II OF SUBCHAPTER A OF CHAPTER 68".

(7) Subsection (d) of section 6222 is amended by striking "section 6653(a)" and inserting "part II of subchapter A of chapter 68".

(8) Paragraph (2) of section 6601(e) is amended by striking "section 6651(a)(1), 6653, 6659, 6660, or 6661" each place it appears and inserting "section 6651(a)(1) or 6653 or under part II of subchapter A of chapter 68".

(9) Subsection (a) of section 6672 is amended by striking "under section 6653" and inserting "under section 6653 or part II of subchapter A of chapter 68".

(10) Subparagraph (C) of section 461(i)(3) is amended by striking "section 6662(b)(2)(C)(ii)" and inserting "section 6662(d)(2)(C)(ii)".

(11) Clause (i) of section 1274(b)(3)(B) is amended by striking "section 6661(b)(2)(C)(ii)" and inserting "section 6662(d)(2)(C)(ii)".

(12) Subparagraph (B) of section 7519(f)(4) is amended by striking "section 6653" and inserting "part II of subchapter A of chapter 68".

(13) Subchapter A of chapter 68 is amended by inserting after the subchapter heading the following:

"Part I. General provisions.
"Part II. Accuracy-related and fraud penalties.
"Part III. Applicable rules.

"PART I—GENERAL PROVISIONS".

(14) The table of sections for part I of subchapter A of chapter 68 (as amended by paragraph (1)) is amended—

(A) by striking out the items relating to sections 6659, 6659A, 6660, and 6661, and

(B) by striking the item relating to section 6653 and inserting:

"Sec. 6653. Failure to pay stamp tax."

26 USC 461 note. (d) EFFECTIVE DATE.—The amendments made by this section shall apply to returns the due date for which (determined without regard to extensions) is after December 31, 1989.

## PART III—PREPARER, PROMOTER, AND PROTESTER PENALTIES

### SEC. 7731. PENALTY FOR INSTITUTING PROCEEDINGS BEFORE TAX COURT PRIMARILY FOR DELAY, ETC.

(a) GENERAL RULE.—Section 6673 (relating to damages assessable for instituting proceedings before the Tax Court primarily for delay, etc.) is amended to read as follows:

"SEC. 6673. SANCTIONS AND COSTS AWARDED BY COURTS.

"(a) TAX COURT PROCEEDINGS.—

"(1) PROCEDURES INSTITUTED PRIMARILY FOR DELAY, ETC.—Whenever it appears to the Tax Court that—

"(A) proceedings before it have been instituted or maintained by the taxpayer primarily for delay,

"(B) the taxpayer's position in such proceeding is frivolous or groundless, or

**SEC. 7743. EFFECT OF PAYMENT OF TAX BY RECIPIENT ON CERTAIN PENALTIES.**

(a) GENERAL RULE.—Section 1463 (relating to tax paid by recipient of income) is amended to read as follows:

**"SEC. 1463. TAX PAID BY RECIPIENT OF INCOME.**

"If—

"(1) any person, in violation of the provisions of this chapter, fails to deduct and withhold any tax under this chapter, and

"(2) thereafter the tax against which such tax may be credited is paid,

the tax so required to be deducted and withheld shall not be collected from such person; but this subsection shall in no case relieve such person from liability for interest or any penalties or additions to the tax otherwise applicable in respect of such failure to deduct and withhold."

26 USC 1463 note.

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall apply to failures after December 31, 1989.

## Subtitle H—Technical Corrections

**SEC. 7801. DEFINITIONS; COORDINATION WITH OTHER SUBTITLES.**

(a) DEFINITIONS.—For purposes of this subtitle—

(1) 1988 ACT.—The term "1988 Act" means the Technical and Miscellaneous Revenue Act of 1988.

(2) 1987 ACT.—The term "1987 Act" means the Revenue Act of 1987.

26 USC 1 note.

(b) COORDINATION WITH OTHER SUBTITLES.—For purposes of applying the amendments made by any subtitle of this title other than this subtitle, the provisions of this subtitle shall be treated as having been enacted immediately before the provisions of such other subtitles.

## PART I—AMENDMENTS RELATED TO TECHNICAL AND MISCELLANEOUS REVENUE ACT OF 1988

**SEC. 7811. AMENDMENTS RELATED TO TITLE I OF THE 1988 ACT.**

(a) AMENDMENTS RELATED TO SECTION 1002 OF THE 1988 ACT.—

(1) The heading for subparagraph (C) of section 42(d)(5) is amended by inserting "SECTION" before "167(k)".

(2) Clause (ii) of section 42(h)(5)(D) is amended by striking "clause (ii)" and inserting "clause (i)".

(b) AMENDMENTS RELATED TO SECTION 1003 OF THE 1988 ACT.—

(1) Subparagraph (C) of section 643(a)(6) is amended by striking "(i)" and by striking ", and (ii)" and all that follows and inserting a period.

(2) Paragraph (6) of section 643(a) is amended by striking subparagraph (D).

(c) AMENDMENTS RELATED TO SECTION 1006 OF THE 1988 ACT.—

(1) Subparagraphs (C) and (D) of section 26(b)(2) are amended to read as follows:

"(C) subsection (m)(5)(B), (q), (t), or (v) of section 72 (relating to additional taxes on certain distributions),

PUBLIC LAW 99–514 [H.R. 3838]; October 22, 1986

# TAX REFORM ACT OF 1986

**An Act to reform the internal revenue laws of the United States.**

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

Tax Reform Act of 1986.
26 USC 1 *et seq.*

SECTION 1. SHORT TITLE; TABLE OF CONTENTS.

(a) SHORT TITLE.—This Act may be cited as the "Tax Reform Act of 1986".

(b) TABLE OF CONTENTS.—


TITLE I—INDIVIDUAL INCOME TAX PROVISIONS

Subtitle A—Rate Reductions; Increase in Standard Deduction and Personal Exemptions

Sec. 101. Rate reductions.
Sec. 102. Increase in standard deduction.
Sec. 103. Increase in personal exemptions.
Sec. 104. Technical amendments.

Subtitle B—Provisions Related to Tax Credits

Sec. 111. Increase in earned income credit.
Sec. 112. Repeal of credit for contributions to candidates for public office.

Subtitle C—Provisions Related to Exclusions

Sec. 121. Taxation of unemployment compensation.
Sec. 122. Prizes and awards.
Sec. 123. Scholarships.

Subtitle D—Provisions Related to Deductions

Sec. 131. Repeal of deduction for 2-earner married couples.
Sec. 132. 2-percent floor on miscellaneous itemized deductions.
Sec. 133. Medical expense deduction limitation increased.
Sec. 134. Repeal of deduction for State and local sales tax.
Sec. 135. Repeal of deduction for adoption expenses.

Subtitle E—Miscellaneous Provisions

Sec. 141. Repeal of income averaging.
Sec. 142. Limitations on deductions for meals, travel, and entertainment.
Sec. 143. Changes in treatment of hobby loss, etc.
Sec. 144. Deduction for mortgage interest and real property taxes allowable where parsonage allowance or military housing allowance received.

Subtitle F—Effective Dates

Sec. 151. Effective dates.

TITLE II—PROVISIONS RELATING TO CAPITAL COST

Subtitle A—Depreciation Provisions

Sec. 201. Modification of accelerated cost recovery system.
Sec. 202. Expensing of depreciable assets.
Sec. 203. Effective dates; general transitional rules.

Subtitle B—Repeal of Regular Investment Tax Credit

Sec. 211. Repeal of regular investment tax credit.
Sec. 212. Effective 15-year carryback of existing carryforwards of steel companies.
Sec. 213. Effective 15-year carryback of existing carryforwards of qualified farmers.

## Subtitle B—Interest Provisions

SEC. 1511. DIFFERENTIAL INTEREST RATE.

(a) GENERAL RULE.—Section 6621 (relating to determination of rate of interest) is amended by striking out subsections (a), (b), and (c) and inserting in lieu thereof the following:

"(a) GENERAL RULE.—

"(1) OVERPAYMENT RATE.—The overpayment rate established under this section shall be the sum of—

"(A) the short-term Federal rate determined under subsection (b), plus

"(B) 2 percentage points.

"(2) UNDERPAYMENT RATE.—The underpayment rate established under this section shall be the sum of—

"(A) the short-term Federal rate determined under subsection (b), plus

"(B) 3 percentage points.

"(b) SHORT-TERM FEDERAL RATE.—For purposes of this section—

"(1) GENERAL RULE.—The Secretary shall determine the short-term Federal rate for the first month in each calendar quarter.

"(2) PERIOD DURING WHICH RATE APPLIES.—

"(A) IN GENERAL.—Except as provided in subparagraph (B), the Federal short-term rate determined under paragraph (1) for any month shall apply during the first calendar quarter beginning after such month.

"(B) SPECIAL RULE FOR INDIVIDUAL ESTIMATED TAX.—In determining the addition to tax under section 6654 for failure to pay estimated tax for any taxable year, the Federal short-term rate which applies during the 3rd month following such taxable year shall also apply during the first 15 days of the 4th month following such taxable year.

"(3) FEDERAL SHORT-TERM RATE.—The Federal short-term rate for any month shall be the Federal short-term rate determined during such month by the Secretary in accordance with section 1274(d). Any such rate shall be rounded to the nearest full percent (or, if a multiple of ½ of 1 percent, such rate shall be increased to the next highest full percent)."

(b) COORDINATION BY REGULATION.—The Secretary of the Treasury or his delegate may issue regulations to coordinate section 6621 of the Internal Revenue Code of 1954 (as amended by this section) with section 6601(f) of such Code. Such regulations shall not apply to any period after the date 3 years after the date of the enactment of this Act.

(c) TECHNICAL AMENDMENTS.—

(1) Section 6621 is amended—

(A) by redesignating subsection (d) as subsection (c), and

(B) by striking out "the adjusted rate established under subsection (b)" in subsection (c)(1) (as so redesignated) and inserting in lieu thereof "the underpayment rate established under this section", and

(C) by striking out "annual" in subsection (c)(1) (as so redesignated).

(2) Subparagraph (G) of section 47(d)(3) is amended by striking out "determined under section 6621" and inserting in lieu

[100 STAT. 2744]

Internal Revenue Code of 1986 as amended by this section) interests in which are first offered for sale after December 31, 1986.

**SEC. 1532. INCREASED PENALTY FOR FAILURE TO REGISTER TAX SHELTERS.**

(a) IN GENERAL.—Paragraph (2) of section 6707(a) (relating to penalty for failure to register tax shelters) is amended to read as follows:

"(2) AMOUNT OF PENALTY.—The penalty imposed under paragraph (1) with respect to any tax shelter shall be an amount equal to the greater of—

"(A) 1 percent of the aggregate amount invested in such tax shelter, or

"(B) $500."

(b) EFFECTIVE DATE.—The amendment made by this section shall apply to failures with respect to tax shelters interests in which are first offered for sale after the date of the enactment of this Act.

**SEC. 1533. PENALTY FOR FAILURE TO INCLUDE TAX SHELTER IDENTIFICATION NUMBER ON RETURN INCREASED TO $250.**

(a) IN GENERAL.—Paragraph (2) of section 6707(b) (relating to penalty for failure to furnish tax shelter identification number) is amended by striking out "$50" and inserting in lieu thereof "$250".

(b) EFFECTIVE DATE.—The amendment made by this section shall apply to returns filed after the date of the enactment of this Act.

**SEC. 1534. INCREASED PENALTY FOR FAILURE TO MAINTAIN LISTS OF INVESTORS IN POTENTIALLY ABUSIVE TAX SHELTERS.**

(a) IN GENERAL.—Subsection (a) of section 6708 (relating to failure to maintain lists of investors in potentially abusive tax shelters) is amended by striking out "$50,000" and inserting in lieu thereof "$100,000".

(b) EFFECTIVE DATE.—The amendments made by this section shall apply to failures occurring or continuing after the date of the enactment of this Act.

**SEC. 1535. CLARIFICATION OF TREATMENT OF SHAM OR FRAUDULENT TRANSACTIONS UNDER SECTION 6621(c).**

(a) CLARIFICATION OF TREATMENT OF SHAM OR FRAUDULENT TRANSACTIONS.—Subparagraph (A) of section 6621(c)(3) (as so redesignated) is amended by striking out "and" at the end of clause (iii), by striking out the period at the end of clause (iv) and inserting in lieu thereof ", and", and by adding at the end thereof the following new clause:

"(v) any sham or fraudulent transaction."

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall apply to interest accruing after December 31, 1984; except that such amendment shall not apply in the case of any underpayment with respect to which there was a final court decision before the date of the enactment of this Act.

**DEFICIT REDUCTION ACT OF 1984**

P.L. 98-369

HOUSE CONFERENCE REPORT NO. 98-861

* * * * *

[page 757]

JOINT EXPLANATORY STATEMENT OF THE COMMITTEE OF CONFERENCE

The managers on the part of the House and the Senate at the conference on the disagreeing votes of the two Houses on the amendment of the House to the amendments of the Senate to the bill (H.R. 4170) to provide for tax reform, and for other purposes, submit the following joint statements to the House and the Senate in explanation of the effect of the action agreed upon by the managers and recommended in the accompanying conference report:

The joint statement of managers which follows was prepared by the committee of jurisdiction and is arranged by title of the conference agreement.

## SUMMARY TABLE OF CONTENTS


| | Page |
|---|---|
| REVENUE PROVISIONS: | |
| I. Tax Freeze; Tax Reforms Generally | 766 |
| II. Life Insurance Tax Provisions | 1042 |
| III. Charitable Deduction Rules; Private Foundation Provisions; Exempt Organizations | 1081 |
| IV. Simplification Provisions | 1115 |
| V. Provisions Relating to Employers and Employees and to Retirement | 1131 |
| VI. Tax-Exempt Obligations | 1185 |
| VII. Technical Corrections | 1218 |
| VIII. Enterprise Zones | 1227 |
| IX. Highway Revenue Provisions | 1228 |
| X. Miscellaneous Revenue Provisions | 1235 |
| XI. Studies | 1283 |
| XII. Miscellaneous Tariff Provisions | 1284 |


## TABLE OF CONTENTS FOR REVENUE PROVISIONS


I. TAX FREEZE; TAX REFORMS GENERALLY ..... 766
- A. Tax Freeze and Related Provisions ..... 766
  - 1. Postponement of finance lease provisions ..... 766
  - 2. Postponement of increase in amount of used property eligible for investment tax credit ..... 772
  - 3. Postponement of increases in amount of property eligible for expensing ..... 772
  - 4. Net interest exclusion ..... 773
  - 5. Postponement of increase in foreign earned income exclusion ..... 773
  - 6. Defer scheduled reductions in maximum gift and estate tax rates ..... 774
  - 7. Windfall profit tax on rate newly discovered oil ..... 774

[page 758]

  - 8. Percentage depletion for secondary and tortiary production after 1983 ..... 775
  - 9. Modification of excise tax rates on cigarettes and distilled spirits ..... 776
    - a. Cigarette excise tax ..... 776
    - b. Distilled spirits excise tax ..... 776
  - 10. Modification of time and manner of paying excise taxes on cigarettes and alcohol products ..... 777
  - 11. Extension of excise tax on communications services ..... 778
- B. Leasing Provisions ..... 778
  - 1. Tax-exempt entity leasing ..... 778
    - a. General rule ..... 778
    - b. Definition tax-exempt entity ..... 780
    - c. Tax-exempt use property ..... 782
    - d. Tax treatment of tax-exempt use personal property ..... 784
    - e. Tax treatment of tax-exempt use real property ..... 785
    - f. Depreciation of certain short-lived property ..... 786

tivities subject to penalty under either section 6700 or section 6701, or both, as appropriate. Both amendments take effect on the day after the date of enactment.

No inference should be drawn that the general injunctive power of the district courts under section 7402(a) is, in any way, limited by the action to enjoin promoters of abusive tax shelters (sec. 7408) or the action to enjoin income tax return preparers (sec. 7407). This is in accordance with *U.S.* v. *Landsberger*, 692 F.2d 501 (8th Cir., 1982).

### d. Increased rate of interest for tax shelter cases

*Present law*

Interest must be paid by the taxpayer on underpayments of tax and by the United States on overpayments of tax at the statutory rate (generally, the prime rate, compounded daily). There is no different interest rate for tax shelter cases.

*House bill*

No provision.

*Senate amendment*

In the case of tax shelter items, the rate of interest paid to taxpayers on refunds or due the IRS on underpayments is 150 percent of the statutory rate (generally, the prime rate, compounded daily). This rule applies to items arising from any plan or arrangement the principal purpose of which is the avoidance or evasion of tax in which more than 34 persons participate. The provision is effective for interest accruing after December 31, 1984.

*Conference agreement*

The conference agreement contains a modified form of the Senate amendment, which increases the interest rate on tax shelter underpayments to 120 percent of the otherwise applicable rate and modifies the definition of tax shelter in the Senate amendment.

The increased interest rate applies to an underpayment of tax attributable to one or more tax motivated transactions, if the amount of the underpayment exceeds $1,000. A tax motivated transaction is (1) any valuation overstatement of 150 percent or more, (2) any activity with respect to which a loss or an investment tax credit is disallowed by reason of the at-risk rules, (3) any tax straddle, or (4) any use of any accounting method specified in regulations as potentially resulting in a substantial distortion of income. The conferees anticipate that the following deductions and other claimed tax benefits might be considered by the Secretary to arise from accounting methods that may result in a substantial distortion of income:

(1) Deductions disallowed under section 464, relating to farming syndicates;

(2) In the case of a cash method taxpayer, interest deductions disallowed under section 461(g), relating to prepaid interest;

(3) Interest deductions disallowed because they exceed the effective rate of interest, such as under the rule of 78's;

(4) Improper deductions for syndication expenditures;

(5) Deductions disallowed under section 267(a)(2), relating to transactions between related taxpayers with different accounting methods;

(6) Failure to take into account deferred rental payments in accordance with the principles section 467, as added by this Act; and

(7) Deductions disallowed under the principles of section 461(i), as added by this Act, relating to prepayments of expenses by tax shelters.

In addition, the Secretary is given regulatory authority to specify other types of transactions that will be treated as tax motivated. He shall take into account the ratio of tax benefits to cash invested, the method of promoting this type of transaction, as well as other factors he considers relevant.

The provision is effective with respect to interest accruing after December 31, 1984, regardless of the date the return was filed.

The conferees note that a number of the provisions of recent legislation have been designed, in whole or in part, to deal with the Tax Court backlog. Examples of these provisions are the increased damages assessable for instituting or maintaining Tax Court proceedings primarily for delay or that are frivolous or groundless (sec. 6673), the adjustment of interest rates (sec. 6621), the valuation overstatement and substantial understatement penalties (secs. 6659 and 6661), and the tax straddle rules (secs. 1092 and 1256). Additionally, the conference agreement did not follow the provision of the House bill permitting certified public accountants and enrolled agents to represent a taxpayer in a small tax case because the Tax Court stated that permitting this would jeopardize the integrity of the small tax case process, which is working well.

The conferees believe that, with this amendment, the Congress has given the Tax Court sufficient tools to manage its docket, and that the responsibility for effectively managing that docket and reducing the backlog now lies with the Tax Court. The positive response that the Court has made to several recent GAO recommendations is encouraging and the conferees expect the Court to implement swiftly these and other appropriate management initiatives. The conferees also note favorably the steps the Court has begun to take in consolidating similar tax shelter cases and dispensing with lengthy opinions in routine tax protester cases. The Court should take further action in these two areas, as well as to assert, without hesitancy in appropriate instances, the penalties that the Congress has provided.

The Internal Revenue Service also has significant responsibilities in reducing the Tax Court backlog. The Service's settlement policy should be fair and flexible, and only appropriate cases should be litigated. Although in the recent past the Service has offered to settle many tax shelter cases by permitting taxpayers to deduct out of pocket expenses, the Service no longer routinely offers this as a settlement. This is a constructive change in policy, in that a taxpayer should not expect to be able to deduct out of pocket expenses regardless of the circumstances of his case. The Service should assert, without hesitancy in appropriate circumstances, the penalties that the Congress has provided. In particular, the negligence and fraud penalties are not currently being applied in a large

number of cases where their application is fully justified. The conferees note with approval the steps the Service has recently taken to eliminate the backlog in the Appeals Division.

### 2. Information reporting provisions

#### a. Returns relating to mortgage interest received in a trade or business

*Present law*

There is no requirement that recipients of mortgage interest report interest received to the Internal Revenue Service.

*House bill*

A person who, in the course of his trade or business, or a governmental agency that receives interest on obligations secured by real property must report to the Internal Revenue Service payments from a payor aggregating $600 or more and provide a copy of that report to the payor. Present law penalties for other failures to file information returns and furnish statements apply (generally, $50 per failure except in cases of intentional disregard). The provision is effective with respect to amounts received after December 31, 1984, except that no penalty is imposed on persons reporting for failure to furnish identification numbers with respect to an obligation in existence on December 31, 1984, for amounts received before January 1, 1986.

*Senate amendment*

The Senate amendment generally is the same as the House bill, except that the reporting threshold is $2,300 and the provision is effective with respect to amounts received after December 31, 1984, and except for technical differences.

*Conference agreement*

The conference agreement follows the House bill, with modifications. Thus, recipients of $600 or more of mortgage interest with respect to any obligation secured by real property will be required to report that interest to the Internal Revenue Service. The conferees choose the lower reporting threshold of the House bill because more complete reporting reduces the likelihood that the Internal Revenue Service will have to contact a taxpayer concerning claimed deductions.

At the same time, the agreement seeks to eliminate any unnecessary burden to interest recipients. The agreement provides that reporting is required only on payments received from an individual. Under the agreement, the $600 aggregate annual reporting threshold will apply on an obligation by obligation basis. Interest received on two different obligations secured by the same real property does not have to be aggregated into one report; thus, interest on each obligation may be reported separately. The agreement also provides that the Secretary may provide exceptions from this reporting requirement where such exceptions are consistent with effective reporting of mortgage interest and the matching of these reports with a specific line on the tax return. Therefore, the Secre-

**TAX REFORM ACT OF 1986**

*P.L. 99–514, see page 100 Stat. 2085*

DATES OF CONSIDERATION AND PASSAGE

*House: December 17, 1985; September 25, 1986*
*Senate: June 24, September 27, 1986*

**House Report (Ways and Means Committee) No. 99–426, Dec. 7, 1985 [To accompany H.R. 3838]**

**Senate Report (Finance Committee) No. 99–313, May 29, 1986 [To accompany H.R. 3838]**

**House Conference Report No. 99–841, Sept. 18, 1986 [To accompany H.R. 3838]**

**Cong. Record Vol. 131 (1985)**
**Cong. Record Vol. 132 (1986)**

*Conference Report is set out below, and the Signing Statement of the President follows.*

**HOUSE CONFERENCE REPORT NO. 99–841**

[4075]

# JOINT EXPLANATORY STATEMENT OF THE COMMITTEE OF CONFERENCE

The managers on the part of the House and the Senate at the conference on the disagreeing votes of the two Houses on the amendment of the Senate to the bill (H.R. 3838) to reform the internal revenue laws of the United States, submit the following joint statement to the House and the Senate in explanation of the effect of the action agreed upon by the managers and recommended in the accompanying conference report:

The Senate amendment struck out all of the House bill after the enacting clause and inserted a substitute text.

The House recedes from its disagreement to the amendment of the Senate with an amendment which is a substitute for the House bill and the Senate amendment. The differences between the House bill, the Senate amendment, and the substitute agreed to in conference are noted below, except for clerical corrections, conforming changes made necessary for agreements reached by the conferees, and minor drafting and clarifying changes.

transactions from 120 percent to 200 percent of the generally applicable interest rate. The provision is effective for interest accruing after December 31, 1986.

### *Conference Agreement*

The conference agreement does not include the provision of the Senate amendment increasing the rate of interest on tax-motivated transactions. The conference agreement instead makes a technical correction to the present-law provision that increases the rate of interest for tax-motivated transactions.

The Tax Court has recently held (*DeMartino v. Comm'r.*, T. C. Memo 1986-263 (June 30, 1986); *Forseth v. Comm'r.*, T. C. Memo 1985-279 (June 11, 1985)) that sham transactions that would be subject to this special interest rate were they not shams are not subject to this special interest rate because they are shams. The conferees view it as anomalous that a genuine transaction (lacking the proper profit motive) would be subject to a higher interest rate, while a sham transaction, which is significantly more abusive, would escape the higher interest rate simply because it is a sham. Accordingly, the conference agreement, consistent with the legislative intent in originally enacting section 6621(d) in 1984, explicitly adds sham or fraudulent transactions to the list of transactions subject to this higher interest rate. The intent of the conferees is to reverse the holding of these Tax Court cases on this issue.

This clarification of present law applies to interest accruing after December 31, 1984, which is the date this higher interest rate took effect. This clarification does not apply, however, to any underpayment with respect to which there was a final court decision (either through exhausting all appeals rights or the lapsing of the time period within which an appeal must be pursued) before the date of enactment of this Act.

## OMNIBUS BUDGET RECONCILIATION ACT OF 1989

*P.L. 101-239, see page 103 Stat. 2106*

DATES OF CONSIDERATION AND PASSAGE

*House: October 5, November 21, 1989*
*Senate: October 13, November 21, 1989*

**House Report (Budget Committee) No. 101-247, Sept. 20, 1989**
**[To accompany H.R. 3299]**

**House Conference Report No. 101-386, Nov. 21, 1989**
**[To accompany H.R. 3299]**
**Cong. Record Vol. 135 (1989)**

*No Senate Report was submitted with this legislation. The House Report (this page) is set out below and the House Conference Report (page 3018) and the President's Signing Statement (page 3555) follow.*

## HOUSE REPORT NO. 101-247

[page III]

### CONTENTS


| | Page |
|---|---|
| Statement of the Committee on the Budget | 1 |
| Reporting of the Bill | 1 |
| Title I—Committee on Agriculture: | |
| Letter of Transmittal | 3 |
| Report to Accompany Recommendations from the Committee on Agriculture | 3 |
| CBO Cost Estimates | 23 |
| Title II—Committee on Banking, Finance, and Urban Affairs: | |
| Letter of Transmittal | 39 |
| Report to Accompany Recommendations from the Committee on Banking, Finance, and Urban Affairs | 39 |
| CBO Cost Estimates | 43 |
| Title III—Committee on Education and Labor: | |
| Letter of Transmittal | 45 |
| Report to Accompany Recommendations from the Committee on Education and Labor | 45 |
| CBO Cost Estimates | 132 |
| Title IV—Committee on Energy and Commerce: | |
| Letter of Transmittal | 327 |
| Report to Accompany Recommendations from the Committee on Energy and Commerce | 327 |
| CBO Cost Estimates | 334 |
| Title V—Committee on Government Operations: | |
| Letter of Transmittal | 845 |
| Report to Accompany Recommendations from the Committee on Government Operations | 845 |
| CBO Cost Estimates | 845 |
| Title VI—Committee on Interior and Insular Affairs: | |
| Letter of Transmittal | 857 |
| Report to Accompany Recommendations from the Committee on Interior and Insular Affairs | 857 |
| CBO Cost Estimates | 858 |

received initially by the SSA, which IRS uses to revise its records, and (4) how taxpayers can best inform the IRS of a name or address change, prior to waiting until the next tax return filing date. A report on the study, together with any recommendations, is to be submitted to the tax-writing committees of the Congress by June 1, 1990. In the interim, the IRS should establish a procedure and contact point within the IRS where taxpayers themselves (or information return filers who obtain a exception from the taxpayer) can obtain a listing of the names that the IRS recognizes as valid when matching information returns with a particular taxpayer identification number.

*Study of service bureaus*

The bill requires the General Accounting Office, in consultation with the Treasury Department, to conduct a study of whether service bureaus engaged in the business of transmitting information returns or other documents to the IRS on behalf of other persons should be subject to registration or other regulation. A report on the study, together with any recommendations, is to be submitted to the tax-writing committees of the Congress not later than July 1, 1990.

The committee is concerned that some service bureaus may not be effectively communicating with their customers as to difficulties the IRS has encountered with the data the service bureau has transmitted on behalf of payors. This failure of communication may increase the difficulty that both the actual payor and the IRS have in resolving problems with the transmitted data. In addition, it may be difficult for payors to assess the relative competence of individual service bureaus, in that the IRS cannot legally state whether or not it has encountered problems with a particular service bureau. The GAO study should consider problems such as these.

### *Effective Dates*

The information reporting provisions of the bill generally apply to information returns and payee statements the due date for which (determined without regard to extensions) is after December 31, 1989.

**2. Accuracy penalties (sec. 11721 of the bill and new secs. 6662-6665 of the Code and secs. 6621(c), 6653, 6659, 6659A, 6660, and 6661 of the Code)**

### *Present Law*

*Negligence penalty*

If any part of an underpayment of tax required to be shown on a return is due to negligence or disregard of rules or regulations, a penalty may be imposed equal to 5 percent of the total amount of the underpayment. An underpayment of tax that is attributable to a failure to include on an income tax return an amount shown on an information return is treated as subject to the negligence penalty absent clear and convincing evidence to the contrary.

### *Fraud penalty*

If any part of an underpayment of tax required to be shown on a return is due to fraud, a penalty may be imposed equal to 75 percent of the portion of the underpayment that is attributable to fraud.

### *Substantial understatement penalty*

If the correct income tax liability of a taxpayer for a taxable year exceeds that reported by the taxpayer by the greater of 10 percent of the correct tax or $5,000 ($10,000 in the case of most corporations), then a substantial understatement exists and a penalty may be imposed equal to 25 percent of the underpayment of tax attributable to the understatement. In determining whether a substantial understatement exists, the amount of the understatement is reduced by any portion attributable to an item if (1) the treatment of the item on the return is or was supported by substantial authority, or (2) facts relevant to the tax treatment of the item were adequately disclosed on the return or on a statement attached to the return. Special rules apply to tax shelters.

### *Valuation penalties*

If an individual, personal service corporation, or closely held corporation underpays income tax for any taxable year by $1,000 or more as a result of a valuation overstatement, then a penalty may be imposed with respect to the amount of the underpayment that is attributable to the valuation overstatement. A valuation overstatement exists if the valuation or adjusted basis of any property claimed on a return is 150 percent or more of the correct value or adjusted basis. The amount of the penalty that may be imposed increases from 10 to 20 to 30 percent of the underpayment attributable to the valuation overstatement as the percentage by which the valuation claimed exceeds the correct valuation increases. Similar penalties may be imposed with respect to (1) an underpayment of income tax that is attributable to an overstatement of pension liabilities and (2) an underpayment of estate or gift tax that is attributable to a valuation understatement.

## *Reasons for Change*

The committee believes that the number of different penalties that relate to accuracy of a tax return, as well as the potential for overlapping among many of these penalties, causes confusion among taxpayers and leads to difficulties in administering these penalties by the IRS. Consequently, the committee has revised these penalties and consolidated them. The committee believes that its changes will significantly improve the fairness, comprehensibility, and administrability of these penalties.

## *Explanation of Provisions*

### *Overview*

The bill consolidates into one part of the Internal Revenue Code all of the generally applicable penalties relating to the accuracy of tax returns. The penalties that are consolidated are the negligence

penalty, the substantial understatement penalty, and the valuation penalties. These consolidated penalties are also coordinated with the fraud penalty. The bill repeals the present-law versions of these penalties. The bill reorganizes the accuracy penalties into a new structure that operates to eliminate any stacking of the penalties. The bill is effective for returns the due date for which is after December 31, 1989.

*Accuracy-related penalty*

The accuracy-related penalty, which is imposed at a rate of 20 percent, applies to the portion of any underpayment that is attributable to (1) negligence, (2) any substantial understatement of income tax, (3) any substantial valuation overstatement, (4) any substantial overstatement of pension liabilities, or (5) any substantial estate or gift tax valuation understatement.

*(1) Negligence*

If an underpayment of tax is attributable to negligence, the negligence penalty is to apply only to the portion of the underpayment that is attributable to negligence rather than, as under present law, to the entire underpayment of tax. This is a significant change from present law. Under present law, if any portion of an underpayment is attributable to negligence, the negligence penalty applies to the entire underpayment (both the portion attributable to negligence and the portion not attributable to negligence). Thus, under present law, a taxpayer who has an underpayment, only a small portion of which was attributable to negligence, is subject to the same penalty as a taxpayer with the same underpayment, all of which is attributable to negligence, even though the behavior of the first taxpayer is arguably less culpable than the behavior of the second taxpayer. The bill rectifies this inequity by applying the negligence penalty only to the portion of the underpayment attributable to negligence.

Negligence includes any careless, reckless, or intentional disregard of rules or regulations, as well as any failure to make a reasonable attempt to comply with the provisions of the Code. In addition, the bill repeals the present-law presumption under which an underpayment is treated as attributable to negligence if the underpayment is due to a failure to include on an income tax return an amount shown on an information return. As a practical matter, even in the absence of a statutory presumption, evidence of such a failure is still strong evidence of negligence.

*(2) Substantial understatement of income tax*

The accuracy-related penalty that applies to the portion of an underpayment that is attributable to a substantial understatement of income tax is the same as the substantial understatement penalty provided under present law with three principal modifications. First, the rate is lowered to 20 percent. Second, the committee expands the list of authorities upon which taxpayers may rely (currently contained in Treasury regulations) to include proposed regulations, private letter rulings, technical advice memoranda, actions on decisions, general counsel memoranda, information or press releases, notices, and any other similar documents published by the

[2859]

IRS in the *Internal Revenue Bulletin.*[79] In addition, the list of authorities is to include General Explanations of tax legislation prepared by the Joint Committee on Taxation (the "Blue Book"). Third, the bill requires the IRS to publish not less frequently than annually a list of positions for which the IRS believes there is no substantial authority and which affect a significant number of taxpayers. The purpose of this list is to assist taxpayers in determining whether a position should be disclosed in order to avoid the substantial understatement penalty. Thus, if a taxpayer takes a position that is enumerated on this list, the taxpayer could choose to disclose that position to avoid imposition of the substantial understatement component of the accuracy-related penalty. However, inclusion of a position on this list is not conclusive as to whether or not substantial authority exists with respect to that position. If, however, there is litigation as to whether there is substantial authority, and the court concludes that the IRS is correct in the belief that there is not substantial authority for the position, then this penalty would apply. The committee believes that this list will be useful to taxpayers, in that it will assist taxpayers in determining whether substantial authority exists with respect to a particular issue on the list. Although the list is not exclusive, the committee intends that the IRS make the list as comprehensive as practical, which will make it more useful to taxpayers and their advisors. The committee intends that there should be no inference that substantial authority exists with respect to positions that are not included on this list. Disclosure of a position for purposes of this penalty does not necessarily prevent imposition of the negligence penalty. Thus, for example, if a taxpayer discloses a frivolous position, the imposition of the negligence penalty could be appropriate.

*(3) Substantial valuation overstatement*

The penalty that is to apply to the portion of an underpayment that is attributable to a substantial valuation overstatement is generally the same as the valuation overstatement penalty provided under present law with five principal modifications. First, the bill extends the penalty to all taxpayers. The committee believes that this modification increases the fairness of this component of the accuracy-related penalty, in that the penalty is imposed upon proscribed behavior, regardless of who engages in it. Second, a substantial valuation overstatement exists if the value or adjusted basis of any property claimed on a return is 200 percent or more of the correct value or adjusted basis. Third, the penalty is to apply only if the amount of the underpayment attributable to a valuation overstatement exceeds $5,000 ($10,000 in the case of most corporations). This increases five-fold the threshold below which the penalty does not apply to individuals. Fourth, the amount of the penalty

[79] The committee's intent is to broaden the list of authorities upon which taxpayers may rely. The committee would, however, permit the Treasury to issue regulations providing that specific items on the committee's list of additional authorities (except for proposed regulations not yet superceded or "Blue Books") that were issued prior to the date of enactment of this bill may not be considered to be substantial authority. For example, Treasury regulations could provide that private letter rulings issued prior to the date they began to be publicly disseminated are not substantial authority. Any such limitation should, however, be as narrow as practicable, in order to further the committee's general intent that the list of authorities on which taxpayers may rely should be broadened.

for a substantial valuation overstatement is 20 percent of the amount of the underpayment if the value or adjusted basis claimed is 200 percent or more but less than 400 percent of the correct value or adjusted basis. Fifth, as explained below, the bill provides that the rate of this penalty is doubled if the value or adjusted basis claimed is 400 percent or more of the correct value or adjusted basis. The bill retains the special rules in present law that apply to charitable deduction property. The committee believes that raising both the threshold and the minimum percentage will eliminate from the penalty's scope a number of instances of good-faith valuation disputes that may be subject to penalty under present law. As under present law, valuation misstatements that do not fall within the scope of this or the following elements of the accuracy-related penalty may still be subject to penalty if they are attributable to negligence or fraud or give rise to a substantial understatement of income tax.

*(4) Substantial overstatement of pension liabilities*

The accuracy-related penalty also applies to substantial overstatements of pension liabilities. This penalty is derived from the present-law penalty in section 6659A. The committee has, however, modified the present-law penalty by providing that the taxpayer is subject to this component of the accuracy-related penalty only if the actuarial determination of pension liabilities (taken into account for purposes of computing the deduction under paragraph (1) or (2) of section 404(a)) is 200 percent or more of the amount determined to be correct (under present law, the penalty applies to claims 150 percent or more in excess of the amount determined to be correct). As under present law, this penalty applies only if the underpayment attributable to the valuation overstatement exceeds $1,000.

*(5) Substantial estate or gift tax valuation understatement*

The accuracy-related penalty also applies to substantial estate or gift tax valuation understatements. This penalty is derived from the present-law penalty in section 6660. The committee has, however, modified the present-law penalty by providing that the taxpayer is subject to this penalty only if the value of any property claimed on an estate or gift tax return is 50 percent or less of the amount determined to be correct. (Under present law, the penalty applies to claims that are 66 2/3 percent or less of the amount determined to be correct.) In addition, the committee has modified the present-law penalty by increasing five-fold the threshold below which the penalty does not apply, from $1,000 to $5,000. The committee believes that raising both the threshold and the minimum percentage will eliminate from the penalty's scope a number of instances of good-faith valuation disputes that may be subject to penalty under present law.

*(6) Gross valuation misstatements*

The bill provides that the rate of the general accuracy penalty is to be doubled (to 40 percent) in the case of gross valuation misstatements. There are three types of gross valuation misstatements. The first is the same as the substantial valuation overstatement compo-

nent of the accuracy-related penalty, except that the doubling is to apply only to valuation overstatements claimed on a return that are 400 percent or more of the amount determined to be the correct amount. The second is the same as the substantial overstatement of pension liabilities component of the accuracy-related penalty, except that the doubling is to apply only to overstatements of pension liabilities that are 400 percent or more of the amount determined to be the correct amount. The third is the same as the substantial estate or gift tax valuation understatement component of the accuracy-related penalty, except that the doubling is to apply only to valuations claimed on the estate or gift tax return that are 25 percent or less of the amount determined to be the correct amount.

***Fraud penalty***

The fraud penalty, which is imposed at a rate of 75 percent, applies to the portion of any underpayment that is attributable to fraud.

The committee has retained the special rule in present law that determines the portion of the understatement that is attributable to fraud. The bill provides that, if the IRS establishes that any portion of an underpayment is attributable to fraud, the entire underpayment is treated as attributable to fraud, except with respect to any item that the taxpayer establishes is not attributable to fraud. The committee has clarified the taxpayer's burden of proof in establishing the items not attributable to fraud (present law is unclear on this issue). The committee has provided that the taxpayer must establish the items not attributable to fraud by a preponderance of the evidence. The committee has not altered the present-law burden of proof imposed on the IRS in establishing fraud initially; the IRS must continue to meet its burden of proof by clear and convincing evidence. The committee believes that it is appropriate that the burden imposed on the IRS be higher than the burden imposed on a taxpayer in these circumstances.

Under the bill, the accuracy-related penalty is not to apply to any portion of an underpayment on which the fraud penalty is imposed. (Under present law, the fraud penalty is coordinated in this manner with the negligence penalty, but not with the other components of the accuracy-related penalty.) However, the accuracy-related penalty may be applied to any portion of the underpayment that is not attributable to fraud.

***Definitions and special rules***

The bill provides special rules that apply to each of the penalties imposed under the new structure. First, the bill provides standardized exception criteria for all of these accuracy-related penalties. The bill provides that no penalty is to be imposed if it is shown that there was reasonable cause for an underpayment and the taxpayer acted in good faith. The enactment of this standardized exception criterion is designed to permit the courts to review the assertion of penalties under the same standards that apply in reviewing additional tax that the Internal Revenue Service asserts is due. By applying this unified exception criterion to all the accuracy-related penalties, the committee believes that taxpayers will more

easily understand the standard of behavior that is required. The committee also believes that this unified exception criterion will simplify the administration of these penalties by the IRS.

The committee is concerned that the present-law accuracy-related penalties (particularly the penalty for substantial understatements of tax liability) have been determined too routinely and automatically by the IRS. The committee expects that enactment of standardized exception criterion will lead the IRS to consider fully whether imposition of these penalties is appropriate before determining these penalties.

In addition, the committee has designed this standardized exception criterion to provide greater scope for judicial review of IRS determinations of these penalties. Under the waiver provision contained in present law, the Tax Court has held that it can overturn an IRS determination of the substantial understatement penalty on reasonable cause and good faith grounds only if the Tax Court finds that the IRS abused its discretion in asserting the penalty. The committee believes that it is appropriate for the courts to review the determination of the accuracy-related penalties by the same general standard applicable to their review of the additional taxes that the IRS determines are owed. The committee believes that providing greater scope for judicial review of IRS determinations of these penalties will lead to greater fairness of the penalty structure and minimize inappropriate determinations of these penalties.

The committee believes that the application of standardized exception criteria to the negligence component of the accuracy-related penalty will result in several consequences that are beneficial to taxpayers. First, the complete, item-specific disclosure of a non-frivolous position on a tax return may generally be considered to permit an exception from the negligence penalty insofar as such disclosure would tend to demonstrate that there was no intentional disregard of rules or regulations. Disclosure must be full and substantive, parallel to the disclosure required under the substantial understatement component of the accuracy-related penalty; completing and filling in a tax form is by itself insufficient disclosure for this purpose. In addition, the disclosure must be clearly identified as being made to avoid the imposition of the accuracy-related penalty. Imposition of the negligence component of the accuracy-related penalty would not be eligible for exception due to disclosure where the taxpayer fails to keep proper books and records or to substantiate items properly. Second, the application of standardized exception criteria to the negligence component of the accuracy-related penalty may also permit a taxpayer to avoid imposition of that penalty where the taxpayer makes a good-faith challenge to the validity of an IRS regulation, if the taxpayer discloses (in the manner just described) that the taxpayer is taking the position and makes specific reference to the regulation being challenged. As under present law, frivolous challenges to IRS regulations would be subject to penalty. The committee intends that the terms "reasonable cause" and "good faith" be interpreted under the bill as those terms are interpreted under present law.

Second, the bill provides that an accuracy-related or fraud penalty is to be imposed only if a return has been filed. This is intended

to improve the coordination between the accuracy-related penalties and the failure to file penalties. Under present law, the courts have dealt with a number of difficult interpretative issues on the relationship between the penalty for failure to file a tax return and the accuracy-related penalties. The committee determined that it would clarify the law if the penalty for failure to file were entirely separate and distinct from the accuracy-related penalties. (The bill also provides for an increase in the failure to file penalty where that failure is due to fraudulent failure to file.)

Third, the bill provides a standard definition of underpayment for all of the accuracy-related penalties. This standard definition is intended to simplify and coordinate the definitions in present law; it is not intended to be substantively different from present law.

The bill retains the general rule of present law that interest on these penalties commences with the date the return was required to be filed. The committee believes this rule is appropriate because the behavior being penalized is reflected on the tax return, so that imposition of interest from this date will reduce the incentives of taxpayers and their advisors to "play the audit lottery."

*Repeal of present-law penalties*

The bill repeals the present-law penalties for negligence and fraud,[80] substantial understatements of liability,[81] valuation overstatements,[82] and valuation understatements for purposes of estate or gift taxes [83] . The bill also repeals the special negligence rules applicable to straddles [84] and to amounts shown on information returns.[85] The committee believes that, by repealing the special rule applicable to information returns, the burdens on taxpayers will be reduced. Finally, the bill repeals the higher interest rate that applies to substantial underpayments that are attributable to tax-motivated transactions.[86]

## *Effective Date*

The accuracy provisions of the bill generally apply to returns the due date for which (determined without regard to extensions) is after December 31, 1989.

### 3. Preparer, promoter, and protester penalties (secs. 11731-11739 of the bill and new sec. 6673 of the Code and secs. 6672, 6694, 6695, 6700, 6701, 6702, 7216, and 7407 of the Code)

## *Present Law*

*Return preparer penalties*

An income tax return preparer is subject to a penalty of $100 if any part of an understatement of tax on a return or claim for refund is due to the return preparer's negligent or intentional dis-

[80] Present-law section 6653. The portion of 6653 applicable to stamp taxes is retained.
[81] Present-law sec. 6661.
[82] Present-law secs. 6659 and 6659A.
[83] Present-law sec. 6660.
[84] Present-law sec. 6653(f).
[85] Present-law sec. 6653(g).
[86] Present-law sec. 6621(c).

[2864]

135 Cong. Rec. S13893-7, 1989 WL 186980 (Oct. 24, 1989)

Mr. PRYOR.

Mr. President, I stand today to introduce the Internal Revenue Code Penalty Reform Act. In 1975 the Administrative Conference of the United States issued a report on the 64 penalties of the Internal Revenue Code. The report characterized the penalty structure of that day as "mind numbing." Fourteen years have gone by, and that mind numbing array of 64 penalties has now grown to over 150. If it was mind numbing in 1975, it has become mind boggling in 1989. The present structure is a morass of inconsistency and irrationality that often discourages rather than encourages compliance in our tax system.

Under this system, a hapless taxpayer can find himself, or herself, confronting the Internal Revenue Code over a tax deficiency, where the penalties and interest have been piled on to the extent that they are twice the amount of tax in dispute. This sort of leverage has a highly negative effect over the tax process.

. . . .

A lot of very thoughtful people have spent a good deal of time thinking about this problem over the last 2 years. After 2 years of study and debate the various groups, task forces, and committees have developed a surprisingly similar philosophy on Internal Revenue Code penalty reform. This philosophy can be summarized in a number of short, simple rules for reform:

The amount of the penalty should be proportional to the culpability of the taxpayer. Under the present system, a taxpayer who is 1 day late pays the same penalty as a taxpayer who decides to never deposit payroll taxes.

The law should not allow the Internal Revenue Service to stack penalties for the same act of noncompliance. The IRS can now pick and choose among a host of penalties, or simply pile all available penalties on a taxpayer hoping to persuade him to negotiate.

Penalties should not discourage compliance with the tax laws. If a penalty is the same if a taxpayer is a little bit late or a lot late, taxpayers will always choose to be a lot late.

Whenever possible, waiver requirements should be standardized. The Internal Revenue Code presently contains many different standards for waiving penalties. The result is taxpayer confusion.

Similarly situated taxpayers should be treated similarly. Taxpayers are often confused to find they owe different penalty amounts for what are basically the same act of noncompliance.

[135 Cong. Rec. S13893-7, (Oct. 24, 1989) (Statement of Senator Pryor), continued]

Overlapping or redundant penalties should be eliminated. Rather than making changes to existing penalties that might not be working correctly, Congress has too often simply created an additional, redundant penalty for the same act.

Although a particular penalty may be correct in theory, if the Internal Revenue Service is unable to administer the penalty, it should not be in the Internal Revenue Code.

Penalties should be written clearly enough for taxpayers to understand the consequences of noncompliance. Because penalties have evolved over time, they are often difficult to understand. As a consequence of this vagueness, it is often difficult for taxpayers to know exactly what is the proper behavior.

Penalties should be tough enough to discourage noncompliance and to encourage noncompliant taxpayers to correct their actions.

. . . .

Federal Rules of Appellate Procedure

Rule 32.1

> . . . .
>
> (b) Copies required. If a party cites a federal judicial opinion, order, judgment, or other written disposition that is not available in a publicly accessible electronic database, the party must file and serve a copy of that opinion, order, judgment, or disposition with the brief or other paper in which it is cited.

Rules of the U.S. Court of Appeals for the Sixth Circuit

Rule 28. Briefs

> . . . .
>
> (g) Citation of Unpublished Decisions. Citation of unpublished opinions is permitted. FRAP 32.1(b) applies to all such citations.
>
> . . . .

**APPENDIX B**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 05-1189 T
(Judge Charles F. Lettow)

---

THOMAS H. McGANN and EVELYN G. McGANN,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

---

DECLARATION OF MICHAEL FAUST

---

I, Michael Faust, am a revenue agent employed by the Internal Revenue Service (IRS). I have been a revenue agent since 1983. I make this declaration of my personal knowledge.

1. After June 13, 2002, when the Tax Court entered its final order concerning Drake Oil Technology Partners' (Drake Oil's) 1983 taxable year in *Vulcan Oil Technology Partners et al. v. Commissioner*, No 21530-87, I was assigned to apply the decision to the McWal Company.

2. The IRS applied the Tax Court's decision to Drake Oil by reversing its 1983 deductions for interest expense and license fees (a total adjustment of $21,556,521). It then reduced that adjustment by subtracting an administrative adjustment in the taxpayers' favor ($1,867,438); it also made several smaller adjustments, which are set out in the Form 4605-A issued to Drake Oil, a copy of which is attached to this document as Exhibit 1. The net adjustment was $19,689,083.00. Exhibit 1 also records the IRS's determination that interest under Code § 6621(c) would apply to resulting underpayments.

3. The attached Exhibit 1 is a true copy of a Form 4605-A that records the adjustments made to Drake Oil's partnership items in accord with the Tax Court's decision. Despite the date at the bottom of its first page (02-Jul-01), which seems to be a typographical error, the form was completed soon after the Tax Court's decision, as the notation at the top of each page demonstrates. It was made by a person with knowledge of the decision and of the IRS's procedures; it was generated and kept in the course of the IRS's regular operations; and it is the IRS's regular practice to make and keep such records. I was the custodian of this document during my involvement with the tax accounts of the Drake Oil partners.

4. The IRS divided the $19,689,083.00 adjustment to Drake Oil's ordinary income among its partners and attributed .27% of the amount to the McWal Company, a total of $53,161.00. The attached Exhibit 2 is an excerpt from a Form 886-Z, which shows how the Drake Oil adjustments were divided among the partners according to their share in the partnership's profits.

5. When I applied the $53,161.00 share of the Drake Oil adjustment to the 1983 partnership return of the McWal Company, I assumed that McWal had a tax benefit of only $51,778 from the $53,187.00 loss reported on the original 1983 Form K-1 it received from Drake Oil. I therefore reduced the $53,187 adjustment determined by the Tax Court by $1,409 and adjusted the McWal Company's ordinary-income distribution from Drake Oil by $51,778. See the Form 4605-A issued to the McWal Company, a true copy of which is attached to this document as Exhibit 3. I completed, signed, and dated this form on December 6, 2002, and I wrote the following note in the "Remarks" section: "120% interest applies to investors."

6. As Exhibit 3 shows, the $51,778 adjustment eliminated the ($29,393) loss that McWal had originally passed through to its partners and resulted in positive ordinary income of $22,385. I divided that income between the partners of the McWal Company as follows: George C. & Natalie Walueff, $11,193; and Thomas Herbert & Evelyn McGann, $11,192. See the Form 886-Z that I completed, a true copy of which is attached to this declaration as Exhibit 4. On the Form 886-Z, I noted: "IRC sec. 6621(c) 120% int. applies" to the adjustment to be made to the McGanns' 1983 tax account. The notation reflects the IRS's decision to apply § 6621(c) to the entire substantial underpayment that might result from the changes to the individual partners' shares of the McWal Company's 1983 tax attributes.

I declare under penalty of perjury that the foregoing is true and correct. Executed on November 26, 2007.

MICHAEL FAUST

DECISION ENTERED 6-13-2002



| Form 4605-A | Department of the Treasury - Internal Revenue Service<br>Examination Changes - Partnerships, Fiduciaries, Small Business Corporations,<br>Domestic International Sales Corporations | Docket No.<br>21530-87 |
|---|---|---|

| Name and Address | Employer Identification No.<br>84-0856853 | | Form No.<br>1065 |
|---|---|---|---|
| DRAKE OIL TECHNOLOGY | Person Exam Changes Were Discussed With | Name: | |
| | | Title | |

| 1. Adjustments to ordinary income. | Year: 1983 | | |
|---|---|---|---|
| a. Interest Expense | 3,401,521.00 | | |
| b. Other Deductions - License Fee | 18,155,000.00 | | |
| c. Administrative Adjustment | (1,867,438.00) | | |
| d. | | | |
| e. | | | |
| f. | | | |
| g. | | | |
| 2. Total adjustments to ordinary income. | 19,689,083.00 | | |
| 3. Ordinary or taxable income as reported | (19,698,934.00) | | |
| 4. Corrected ordinary or taxable income | (9,851.00) | | |
| 5. Other adjustments. | | | |
| a. Net Earnings (Loss) from Self-employment | | | |
| (1) Adjustment | 9,269.00 | | |
| (2) As reported | (7,720.00) | | |
| (3) Corrected | 1,549.00 | | |
| b. Tax Preference Item:<br>Net Investment Income (Loss) | | | |
| (1) Adjustment | 0.00 | | |
| (2) As reported | (19,501,945.00) | | |
| (3) Corrected | (19,501,945.00) | | |

Remarks:

NOT FOR DISTRIBUTION TO TAXPAYER

NO PENALTIES ..... I.R.C. SECTION 6621(c) APPLIES

| Appeals Officer<br>Judy Helm | Appeals Office<br>Houston | EXHIBIT<br>tabbies<br>1 | Date<br>02-Jul-01 |
|---|---|---|---|

DECISION ENTERED 6-13-2002



| Form 4605-B | Department of the Treasury - Internal Revenue Service<br>Examination Changes - Partnerships, Fiduciaries, Small Business Corporations,<br>Domestic International Sales Corporations | | Docket No.<br>21530-87 |
|---|---|---|---|
| Name<br>DRAKE OIL TECHNOLOGY | Employer Identification No.<br>84-0856853 | | Form No.<br>1065 |
| 5. Other Adjustments continued from Form 4605-A | Year: 1983 | | |
| c. Unadjusted Basis in Qualified Recovery Property New - Other - Sec 48(q) Election | | | |
| 1. Adjustment | 0.00 | | |
| 2. As Reported | 3,272.00 | | |
| 3. Corrected | 3,272.00 | | |
| d. Unadjusted Basis in Qualified Recovery Property Used - Other - Sec 48(q) Election | | | |
| 1. Adjustment | 0.00 | | |
| 2. As Reported | 107,083.00 | | |
| 3. Corrected | 107,083.00 | | |
| e. Cost Depletion Oil and Gas | | | |
| 1. Adjustment | 0.00 | | |
| 2. As Reported | 152,496.00 | | |
| 3. Corrected | 152,496.00 | | |
| f. O & G Depletion to Extent of Basis | | | |
| 1. Adjustment | 0.00 | | |
| 2. As Reported | 152,496.00 | | |
| 3. Corrected | 152,496.00 | | |
| | | | |
| 1. Adjustment | | | |
| 2. As Reported | | | |
| 3. Corrected | | | |
| | | | |
| 1. Adjustment | | | |
| 2. As Reported | | | |
| 3. Corrected | | | |

Remarks:

NOT FOR DISTRIBUTION TO TAXPAYER

NO PENALTIES ..... I.R.C. SECTION 6621(c) APPLIES

| Appeals Officer | Appeals Office | Date |
|---|---|---|
| Judy Helm | Houston | 08-Jul-99 |

# Court Decision Entered 6-13-2002

| Name of Partnership or S. Corporation | TIN of Partnership | | Taxable Year | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| DRAKE OIL TECHNOLOGY PARTNERS | 840856853 | | 8312 | | | | | | |
| Partnership Totals | | | $ (9,851.00) | | $ 19,501,845.00 | $ 3,272.00 | $ 152,496.00 | $ 152,496.00 | $ 107,083.00 |
| Name and Address of each Partner | TIN of Partner | Percentage of Profit | Ordinary income(Loss) | S/E Net Earnings | Net Investment Income | Unadjusted Basis in Qualified Property New Other Sec. 48(q) Election | Cost Depletion Oil and Gas | Oil and Gas Depletion to extent of basis | Unadjusted Basis in Qualified Investment Used Other Sec. 48(q) Election |
| TROUP,SHERMAN L<br>1008 DEVONSHIRE CURVE<br>BLOOMINGTON , MN 55431 | [redacted] | 0.270% | $ (26.60) | $ 0.00 | $ 52,655.25 | $ 8.83 | $ 411.74 | $ 411.74 | $ 289.12 |
| GRAY,PAUL S<br>20140 GENEVA CT<br>FARIBAULT , MN 55021 | [redacted] | 0.270% | $ (26.60) | $ 0.00 | $ 52,655.25 | $ 8.83 | $ 411.74 | $ 411.74 | $ 289.12 |
| HUNT,DONALD W & CONSTANCE W<br>1500 HOLDRIDGE CIR<br>WAYZATA , MN 55391 | [redacted] | 0.270% | $ (26.60) | $ 0.00 | $ 52,655.25 | $ 8.83 | $ 411.74 | $ 411.74 | $ 289.12 |
| LYNCH,RICHARD & MARLYS<br>408 WAYCLIFFE DR N<br>WAYZATA , MN 55391 | [redacted] | 0.270% | $ (26.60) | $ 0.00 | $ 52,655.25 | $ 8.83 | $ 411.74 | $ 411.74 | $ 289.12 |
| CAWLEY,WILLIAM L & NORMA<br>1560 E ROSE<br>OWATONNA , MN 55060 | [redacted] | 0.270% | $ (26.60) | $ 0.00 | $ 52,655.25 | $ 8.83 | $ 411.74 | $ 411.74 | $ 289.12 |
| HARLAN,RICHARD D & PATRICIA H<br>2610 G N TUSTIN AVE<br>SANTA ANA , CA 92705 | [redacted] | 0.270% | $ (26.60) | $ 0.00 | $ 52,655.25 | $ 8.83 | $ 411.74 | $ 411.74 | $ 289.12 |
| JOHNSON,FLOYD L<br>PO BOX 610394<br>SAN JOSE , CA 95161 | [redacted] | 0.540% | $ (53.20) | $ 0.00 | $ 105,310.50 | $ 17.67 | $ 823.48 | $ 823.48 | $ 578.25 |
| WALUEFF,GEORGE C & T H MCGANN PTR<br>512 WESTWIND DR<br>BERWYN , PA 19312 | 510121089 | 0.270% | $ (26.60) | $ 0.00 | $ 52,655.25 | $ 8.83 | $ 411.74 | $ 411.74 | $ 289.12 |
| EASON,STANLEY D & CALLITA A<br>2550 OLD ORCHARD TRAIL<br>MARIETTA , GA 30062 | [redacted] | 0.810% | $ (79.79) | $ 0.00 | $ 157,965.75 | $ 26.50 | $ 1,235.22 | $ 1,235.22 | $ 867.37 |

NOT FOR DISTRIBUTION TO TAXPAYER **NO PENALTIES** assert §6621(c) interest

EXHIBIT 2
tabbies

Form 4605-A (Rev. September 1986)

Department of the Treasury—Internal Revenue Service

# Examination Changes - Partnerships, Fiduciaries, S Corporations, and Interest Charge Domestic International Sales Corporations

8312 51-0121089 051033223
GEORGE C WALUEFF & T H MCGANN PTR
MCWAL COMPANY 8712
PO BOX 467
WILM DE 19899

Employer Identification Number: 51-0121089

Form Number: 1065

Person Examination Changes Were Discussed With — Name: — Title:

| | Year: 8312 | Year: | Year: |
|---|---|---|---|
| 1. Adjustments to ordinary, distributable net, or taxable income. | | | |
| a. DRAKO OIL | | | |
| b. 84-0856813 | 51,778 | | |
| c. | | | |
| d. | | | |
| e. | | | |
| f. | | | |
| g. | | | |
| 2. Total adjustments to ordinary, distributable net, or taxable income. | 51,778 | 25886 | |
| 3. Ordinary, distributable net, or taxable income as reported. | (29,393) | 14696 | |
| 4. Corrected ordinary, distributable net, or taxable income. | 22385 | 11192 | |
| 5. Other adjustments. | | | |
| a. | | | |
| (1) Adjustment | | | |
| (2) As reported | | | |
| (3) Corrected | | | |
| b. | | | |
| (1) Adjustment | | | |
| (2) As reported | | | |
| (3) Corrected | | | |

EXHIBIT 3

Remarks
1 YR DATE 9-10-03
FINAL
120% INTEREST APPLIES TO INVESTOR

Examiner's Signature: [signature] District Office: BSC Date: 12-6-02

Cat. No. 41817X *U.S. GPO: 1990-262-184/04277 Form 4605-A (Rev. 9-86)

| Form 886-Z (C) Rev June 1989 | Department of the Treasury — Internal Revenue Service **Partners' or S Corporation Shareholders' Shares of Income** | Schedule Number |
|---|---|---|

| Name of Partnership or S Corporation | TIN of Partnership or S Corporation | Taxable Year Ended |
|---|---|---|
| George C. Walutff & T.H McGANN | 51-0121089 | 8312 |

| Name and Address of Each Partner or Shareholder (1) | TIN of Partner or Shareholder (2) | Percentage of Profit (3) | Ordinary Income (Loss) (4) |
|---|---|---|---|
| (a) George C. & Natalie WAlueff | [redacted] | 50.00 | 11,193 |
| (b) Thomas Herbert & Evelyn McGANN | [redacted] | 50.00 | 11,192 |
| (c) | | | |
| (d) | | | |
| (e) | | | |
| (f) | | | |
| Totals | | 100% | 22,385 |

**Continuation**

| | (5) | (6) | (7) | IRC Sec. 6621(c) 12/30 [illegible] (8) | (9) | (10) | (11) | (12) |
|---|---|---|---|---|---|---|---|---|
| (a) | $ | $ | $ | $ APPLIES | $ | $ | $ | $ |
| (b) | | | | APPLIES | | | | |
| (c) | | | | | | | | |
| (d) | | | | | | | | |
| (e) | | | | | | | | |
| (f) | | | | | | | | |
| Totals | | | | | | | | |

Form 886-Z (C) (Rev 6-89)

Page 1

EXHIBIT 4

tabbies

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 05-1189 T
(Judge Charles F. Lettow)

THOMAS H. McGANN and EVELYN G. McGANN,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

DECLARATION OF MARION S. FRIEDMAN

I, Marion S. Friedman, am a supervisory attorney employed by the Office of Chief Counsel, Internal Revenue Service (IRS) in its Houston, Texas office. Between 1980 and 1991, I was an attorney in the Houston office. Since 1991, I have been a supervisory attorney there. I make this declaration of my personal knowledge.

**My Responsibility for the Elektra Hemisphere Tax Shelter Project**

1. In 1983, I was first assigned to work on a matter which later came to be known as the Elektra Hemisphere Tax Shelter Project. Once the project was so organized and designated, I was named as one of the project attorneys.

2. As a project attorney, I had responsibility for many activities associated with managing the project. This included preparing for and participating in the related litigation.

3. Until late 1991, primary responsibility for the inventory of Elektra Hemisphere cases was with the then lead project attorney in Chief Counsel's National

Office. In late 1991, all project files and full responsibility for managing the inventory of Elektra Hemisphere tax shelter cases was transferred to the Houston office. From that point on, with one exception[1], I had lead supervisory responsibility for the full inventory of project cases (approximately 2000). In carrying out these responsibilities, I personally handled a number of matters.

**The Test Case and Show Cause Procedure in the Tax Court**

4. Cases relating to the Elektra Hemisphere Tax Shelter Project had been pending with the United States Tax Court since 1983. In January, 1986, the Court issued orders for pending cases in this group indicating that this group of cases constituted "multiple litigation" and scheduled a preliminary pre-trial hearing for April, 1986.

5. At, and following the April, 1986, hearing, the Court established certain procedures for administration and litigation of this group of cases. These procedures included the selection of cases to be tried as test cases for the entire group. The trial of the selected test cases ran in excess of 12 weeks, spread across the late Spring, Summer and Fall of 1990, and involved testimony from dozens of witnesses. I served as second-chair on the IRS trial team and was present throughout the trial.

---

1 In Fall of 1996, motions were filed in dockets 21530-87 and 16768-88, both captioned *Vulcan Oil Technology Partners, et al. v. Commissioner* (and a third case) by various movants seeking leave to file untimely notices of election to participate and to set aside certain settlement agreements or to compel the IRS to enter into consistent settlements. Among other things, these motions alleged that certain settlements had been obtained through a fraud on the court. An evidentiary hearing on these matters was held in May of 1997, in which I, and a project attorney that I then supervised, were called as witnesses. Due to the allegations and my role as a witness, I did not have supervisory responsibility for the handling of these motions. The Court's opinion issued March 5th, 1998, found no evidence of fraud or malfeasance and denied the motions. *See Vulcan Oil Technology Partners v. Commissioner*, 110 T.C. 153 (1998), *aff'd sub nom. Tucek v. Commissioner*, 198 F.3d 259 (10th Cir. 1999) and *aff'd sub nom. Drake Oil Tech. Partners v. Commissioner*, 211 F.3d 1277 (10th Cir. 2000), *cert. denied*, 531 U.S. 875, 121 S. Ct. 180 (2000).

6. The Tax Court's opinion in the trial of the Elektra Hemisphere test cases was issued in 1992 and is cited as *Krause v. Commissioner*, 99 T.C. 132 (1992), *aff'd sub nom. Hildebrand v. Commissioner*, 28 F.3d 1024 (10th Cir. 1994), *cert. denied*, 513 U.S. 1078 and 1079, 115 S. Ct. 726 (1995), and *aff'd sub nom. Hill v. Commissioner*, 204 F.3d 1214 (9th Cir. 2000).

7. Subsequently, trials or evidentiary hearings were held in three other Elektra Hemisphere cases in which taxpayers attempted to distinguish their partnership investments from the original test case partnerships, or raised new arguments. In each instance, the Tax Court's opinion was consistent with its prior opinion in *Krause*. *See Acierno v. Commissioner*, T.C. Memo. 1997-441, *aff'd*, 185 F.3d 861 (3rd Cir. 1999); *Karlsson v. Commissioner,* T.C. Memo. 1997-432; and *Vanderschraaf v. Commissioner*, T.C. Memo. 1997-306, *aff'd*, 211 F.3d 1276 (9th Cir. 2000) and *aff'd sub nom. Estate of Lawrenz*, 238 F.3d 429 (9th Cir. 2000). I attended all of these subsequent trials in a supervisory capacity and also participated directly as co-counsel in the *Acierno* and *Karlsson* hearings.

8. In the late 1990s, in an effort to dispose of the hundreds of Elektra Hemisphere cases then still pending, the Tax Court issued orders in most of the pending investor and TEFRA partnership cases for the petitioners to show cause why their case should not be controlled by *Krause*. (In *Acierno* the Tax Court discussed its use of show cause procedures when the disposition of a pending case could be affected by a previously decided test case. *See* T.C. Memo. 1997-441.)

9. I personally represented the IRS in dozens of these show cause proceedings, and I also supervised the two attorneys who appeared for the IRS in the

others.

10. The great majority of the investor cases were ultimately resolved by agreement with stipulated decisions consistent with the *Krause* opinion.[2] However, in a number of cases, the taxpayers failed to provide instruction to their own counsel, appear for the hearings, or communicate with IRS counsel. In these instances, pursuant to the Court's orders to show cause and Rule 123 of the Tax Court's Rules of Practice and Procedure, we filed motions to dismiss the cases for lack of prosecution and for the court to enter decisions in accordance with the opinion in *Krause*. In each instance, attached to our motion was a proposed Order of Dismissal and Decision, applying the opinion in *Krause* to the facts of the particular case.

11. If the taxpayer took no further action, our motion to dismiss would be granted, an Order and Decision would be entered, and the court would deem the order to show cause as having been "made absolute."

12. Generally, for the TEFRA partnership cases in which show cause orders had been issued, prior to the date scheduled for the show cause hearing, the IRS moved for entry of decision under Tax Court Rule 248(b), a procedure for entering an agreed decision in a partnership action when the tax matters partner agreed to the proposed decision, but did not certify that no party objects. Typically, in these cases, no objecting party came forward or moved to intervene in the 60-day period provided, and the motions for entry of decision were granted and the decisions entered. The decisions proposed and entered in connection with these motions applied the *Krause* opinion to the facts of the subject partnership tax years.

---

2 In a few instances, investor cases were resolved by agreement based on the application of the innocent spouse provisions of the Code.

**Drake Oil Technology Partners**

13. Drake Oil Technology Partners (Drake Oil) was one of seven Denver-based limited partnerships included among the Elektra Hemisphere tax shelter partnerships.

14. Drake Oil's 1982 tax year was the subject of the Tax Court's opinion in *Acierno*. In *Acierno*, the taxpayer was subject to one of the Tax Court's orders to show cause why his case should not be controlled by *Krause*. The Tax Court held an evidentiary hearing and gave the taxpayer an opportunity to show how his limited partnership investment in Drake and the activities of Drake might be distinguishable from the limited partnership investments in, and the activities of one of the test case partnerships addressed in *Krause*. However, the court ultimately concluded that the investment in and the partnership activities of Drake were not distinguishable from those described in *Krause*. *See* T.C. Memo. 1997-441.

15. Drake Oil's 1983 tax year was before the Tax Court in the case captioned *Vulcan Oil Technology Partners, et al. v. Commissioner* at Docket No 21530-87. Drake Oil's 1984 and 1985 tax years were before the Tax Court in the related and identically captioned case at Docket No. 16768-88. (Hereafter, these cases will be referred to as the *Vulcan* dockets.)

16. During the late 1990s, the period during which show cause orders had been issued for the other pending Elektra Hemisphere partnership cases, the Denver-based partnerships pending before the Tax Court in the *Vulcan* dockets were involved with motions proceedings and an evidentiary hearing involving claims for consistent settlement. *See* footnote 1 on page 2 of this Declaration. These claims ultimately failed.

17. In the opinion issued in March of 1998 in the *Vulcan* dockets in connection with those claims, the Tax Court described *Acierno* as concluding that the Denver-based partnerships were similar to the partnerships involved in the test cases, and "accordingly that the limited partners of the Denver-based partnerships who had not settled their cases with [the IRS] were to be bound by the opinion in Krause." *See Vulcan Oil Technology Partners, et al. v. Commissioner*, 110 T.C. at 154 (1998), *aff'd sub nom. Tucek v. Commissioner*, 198 F.3d 259 (10th Cir. 1999) and *aff'd sub nom. Drake Oil Tech. Partners v. Commissioner*, 211 F.3d 1277 (10th Cir. 2000), *cert. denied*, 531 U.S. 875, 121 S. Ct. 180 (2000).

**The Motion to Dismiss *Vulcan* Docket No. 21530-87**[3]

18. During 1989, after the Tax Court's opinion was issued in the *Vulcan* dockets, I began to take direct responsibility for these cases. This included preparing and signing documents filed on behalf of the IRS in these dockets.

19. Starting in 1989 and continuing until the cases were closed in August of 2002, I was the custodian of the legal and administrative files for the *Vulcan* dockets. These materials continue to be stored in the Houston office of the Office of Chief Counsel and have been available to me for purposes of preparing this Declaration.

20. On March 22, 1999, the Tax Court issued an order largely granting a motion filed by the IRS on November 10, 1997 for appointment of a new tax matters

3 Since the subject case concerns 1983, the remainder of this Declaration will focus primarily on events relevant to the 1983 tax year of Drake Oil and, thus on, *Vulcan* Docket No. 21530-87. Note however that *Vulcan* Docket No. 16768-88 and the 1984 and 1985 tax years of Drake Oil proceeded along a parallel course.

partner for the partnership tax years then pending in the two *Vulcan* dockets.[4] In its order, the Tax Court appointed Louis Coppage as tax matters partner for the 1983, 1984 and 1985 tax years of Drake Oil (and various of the other Denver-based partnerships) and recognized Declan O'Donnell as counsel for Louis Coppage.

21. In 2000, after the Tenth Circuit affirmed *Vulcan* in *Tucek* and *Drake*, I initiated contact with Declan O'Donnell, counsel for Louis Coppage, in an effort to move the *Vulcan* dockets toward resolution. However, in July 2000, I learned that Mr. O'Donnell was no longer in contact with Louis Coppage and did not have any current contact information (address or phone number) for him. Following this and with authorization from Mr. O'Donnell, I made a variety of efforts to make contact with Louis Coppage or obtain current contact information for him.

22. These efforts to contact Mr. Coppage and the failure of these efforts to elicit any communication from him are detailed in the IRS' Motion To Dismiss For Lack of Prosecution filed December 20, 2001 in *Vulcan* Docket No. 21530-87 (hereafter, the Motion to Dismiss).

23. I personally prepared the Motion to Dismiss, and every factual representation in it is true and correct. Excerpts from the motion appear at pages 94-109 of Exhibit 13, Joint Stipulations of Fact, filed in this proceeding on November 8, 2007 (Stip. Ex. 13).

24. The Notices of Final Partnership Administrative Adjustment (FPAAs) underlying the *Vulcan* dockets had generally disallowed all deductions and losses claimed by the partnerships, on multiple grounds, without allowing any offsets to

---

4 This motion was necessitated by the bankruptcy of the prior tax matters partner.

ordinary income. Since these FPAAs did not reflect the Tax Court's ultimate findings in *Krause*, I made a conscious decision in drafting the Motion to Dismiss not to ask the court to merely uphold the determinations in the FPAAs.

25. Rather, as counsel for the IRS responsible for the *Vulcan* dockets, I regarded it as a matter of essential fairness and consistency that the adjustments determined by the Tax Court for the Denver-based partnerships be as consistent as possible with the Tax Court's opinion in *Krause*, and thus with all the other decisions that had been entered by the Tax Court for Elektra Hemisphere cases over the course of the shelter project. This was also the same approach I, and the attorneys that I supervised, had taken in preparing motions to dismiss for lack of prosecution and proposed orders of dismissal and decision for the numerous cases we had handled in connection with the Tax Court's orders to show cause in the late 1990s. We had also applied the opinion in *Krause* in preparing the motions for entry of decision under Tax Court Rule 248(b) that we had filed for the Elektra Hemisphere TEFRA partnership cases that were resolved in the late 1990s.

26. Also, at the time of preparing the Motions to Dismiss, I believed that the Tax Court had determined, through its show cause hearing procedures and the Elektra Hemisphere tax shelter opinions issued subsequent to *Krause*, including *Acierno*, that all the Elektra Hemisphere partners and partnerships, including the Denver-based partnerships, were bound by *Krause*. For these reasons, I thought it would be improper to ask the Tax Court to sustain adjustments that were not consistent with *Krause*.[5]

---

5 There was a single partnership tax year involved in Vulcan Docket No. 21530-87, the 1983 tax year of Dillon Oil Technology Partners, for which the application of section 183 would have increased the adjustments to ordinary income. For this single partnership tax

27. It required significant effort, care and time to compute exactly what the IRS would ask the Court to determine in the event the Motion to Dismiss was granted. Aspects of the *Krause* opinion that had to be factored in included the application of I.R.C. § 183, which generally allowed expenses from an activity to the extent of income from the activity. But it was also necessary to vary somewhat from a typical section 183 computation in order to apply determinations in *Krause* specifically disallowing license fees and related interest expenses. These expenses could not be allowed to offset income.

28. In preparing the Motion to Dismiss, I made explicit reference to the fact that the IRS was making concessions required to apply section 183 in accordance with the opinion in *Krause* and that as a result, certain of the adjustments the IRS was asking the court to find in entering the order and decision were less than those proposed in the FPAAs. *See* Stip. Ex. 13 at 96.

29. In drafting the Motion to Dismiss, I also made direct reference to the specific holdings in the *Krause* opinion, which determined that certain technology license fees were not legitimate and could not be recognized, and that the associated debt obligations were also not genuine and were to be disregarded (*Krause*, 99 T.C. at 175). See Stip. Ex. 13 at 107, n. 1. This was included to make clear why license fees and related interest expenses were not being applied to offset income in the section 183 computation.

30. The computations necessary to formulate the determinations that would be requested from the Tax Court in the Motions to Dismiss were further complicated by

---

year, in lieu of applying section 183 and pleading for an increased adjustment to ordinary income, we requested determinations limited to those asserted in the related FPAA. *See* pages 20 -21 of the Motion to Dismiss for Docket No. 21530-87.

flow-through items originating in upper tier partnerships in which the Denver-based partnerships had themselves invested. Items of income or loss from these activities had to be factored in to the section 183 analysis. *See* Stip. Ex. 13 at 106-107.

31. In addition, accurately and fairly computing the appropriate adjustments for certain separately stated items addressed in the FPAAs (such as unadjusted basis in ITC property, tax preference items, depletion, and others) required attempting to identify what portion of those items on the Denver-based partnerships' tax returns (such as on Drake's returns) actually derived from the upper tier partnerships. Items originating with the upper tier partnerships were not subject to adjustment in the lower tier partnership proceedings represented by the *Vulcan* dockets. This process of attempting to tease apart the upper tier portion of these items from the lower tear portion was made only more difficult by the absence of adequate partnership records and of any knowledgeable individual who could fill in gaps or supply missing information.

32. A final factor complicating the computation of the adjustments that would be requested, particularly for identifying which of the expenses disallowed in the FPAAs could be allowed under section 183 for the revised determinations requested in the Motion to Dismiss, was our effort to determine which of the partnerships' claimed deductions had actually been paid. In the absence of direct evidence from partnership books and records, we considered secondary evidence, such as whether certain partnerships had sufficient cash available to have paid the expenses claimed.

33. In summary, the process of computing adjustments, consistent with *Krause*, that would be proposed in the Motion to Dismiss was extremely laborious and required literally hundreds of hours on my part and on the part of several members of the

IRS Appeals Division that provided computational support services for this effort. Ultimately, we tried to allow as deductions under section 183 all proper expenses actually paid, other than the license fees and their related interest expense.

34. The Motion to Dismiss requested that the Tax Court determine specific adjustments for each partnership tax year at issue in *Vulcan* Docket No. 21530-87. These were the adjustments that we had computed for each partnership tax year based on applying the *Krause* opinion.

35. Page 6 of the Motion to Dismiss (Stip. Ex. 13 at 95) sets forth the specific adjustments that were being requested for the 1983 tax year of Drake Oil. The net adjustments to ordinary income requested for the 1983 tax year of Drake Oil in the Motion to Dismiss totaled $21,556,521 (the difference between the claimed deductions of $23,198,105 and the allowed deductions of $1,641,584).

36. The determination the Tax Court was requested to make for Drake Oil's 1983 tax year in the Motion to Dismiss was a concession by the IRS as compared against the determination in the Drake Oil FPAA, which fully disallowed Drake Oil's claimed deductions of $23,198,105, and increased ordinary income by the same amount. The FPAA is set out at pages 23-33 of Stip. Ex. 4.

37. For each partnership tax year addressed in the Motion to Dismiss, the IRS included as an exhibit a schedule reflecting the application of section 183 in accordance with *Krause*, and taking into account income or losses from the upper tier partnerships. Exhibit O to the Motion to Dismiss contained this section 183 computation for the 1983 tax year of Drake Oil. Attached to this Declaration as Exhibit 1 is a true copy of this Exhibit O.

38. Attached to this Declaration as Exhibit 2 are true copies of worksheets prepared by members of the IRS Appeals staff in connection with completing the section 183 computation for the 1983 tax year of Drake Oil that I had requested. I had requested this section 183 computation for purposes of preparing the Motion to Dismiss. These worksheets are located with the legal files for the *Vulcan* dockets that are presently stored in the Houston office of the Office of Chief Counsel.

39. During the period after the Motion to Dismiss had been filed and while it was pending, I received and responded to numerous inquiries from taxpayers and taxpayer representatives, including participating partners and their counsel, regarding the motion and the adjustments that the IRS requested the Tax Court to find, as well as the computational adjustments that would ultimately be assessed against the investors in the partnerships if the Motion to Dismiss was granted.

40. Attached to this Declaration as Exhibit 3 is a true copy of a letter dated March 22, 2002, from me to John Gigounas, counsel for certain participating partners, explaining the determinations being requested in the Motion to Dismiss. Among other things, the letter addresses how and why the determinations sought in the motion were based on the *Krause* opinion.[6] As part of explaining the specifics of the section 183 computation and why license fees and related interest expense were not being allowed to offset income, I wrote:

> Moreover, we did not believe it was proper under any circumstances to request that the Tax Court now make legal determinations in direct conflict with its prior holdings and findings. Accordingly, we concluded, that the only determinations

---

6 The letter also explained that the IRS would make a further administrative adjustment in connection with the computational adjustments ultimately assessed against the investors so that they would not be taxed on any net positive ordinary income from the tax shelter partnerships.

> we could ask the court to make were determinations consistent with and applying the holdings and findings the court had reached in the Krause case.

*See* the last two sentences of the first complete paragraph on page 3. This letter is located in the legal files for the *Vulcan* dockets that are presently stored in the Houston office of the Office of Chief Counsel.

41. On March 22, 2002, the Tax Court entered an Order to Show Cause in *Vulcan* Docket No. 21530-87 directing that the partners of the Denver-based partnerships pending in that docket show cause on or before May 24, 2002, why the case "should not be dismissed for failure to properly prosecute and that there are adjustments to partnerships as stated in said motion."

42. On June 13, 2002, the Tax Court entered an Order and Order of Dismissal and Decision in *Vulcan* Docket No. 21530-87. Among other things, this order made the show cause order of March 22, 2002, absolute, granted the Motion to Dismiss, and determined adjustments for each of the partnership tax years pending in the case identical to the adjustments requested in the Motion to Dismiss that I had prepared and filed on behalf of the IRS.

43. The adjustments determined by the Tax Court's order dated June 13, 2002 for the partnership tax years pending in *Vulcan* Docket No. 21530-87, including for Drake Oil's 1983 tax year, were (except for the 1983 tax year of Dillon Oil Technology Partners[7]) the same adjustments as those that had been computed at my direction based on applying the *Krause* opinion to the facts for each of those partnership tax years.

---

7 See footnote 5, above.

44. The adjustments adopted and determined by the Tax Court in *Vulcan* Docket No. 21530-87 for Drake Oil's 1983 tax year were computed based on the Krause opinion and applied section 183 , as well as specific determinations in *Krause* disallowing license fees as not legitimate and related interest expenses as nongenuine.

I declare under penalty of perjury that the foregoing is true and correct. Executed on January 2, 2008.

MARION S. FRIEDMAN

EXHIBIT O

Docket No. 21530-87
Name: Drake Oil Technology
Tax Year: 1983

| | | |
|---|---|---|
| Income attributable to the Partnership's activities: | | |
| Interest income | | $3,189,395.00 |
| Ordinary Income (Loss) from other partnerships (as determined): | | $309,776.00 (1) |
| Deductions reported per Partnership return: | | |
| Guaranteed Payments | | $156,350.00 |
| Interest Expense | | 3,401,521.00 |
| Depreciation | | 8,583.00 |
| Other Deductions: | | |
| License Fee | $18,155,000.00 | |
| Other | 1,476,651.00 | |
| Total Other Deductions | | 19,631,651.00 |
| Total | | $23,198,105.00 |

| | | |
|---|---|---|
| Application of I.R.C. Sec. 183(b): | | |
| Income attributable to the Partnership's activities | | $3,189,395.00 |
| Income from other partnerships attributable to the same activity | | 309,776.00 (1) |
| Total gross income derived from same activity | | 3,499,171.00 |
| Less: Deductions under I.R.C. Sec. 183(b)(1) | | 0.00 |
| Gross income available for allowance of deductions under I.R.C. Sec. 183(b)(2) | | $3,499,171.00 |
| Deductions allowed under I.R.C. Sec. 183(b)(2): | | |
| Other Deductions | $1,476,651.00 | |
| Guaranteed payments | $156,350.00 | |
| Depreciation | 8,583.00 | |
| | $1,641,584.00 | |



Exhibit 1

**UPPER TIERS**

Name: Drake Oil Technology EIN: 84-0856853

| 1983 % OF OWNERSHIP | OTG Illinois Basin JV | OTG Castaic Hills JV | OTG San Anto JV | Utah Heavy Oil Project | TOTAL | PER RETURN | LOWER TIER'S AMOUNT |
|---|---|---|---|---|---|---|---|
| ORDINARY INCOME | ? | ? | ? | ? | 309,776 * | 309,776 | 0 |
| Net LTCG (Loss) | | | | | | 24,627 | 24,627 |
| Net Earnings (Loss) From Self-Employment | | | | | | (7,720) | (7,720) |
| Investment Credit: Unadjusted Basis: | | | | | | | |
| Section 48(q) Property | | | | | | | |
| New - Other | ? | ? | ? | ? | 3,272 | 3,272 | 0 |
| Used - Other | ? | ? | ? | ? | 107,083 | 107,083 | 0 |
| Investment Interest: | | | | | | | |
| Net Investment Income | | | | | | 3,189,395 | 3,189,395 |
| Tax Preference Items: | | | | | | | |
| Net Income from Oil, Gas or geothermal wells | | | | | 148,280 | 148,280 | 0 |
| Net Investment Income (Loss) | | | | | (22,121,394) | (19,501,945) | 2,619,449 |
| Cost Depletion Oil and Gas | | | | | ? | 152,496 ** | 0 |
| O&G Depletion to the Extent of Basis | | | | | ? | 152,496 ** | 0 |

* Not enough info to show how 309,776 loss accumlated

** Deducted on K-1's but not on Schedule K; in FPAA



Exhibit 2

EIN: 84-0856853

**Drake Oil Technology** | Docket No. **21530-87** | Tax Year **1983**

| Adjustment to Ordinary Income (Loss): | Per Return | Per FPAA |
|---|---|---|
| Ordinary Income (Loss) from Other Partnerships | 309,776 | 309,776 |
| Interest Income | 3,189,395 | 3,189,395 |
| Total Income | 3,499,171 | 3,499,171 |
| | | |
| **Other Deductions Per Return:** | 23,198,105 | |
| License Fee | 18,155,000 | 0 |
| Guaranteed Payments to Partners | 156,350 | 0 |
| Interest Expense | 3,401,521 | 0 |
| Depreciation | 8,583 | 0 |
| Net Other Deductions | 1,476,651 | 0 |
| Other Deductions Per FPAA | | 0 |
| Total Adjustments to Ordinary Income (Loss) | | 23,198,105 |
| | | |
| **Separately Stated Items:** | | |
| Other Deductions Not Included in Ordinary | | |
| Loss: Cost Depletion | 152,496 * | 152,941 ? |
| O&G Depletion to extent of Basis | 152,496 * | 152,941 ? |
| **Tax Preference Items:** | | |
| Net Income from | | |
| Oil, gas or geothermal wells | 148,280 | 0 ** |
| Net Investment Income | (19,501,945) | 0 |
| **Investment Interest: Net Investment Income** | 3,189,395 | 0 ** |
| **Net Earnings (Loss) from Self-employment** | (7,720) | 156,350 |
| **Guaranteed Payments** | 156,350 | 0 |
| **Investment Credit - Unadjusted Basis** | | |
| New - Other - Sec 48(q) Election | 3,272 | 0 |
| Used - Other - Sec 48(q) Election | 107,083 | 0 |
| | | 0 |
| **Net Long-term Capital Gain** | 24,627 ** | |

* Couldn't tie because there was missing K-1's or the numbering was incorrect, Not on Sch K but mentioned on K-1's

** Not mentioned on FPAA

Drake Oil Technology EIN: 84-0856853

**ALLOCATION OF DEDUCTIONS: PAID & ACCRUED.**

DOC. # 21530-87

INFO SOURCE:

| 1983 | TOTAL | CASH | ACCRUAL |
|---|---|---|---|
| GUARANTEED PAYMENTS | $156,350 | $156,350 | $0 |
| INTEREST EXPENSE | 3,401,521 | 3,401,521 | 0 |
| DEPRECIATION | 8,583 | 8,583 | 0 |
| LICENSE FEE | 18,155,000 | 0 | 18,155,000 |
| ROYALTY FEE | 0 | 0 | 0 |
| OTHER DEDUCTIONS | 1,476,651 | 1,476,651 | 0 |
| TOTAL CASH EXPENSES | 23,198,105 | 5,043,105 | 18,155,000 |

Drake
8312

Int exp. 3,401,521
Lic. fee 18,155,000
21,556,521

What was accrued

Int Receivable 5,718,824
2,859,412
2,859,412

current int rec. 0

cash? 274,090
48,056
226,034

AR 6,378,438
488,040
5,890,398 — 6,000,000

prepaid exp. 91,376
64,293
27,083

AP 4,653,938
3,066,889
1,587,049

LT Notes Payable 51,444,008
34,015,208
17,428,800

19,015,849

Counting the decrease in AR as a source of cash, the PS had enough cash & notes to account for deductions.

Worksheet

**Name: Drake Oil Technology**
**Dkt. No.: 21530-87**
**EIN: 84-0856853**

| | | |
|---|---|---|
| Gross Receipts | - | |
| Interest Income | 3,189,395 | |
| Sale of OTG | 334,950 | |
| | 3,524,345 | |

Self-employment Income

| | | |
|---|---|---|
| Gross Receipts | | 0 |
| Plus: | | |
| Illinois Basin JV | 340,838 | |
| Other Partnerships | (31,062) | |
| Subtotal | | 309,776 |
| Total | | 309,776 |
| Rate | | 0.005 |
| SE Income | | 1,549 |

Lou Coppage's Share

**Investment Inc.**

| | |
|---|---|
| Lower Tier: | |
| Qualified Inv. Inc. | 3,524,345 |
| Qualified Inv. Exp | 904,896 |
| Net Inv. Inc. | 2,619,449 |

**Qualified Investment Expenses**

| | G&A | Operating |
|---|---|---|
| Depreciation | 7,803 | 780 |
| License Fee | | 0 |
| Accounting | 22,310 | |
| Legal Fees | 25,182 | |
| Amortization | 54,465 | |
| Misc | 301 | |
| Overhead | 90,775 | |
| Abandonment | | 579,558 |
| Consulting | 704,060 | |
| | 904,896 | 580,338 |

**Preference Investment Income**

| | |
|---|---|
| Inv Inc | 2,619,449 |
| Gen. Business Interest | 0 |
| Total | 2,619,449 |

DEPARTMENT OF THE TREASURY
INTERNAL REVENUE SERVICE
OFFICE OF CHIEF COUNSEL
LARGE AND MID-SIZE BUSINESS DIVISION COUNSEL
8701 S. GESSNER, SUITE 710
HOUSTON, TEXAS 77074
(281) 721-7300
FAX (281) 721-7356

MAR 22 2002

CC:LM:NR:HOU:1:TL-21530-87 and 16768-88
MSFriedman

John Gigounas
Simpson & Gigounas
100 Pine Street, Suite 750
San Francisco, Ca 94111

Re: Vulcan Oil Technology Partners, et al. v. Commissioner
Docket Nos. 21530-87 and 16768-88

Dear Mr. Gigounas:

This is to confirm information previously conveyed to you in telephone conversations regarding the computational adjustments that will be made for the individual partners after resolution of the partnership items pending in these cases. This letter will explain: (1) Why the proposed determinations in our motions to dismiss leave the partnerships in a net positive ordinary income position; and (2) How we will address that problem so that partners will not be assessed for positive ordinary income attributable to these partnerships.

I am also preparing a discussion on the two tax preference items of qualified investment income and qualified investment expense, and the item of investment income for investment interest expense, explaining why I do not think these will generally present a problem for the investors. My analysis of those items will require review by one of our technical computation specialists. I did not want to delay this letter to you, so I will send that information along later, probably within a week or two.

**1. The Proposed Determinations in our Motions**

The proposed determinations in our motions to dismiss leave the partnerships in a net positive ordinary income position because this is the legally correct result of applying the Krause test case findings and holdings to these dockets. As background,



Exhibit 3

note that as a general rule, the FPAAs upon which these cases are based completely disallowed all the deductions (and investment tax credits) claimed by the partnerships. This disallowance was based on a number of grounds, including basic lack of substantiation, sham, overvaluation, at risk, and several others, as well as the not for profit issue on which the Tax Court decided the case. There were no downward adjustments to ordinary income items in the FPAAS. Thus, the FPAAs left the partnerships in a net positive ordinary income posture.

The Krause test case opinion disallowed the partnerships' losses under I.R.C. § 183. The court found that the partnerships' transactions did not constitute legitimate for profit business transactions. It also specifically found that license fees and royalties agreed to by the partnerships were excessive, did not reflect arm's-length obligations, and were not to be recognized as legitimate obligations of the partnerships. Accordingly, it further held that the partnerships' accrued interest deductions relating to the debt associated with the license fees and royalties was to be disallowed since the debt was not genuine.

In accordance with the court's holdings in Krause, the government's motions to dismiss filed in the above dockets request that the Court determine partnership adjustments based on the application of section 183. Accordingly, deductions are allowed to the extent of income (after factoring in upper tier income or losses not at issue in these proceedings). However, deductions for license fees and related interest could not be used to offset partnership income in the section 183 analysis due to the Tax Court's specific findings on those items. Applying all other available deductions to offset income under the section 183 analysis has not been sufficient to offset the ordinary income originally reported by these partnerships on their returns for these years. Consequently, the determinations proposed in respondent's motions typically leave the partnerships in the posture of having net positive ordinary income, though the net income amounts are smaller than those determined in the FPAAs.

We recognized that if the partner level computational adjustments were computed based on this positive income, the adjustments would result in partner level assessments based not merely on eliminating any partnership losses claimed, but based on also attributing net positive ordinary partnership income to the partners. Notably, in the non TEFRA years, deficiencies from these investments were determined by simply disallowing partnership losses claimed by partners; no positive income was

asserted. Of course in making those non TEFRA adjustments, we did not go back and apply a technical section 183 analysis to the partnership items. However, in the TEFRA context we must do this since it is necessary to address the individual partnership item adjustments determined in the FPAAs.

As indicated, only by allowing illegitimate license fee and interest deductions, could all ordinary partnership income be eliminated under the section 183, item by item analysis required for the partnership level determinations in these cases. We did not feel it would be legally correct to request the Tax Court to make determinations allowing these illegitimate deductions. For the Service to have requested the allowance of these deductions would have been in direct contradiction to the position we had maintained throughout all this litigation regarding these fees and the related debt. Moreover, we did not believe it was proper under any circumstances to request that the Tax Court now make legal determinations in direct conflict with its prior holdings and findings. Accordingly, we concluded that the only determinations we could ask the court to make were determinations consistent with and applying the holdings and findings the court had reached in the Krause case.

**2. Net Positive Ordinary Partnership Income Will be Administratively Adjusted**

Our conclusion regarding what determinations we could properly propose to the Court in our motions left us with a dilemma. While the Service has long sought to disallow all losses (and any investment tax credits) claimed by investors with regard to the Elektra/Hemisphere partnerships, we had not intended to assert that individuals were taxable on positive net income flowing from these partnerships. Accordingly, we determined that, in the interest of fair tax administration, it would be appropriate when closing these cases to make an administrative adjustment at the partnership level to zero out any net positive ordinary partnership income resulting from the determinations ultimately made by the court. Obviously, this presumes that the court enters orders disposing of these cases based on the determinations requested in our motions. If the court reaches some different conclusion in these matters, we would of course have to take a fresh look at this whole question.

Provided the court enters orders based on our motions, the administrative adjustments will be reflected on the Forms 4605 and 886-Z forwarded by this office to the Service Centers for processing the resulting computational adjustments.

If you have any further questions, please do not hesitate to contact me. I can be reached at 281-721-7372. Have a good time on your trip.

Sincerely,

MARION S. FRIEDMAN
Associate Area Counsel (LMSB)
T.C. Bar No. FM0245

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 05-1189 T
(Judge Charles F. Lettow)

THOMAS H. McGANN and EVELYN G. McGANN,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

DECLARATION OF ROBERT STODDART

I, Robert Stoddart, an a trial attorney employed by the U.S. Department of Justice. I have been assigned to defend this case. I make this declaration of my personal knowledge.

1. On December 29, 2007, I calculated the amount of tax motivated interest that would have accrued on an $8,620 underpayment from April 15, 1984, through March 24, 2003. I used a commercially available program, TaxInterest for Windows, Version 2007.4.

2. The program computed a total of $57,560.60 in interest.

3. The attached Exhibit 1 is a true copy of a print-out of the calculations produced by the program.

I declare under penalty of perjury that the foregoing is true and correct. Executed on December 29, 2007.

ROBERT STODDART

EXHIBIT
tabbies

INTEREST AND PENALTY DETAIL REPORT TaxInterest Version 2007.4
Taxpayer name...: 12-29-07
Taxpayer ID#....: Page 1

| Events | Date | Amount | Event Date Balance (1) |
|---|---|---|---|
| Motivated tax | 04-15-84 | 8,620.00 | 8,620.00 |
| Interest Computation Date | 03-24-03 | | 66,180.60 |

(1) Balance includes any interest and penalties accrued as of the Event Date

Interest on Motivated Deficiencies

| Event | Date | Rate | Base | Interest | Balance |
|---|---|---|---|---|---|
| Motiv. Tax | 04-15-84 | | 8,620.00 | | 8,620.00 |
| Interest | 06-30-84 | 11.00 | 8,620.00 | 199.13 | 8,819.13 |
| Interest | 12-31-84 | 11.00 | 8,819.13 | 501.36 | 9,320.49 |
| Interest | 06-30-85 | 15.60 | 9,320.49 | 749.48 | 10,069.97 |
| Interest | 12-31-85 | 13.20 | 10,069.97 | 692.75 | 10,762.72 |
| Interest | 06-30-86 | 12.00 | 10,762.72 | 659.78 | 11,422.50 |
| Interest | 12-31-86 | 10.80 | 11,422.50 | 639.03 | 12,061.53 |
| Interest | 03-31-87 | 10.80 | 12,061.53 | 325.47 | 12,387.00 |
| Interest | 06-30-87 | 10.80 | 12,387.00 | 338.01 | 12,725.01 |
| Interest | 09-30-87 | 10.80 | 12,725.01 | 351.10 | 13,076.11 |
| Interest | 12-31-87 | 12.00 | 13,076.11 | 401.48 | 13,477.59 |
| Interest | 03-31-88 | 13.20 | 13,477.59 | 449.59 | 13,927.18 |
| Interest | 06-30-88 | 12.00 | 13,927.18 | 421.72 | 14,348.90 |
| Interest | 09-30-88 | 12.00 | 14,348.90 | 439.34 | 14,788.24 |
| Interest | 12-31-88 | 13.20 | 14,788.24 | 498.82 | 15,287.06 |
| Interest | 03-31-89 | 13.20 | 15,287.06 | 505.66 | 15,792.72 |
| Interest | 06-30-89 | 14.40 | 15,792.72 | 577.16 | 16,369.88 |
| Interest | 09-30-89 | 14.40 | 16,369.88 | 604.95 | 16,974.83 |
| Interest | 12-31-89 | 13.20 | 16,974.83 | 574.17 | 17,549.00 |
| Interest | 03-31-90 | 13.20 | 17,549.00 | 580.47 | 18,129.47 |
| Interest | 06-30-90 | 13.20 | 18,129.47 | 606.45 | 18,735.92 |
| Interest | 09-30-90 | 13.20 | 18,735.92 | 633.74 | 19,369.66 |
| Interest | 12-31-90 | 13.20 | 19,369.66 | 655.17 | 20,024.83 |
| Interest | 03-31-91 | 13.20 | 20,024.83 | 662.37 | 20,687.20 |
| Interest | 06-30-91 | 12.00 | 20,687.20 | 628.16 | 21,315.36 |
| Interest | 09-30-91 | 12.00 | 21,315.36 | 654.46 | 21,969.82 |
| Interest | 12-31-91 | 12.00 | 21,969.82 | 674.55 | 22,644.37 |
| Interest | 03-31-92 | 10.80 | 22,644.37 | 616.20 | 23,260.57 |
| Interest | 06-30-92 | 9.60 | 23,260.57 | 561.81 | 23,822.38 |
| Interest | 09-30-92 | 9.60 | 23,822.38 | 581.78 | 24,404.16 |
| Interest | 12-31-92 | 8.40 | 24,404.16 | 520.71 | 24,924.87 |
| Interest | 03-31-93 | 8.40 | 24,924.87 | 521.57 | 25,446.44 |
| Interest | 06-30-93 | 8.40 | 25,446.44 | 538.47 | 25,984.91 |
| Interest | 09-30-93 | 8.40 | 25,984.91 | 555.97 | 26,540.88 |
| Interest | 12-31-93 | 8.40 | 26,540.88 | 567.86 | 27,108.74 |
| Interest | 03-31-94 | 8.40 | 27,108.74 | 567.27 | 27,676.01 |
| Interest | 06-30-94 | 8.40 | 27,676.01 | 585.65 | 28,261.66 |

Interest on Motivated Deficiencies

| Event | Date | Rate | Base | Interest | Balance |
|---|---|---|---|---|---|
| Interest | 09-30-94 | 9.60 | 28,261.66 | 692.10 | 28,953.76 |
| Interest | 12-31-94 | 10.80 | 28,953.76 | 798.88 | 29,752.64 |
| Interest | 03-31-95 | 10.80 | 29,752.64 | 802.84 | 30,555.48 |
| Interest | 06-30-95 | 12.00 | 30,555.48 | 927.81 | 31,483.29 |
| Interest | 09-30-95 | 10.80 | 31,483.29 | 868.68 | 32,351.97 |
| Interest | 12-31-95 | 10.80 | 32,351.97 | 892.65 | 33,244.62 |
| Interest | 03-31-96 | 10.80 | 33,244.62 | 904.66 | 34,149.28 |
| Interest | 06-30-96 | 9.60 | 34,149.28 | 824.80 | 34,974.08 |
| Interest | 09-30-96 | 10.80 | 34,974.08 | 962.32 | 35,936.40 |
| Interest | 12-31-96 | 10.80 | 35,936.40 | 988.80 | 36,925.20 |
| Interest | 03-31-97 | 10.80 | 36,925.20 | 996.38 | 37,921.58 |
| Interest | 06-30-97 | 10.80 | 37,921.58 | 1,034.79 | 38,956.37 |
| Interest | 09-30-97 | 10.80 | 38,956.37 | 1,074.87 | 40,031.24 |
| Interest | 12-31-97 | 10.80 | 40,031.24 | 1,104.53 | 41,135.77 |
| Interest | 03-31-98 | 10.80 | 41,135.77 | 1,110.00 | 42,245.77 |
| Interest | 06-30-98 | 9.60 | 42,245.77 | 1,023.18 | 43,268.95 |
| Interest | 09-30-98 | 9.60 | 43,268.95 | 1,059.62 | 44,328.57 |
| Interest | 12-31-98 | 9.60 | 44,328.57 | 1,085.57 | 45,414.14 |
| Interest | 03-31-99 | 8.40 | 45,414.14 | 950.33 | 46,364.47 |
| Interest | 06-30-99 | 9.60 | 46,364.47 | 1,122.94 | 47,487.41 |
| Interest | 09-30-99 | 9.60 | 47,487.41 | 1,162.93 | 48,650.34 |
| Interest | 12-31-99 | 9.60 | 48,650.34 | 1,191.40 | 49,841.74 |
| Interest | 03-31-00 | 9.60 | 49,841.74 | 1,203.82 | 51,045.56 |
| Interest | 06-30-00 | 10.80 | 51,045.56 | 1,389.06 | 52,434.62 |
| Interest | 09-30-00 | 10.80 | 52,434.62 | 1,442.75 | 53,877.37 |
| Interest | 12-31-00 | 10.80 | 53,877.37 | 1,482.45 | 55,359.82 |
| Interest | 03-31-01 | 10.80 | 55,359.82 | 1,493.82 | 56,853.64 |
| Interest | 06-30-01 | 9.60 | 56,853.64 | 1,376.98 | 58,230.62 |
| Interest | 09-30-01 | 8.40 | 58,230.62 | 1,245.89 | 59,476.51 |
| Interest | 12-31-01 | 8.40 | 59,476.51 | 1,272.55 | 60,749.06 |
| Interest | 03-31-02 | 7.20 | 60,749.06 | 1,088.03 | 61,837.09 |
| Interest | 06-30-02 | 7.20 | 61,837.09 | 1,119.93 | 62,957.02 |
| Interest | 09-30-02 | 7.20 | 62,957.02 | 1,152.86 | 64,109.88 |
| Interest | 12-31-02 | 7.20 | 64,109.88 | 1,173.97 | 65,283.85 |
| Interest | 03-24-03 | 6.00 | 65,283.85 | 896.75 | 66,180.60 |

Summary as of 03-24-03

| | Amount | Payments | Deposits | Balance |
|---|---|---|---|---|
| Motivated tax | 8,620.00 | 0.00 | 0.00 | 8,620.00 |
| Motivated interest | 57,560.60 | 0.00 | 0.00 | 57,560.60 |
| Totals | 66,180.60 | 0.00 | 0.00 | 66,180.60 |

Prepared using: FEDERAL IRS interest rates
Table end date: 12-31-07 TVS Table